1                  UNITED STATES DISTRICT COURT

2                 CENTRAL DISTRICT OF CALIFORNIA

3                       WESTERN DIVISION

4                          - - -

5      HONORABLE VIRGINIA A. PHILLIPS, DISTRICT JUDGE PRESIDING

6

7      TREVOR WOODS, et al.,           )
                                       )
8            Plaintiffs,               )
                                       )
9                                      )
                                       )
10           vs.                       ) No. CV 14-08374-VAP
                                       )
11                                     )
                                       )
12     JOHN B. FAGAN, et al.,          )
                                       )
13           Defendants.               )
       _____)

14

15

       REPORTER'S TRANSCRIPT OF PARTIAL JURY TRIAL PROCEEDINGS
16
                     *TRIAL DAY 1, P.M. SESSION*
17
                      LOS ANGELES, CALIFORNIA
18
                      TUESDAY, JUNE 14, 2016
19     _____

20                      MARIA R. BUSTILLOS
                       OFFICIAL COURT REPORTER
21                        C.S.R. 12254
                      UNITED STATES COURTHOUSE
22                    312 NORTH SPRING STREET
                            ROOM 404
23               LOS ANGELES, CALIFORNIA 90012
                        (213) 894-2739
24                     MADAMREPORTER.COM

25

```
 1                        A P P E A R A N C E S

 2

 3

 4        ON BEHALF OF THE PLAINTIFFS,
          TREVOR WOODS, et al.:          THE COCHRAN FIRM
 5                                       BY:  BRIAN T. DUNN, ESQ.
                                         4929 WILSHIRE BOULEVARD
 6                                       SUITE 1010
                                         LOS ANGELES, CA 90010
 7                                       (323)435-8205

 8
                                         LAW OFFICES OF JOHN C.
 9                                       FATTAHI
                                         BY:   JOHN C. FATTAHI, ESQ.
10                                       535 N. BRAND BOULEVARD
                                         SUITE 500
11                                       GLENDALE, CA 91203
                                         (818)839-1983
12

13

14        ON BEHALF OF THE DEFENDANTS,
          JOHN B. FAGAN, et al.:         LONG BEACH CITY ATTORNEY'S
15                                       OFFICE
                                         BY:  HOWARD DARRYL RUSSELL,
16                                       ESQ.
                                         333 WEST OCEAN BOULEVARD
17                                       11TH FLOOR
                                         LONG BEACH, CA 90802
18                                       (562)570-2200

19

20

21

22

23

24

25
```

1               <u>I N D E X</u>

2
                                        PAGE
3    PLAINTIFF'S CASE.......................    5

4
     PLAINTIFF'S WITNESSES:   DIRECT   CROSS   REDIRECT   RECROSS
5
     **FAGAN, BERNARD JOHN**        --       --        --        --
6    BY BRIAN DUNN             41       --        --        --

7

8

9

10                           - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    E X H I B I T S

2    PLAINTIFF'S                    RECEIVED        MARKED

3        9-1                           48            --
         10                            48            --
4        9-2                           53
         9-4                           54            --
5        1-5                           67            --
         1-15                          68            --
6        2-8                           75            --

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              LOS ANGELES, CALIFORNIA; TUESDAY, JUNE 14, 2016

 2                              -o0o-

 3                  (COURT RECONVENED AT 1:15 P.M.)

 4         (A.M. TRIAL SESSION REPORTED BY PHYLLIS PRESTON.)

 5              MR DUNN:  It was not in his report.

 6              MR. RUSSELL:  I just want to bring to the Court's

 7    attention because I won't have an opportunity before a

 8    witness testifies...

 9              During the lunch recess, I was reminded that

10    Officer Martinez at his deposition mentioned that he was

11    aware that it was an armed carjacking at the time he was

12    dealing with the decedent.  Plaintiffs were aware of that.

13    It's in the materials that they received.  And while they may

14    not have found it on the radio, the officer should be allowed

15    to testify to it, because it was part of his mindset.

16              THE COURT:  I don't think -- is he the first

17    witness this afternoon?

18              MR. RUSSELL:  He's the second.  And I don't know

19    how long the first is going to go.  So that's why I wanted to

20    do it now.  That's the only reason.

21              THE COURT:  All right.  Mr. Dunn as to the

22    carjacking issue...

23              MR. DUNN:  It was not in his report.  And he wrote

24    the report indisputably immediately after this incident

25    happened.  The references to carjacking were not present in
```

```
 1    that report.  I do stand corrected.  He did raise it for the
 2    first time in his deposition; however, he admitted that it
 3    wasn't his report, and it wasn't in any of the radio dispatch
 4    transmissions that are there.
 5            THE COURT:  All right.  But if he -- I think we're
 6    not going to get to this witness till after the first break.
 7    So let me think about this and let's get the jury in.
 8            Are we ready to proceed?
 9            MR. DUNN:  All right.  I plan to say in my opening
10    though that this is a case involving that will require them
11    to determine whether excessive force was used.  Is that
12    wrong?
13            THE COURT:  No, I think that's correct.
14            MR. DUNN:  Okay.
15            MR. RUSSELL:  The question is, whether the force
16    itself there was time to deliberate and whether the force was
17    used with the purpose to harm or not or whether it was
18    conscious disregard.
19            THE COURT:  This is a -- in a shorthand way of
20    saying that is whether it was excessive.
21            MR. RUSSELL:  Well, excessive force is under the
22    fourth amendment, Your Honor, which is a reasonableness
23    standard which is not the standard here.  You can have a
24    minor use of force with a purpose to harm that --
25            THE COURT:  But it would be excessive if it -- if
```

```
1    it is, whether it is minor or not if it exceeds the standard.

2    And we don't have a fourth amendment claim in this case.

3            MR. RUSSELL:  Right.

4            THE COURT:  If we did, there would be I think a

5    danger of confusion to the jury, but we don't.  So I think

6    it's not likely to be confusing to have that term used.  The

7    instructions are what controls.  All right.

8    (Whereupon the following was held in the presence of the

9    jury:)

10           THE COURT:  Let the record reflect the presence of

11   all members of the jury.  All counsel and parties present.

12           All right.  Ladies and gentlemen, you're now the

13   jury in this case, and it's now my duty to instruct you on

14   the law.  The instructions I'm going to give you now are

15   called "preliminary instructions."  They're intended to help

16   you understand some of the general principles that apply to

17   civil trials and to help you understand the evidence as you

18   listen to it.

19           In a few moments, we're going to hand out notebooks

20   to you and a copy of these instructions will be in your

21   notebooks.  You'll be allowed to keep this set of

22   instructions in your notebooks which -- and they stay in the

23   courtroom every time you leave.  The set of instructions, of

24   course, can't be taken home.  It has to remain here in the

25   courtroom.  At the end of the trial, I will give you a set of
```

```
 1    final instructions, and it's the final instructions which
 2    will govern your deliberations.  You must not infer from
 3    these instructions or from anything that I may say or do
 4    during the trial that I have an opinion regarding the
 5    evidence or what your verdict should be.
 6              It's your duty to find the facts from all the
 7    evidence in the case.  And then to those facts, you will
 8    apply the law as I give it to you.  You must follow the law
 9    as I give it to you, whether you agree with it or not.  And
10    you must not be influenced by any personal likes or dislikes,
11    opinions, prejudices or sympathy.  That means you must decide
12    the case solely on the evidence before you, and you recall
13    that you took an oath to do so.  In following my
14    instructions, you must follow all of them and not single out
15    some and ignore others.  They're all equally important.
16              All right.  To help you follow the evidence, I'll
17    give you a brief summary of the positions of the parties.
18    This case involves the shooting death of the decedent,
19    Tyler Woods by Long Beach police officers, John Fagan and
20    Daniel Martinez on November 9 -- 19th, 2013.  The plaintiffs
21    are the decedent's parents, Trevor woods and Tyler Woodson.
22    The defendants are John Fagan and Daniel Martinez.
23              Plaintiffs Woods and Woodson contend that
24    defendants Fagan and Martinez violated their Constitutional
25    rights to be free from interference with their familial
```

1  relationship with the decedent, their sone.  The plaintiffs

2  seek compensation from the defendants for the loss of their

3  relationship with him.  The plaintiffs have the burden of

4  proving these claims.

5       The defendants deny the plaintiff's claims and also

6  contend that they acted reasonably and lawfully.  The

7  defendants have the burden of proof on their affirmative

8  defenses.  When a party has the burden of proof on any claim

9  or affirmative defense by a preponderance of the evidence --

10  that's the standard that applies -- it means you must be

11  persuaded by the evidence that the claim or affirmative

12  defense is more probably true than not true.  You should base

13  your decision on all of the evidence, regardless of which

14  party presented it.  And you should decide the case as to

15  each defendant separately, unless otherwise stated.  All of

16  the instructions apply to all parties.

17       The evidence that you're to consider in deciding

18  the facts consists are -- excuse me -- let me start that

19  again -- the evidence that you're to consider in deciding

20  what the facts are, consist of the following things:  Number

21  one, the sworn testimony of any witness; two, the exhibits

22  which are received into evidence; and three, any fact to

23  which the lawyers have agreed or stipulated.

24       Now, in reaching your verdict, you may consider

25  only the testimony and the exhibits received into evidence.

1   Certain things are not evidence, and you may not consider

2   them in deciding what the facts are.  I will list them for

3   you:  Number one, arguments and statements by lawyers are not

4   evidence.  The lawyers are not witnesses.  So what they will

5   say in a few moments in their opening statements and at the

6   end of the trial in their closing arguments and at other

7   times during the trial is intended to help you interpret the

8   evidence, but it's not evidence.  If the facts as you

9   remember them, differ from the way the lawyers state them,

10  it's your memory of the facts that controls.

11          Number, two, objections and questions by lawyers

12  are not evidence.  The attorneys have a duty to their clients

13  to object when they believe a question is improper under the

14  Rules of Evidence.  You should not be influenced by either

15  the objection or by the Court's ruling on it.  Any testimony

16  that is excluded or stricken or that I instruct you to

17  disregard is not evidence and must not be considered.  In

18  addition, sometimes testimony and exhibits are received only

19  for a limited purpose, and when I give a limiting

20  instruction, you must follow it.

21          Four, anything that you see or hear when the Court

22  is not in session is not evidence.  You're to decide the case

23  solely on the evidence received during the trial.  Evidence

24  may be either direct or circumstantial.  Direct evidence is

25  direct proof of a fact, such as testimony by a witness about

1    what that witness personally saw heard or did.

2    Circumstantial evidence is proof of one or more facts from

3    which you could find another fact.  Let me give you an

4    example.  Let's say there's a witness on the witness stand

5    and that witness testifies, This morning I was outside and it

6    was raining.  I walked to the courthouse from the parking

7    lot, and I got rained upon.  That's direct evidence because

8    the witness is testifying about something he personally

9    experienced through one of his senses.

10        Let's say another witness is on the witness stand

11   and said, When I came into the courthouse this morning all

12   the sidewalks were wet.  The grass was wet.  And there were

13   puddles everywhere.  Now, from that evidence, you could

14   find -- you don't have to -- but you could find that it had

15   rained earlier.  There could be another explanation, such as

16   somebody left on a garden hose.  So you're not required to

17   draw that inference, but you could find it.  The witness did

18   not personally -- saw direct evidence that it rained because

19   he didn't personally feel the rain.  He's just saying, I -- I

20   saw these other things.  I'm testifying about other facts and

21   from those facts, you could draw the inference, but you

22   should consider both kinds of evidence, direct and

23   circumstantial.  The law makes no distinction between the

24   weight to be given to either direct or circumstantial

25   evidence.  It's for you as members of the jury to decide how

1    much weight to give to any evidence.  Sometimes evidence is

2    admitted for a limited purpose only, and when that happens, I

3    will instruct you at the time.  And when I instruct you when

4    an item of evidence has been admitted for a limited purpose,

5    you must consider only for that limited purpose and no other.

6            There are Rules of Evidence that control what can

7    be received into evidence during a trial.  When a lawyer asks

8    a question or offers an exhibit into evidence and a lawyer on

9    the other side thinks that that is not permitted by the

10   Rules of Evidence, the second lawyer may object.  If I

11   overrule the objection, that means the witness may answer the

12   question or the exhibit may be received into evidence.

13           If I sustain the objection, that means the witness

14   cannot answer the question or that the exhibit cannot be

15   received into evidence.  Whenever I sustain an objection to a

16   question, you must ignore the question.  You must not guess

17   what the answer might have been.  Let me give you an example

18   of how that might work.  And this wouldn't happen -- this

19   particular thing wouldn't happen, because these are excellent

20   lawyers in this case; but let's say, there's a witness on the

21   witness stand, and one of the lawyers asks the witness:  Have

22   you stopped cheating on your taxes yet.  The other lawyer is

23   going to object.  I'd sustain the objection.  So there's no

24   answer to the question.  So there's no evidence about anybody

25   cheating on their taxes, because the question means nothing

```
 1    unless you have an answer.  There's no answer, because I

 2    sustained the objection.  So you ignore the question.  Just

 3    because somebody asked the question, that's not evidence.

 4           Sometimes I may order that evidence be stricken

 5    from the record and that you disregard or ignore the

 6    evidence.  That means that when you're deciding the case, you

 7    must not consider the evidence that I told you to disregard.

 8    In deciding the facts in this case, you may have to decide

 9    which testimony to believe and which testimony not to

10    believe.  You may believe everything a witness says or part

11    of it or none of it.  Proof of a fact doesn't necessarily

12    depend on the number of witnesses who testify about it.  In

13    considering the testimony of any witness, you may take into

14    account, number one, the opportunity and ability of the

15    witness to see or hear or know the things testified to; two,

16    the witness' memory; three, the witness' manner while

17    testifying; four, the witness' interest in the outcome of the

18    case and any bias or prejudice; five, whether other evidence

19    contradicted the witness' testimony; six, the reasonableness

20    of the witness' testimony in light of all the evidence; and

21    seven, any other factors that bear on believability.  The

22    weight of the evidence as to a fact doesn't necessarily

23    depend on the number of witnesses who testify about it.

24           Now, some witnesses because of education or

25    experience are permitted to state opinions and the reasons
```

1   for those opinions.  Opinion testimony should be judged just

2   like any other testimony.  In other words, you may accept it

3   or reject it and give it as much weight as you think it

4   deserves, considering the witness' education and experience,

5   the reasons given for the opinion and all the other evidence

6   in the case.

7            I mentioned to you that sometimes the attorneys may

8   agree or stipulate to a fact, and the parties in this case

9   have agreed to the following fact and you should, therefore,

10  treat this fact as having been proven:  At all times relevant

11  to this lawsuit, John Fagan and Daniel Martinez, the two

12  defendants, were acting under color of state law and within

13  the course and scope of their employment as city of

14  Long Beach police officers.

15           Now, I'm going to read you a couple of

16  instructions.  Those are instructions about, in general, how

17  to regard the evidence and so forth.  The next couple of

18  instructions deal with the substantive law that applies to

19  the claim -- the legal claim in this case.  The plaintiffs

20  bring their claim under the federal statute, Title 42 of the

21  United States Code Section 1983, which provides that any

22  person or persons who under color of law deprives another of

23  any rights, privileges, or immunity secured by the

24  Constitution or laws of the United States, shall be liable to

25  the injured party.  Now, in order to prevail on this claim,

1    the Section 1983 claim, against the defendants' John Fagan

2    and Daniel Martinez, the plaintiffs must prove each of the

3    following elements by a preponderance of the evidence -- and

4    you'll recall I just defined that term "preponderance of the

5    evidence."  Number one, the defendants acted under color of

6    law; and two, defendants acts or failures to act, deprive the

7    plaintiffs of their particular rights under the

8    United States Constitution as explained in the next

9    instruction.  A person acts under color of law when the

10   person acts or purports to act in the performance of official

11   duties under any state, county, or municipal law, ordinance,

12   or regulation.  And as I just instructed you, the parties in

13   this case have stipulated or agreed that defendants

14   John Fagan and Daniel Martinez acted under color of law at

15   all times relevant.

16          Now, remember that there are two elements that the

17   plaintiffs have to prove.  If you find the plaintiffs have

18   proved the second element -- and I'm going to explain that

19   further in the next instruction -- your verdict should be for

20   the plaintiffs on their Section 1983 claim.  If on the other

21   hand, the plaintiffs have failed to prove the second element,

22   your verdict should be for defendants John Fagan and

23   Daniel Martinez.

24          As previously stated, the plaintiffs have the

25   burden to prove that the acts of defendant John Fagan or

```
1    Daniel Martinez or both deprived the plaintiffs of particular

2    rights under the United States Constitution.  In this case,

3    the plaintiffs allege that the defendants, John Fagan and

4    Daniel Martinez, deprived the plaintiffs of their rights

5    under the 14th amendment to a familial association with a

6    decedent, Tyler Woods.  A parent has a constitutionally

7    protected liberty interest under the 14th amendment to the

8    United States Constitution in the companionship and society

9    of his or her child.

10           The plaintiffs have the burden of proving each of

11   the following elements by a preponderance of the evidence

12   with regard to their 14th amendment claim:  Number one,

13   defendants John Fagan or Daniel Martinez or both acted under

14   color of law; that's been stipulated to.  Number two, the

15   conduct of defendant John Fagan or Daniel Martinez or both,

16   shocks the conscience; and three, the conduct of defendant

17   John Fagan or Daniel Martinez or both, caused Tyler Woods

18   death.

19           The standard you should apply to determine whether

20   the actions of defendant John Fagan or Daniel Martinez or

21   both, shocks the conscience depends on whether it is found

22   that they had the opportunity to deliberate before the action

23   as follows:  Number one, if you find that defendant

24   John Fagan or Daniel Martinez or both had the opportunity to

25   deliberate before the action, then the action shocks the
```

UNITED STATES DISTRICT COURT

```
1   conscience if undertaken with deliberate indifference; that

2   is, with conscious disregard as of a risk to Tyler Woods'

3   safety; or two, if you find that defendant John Fagan or

4   Daniel Martinez or both, did not have the opportunity to

5   deliberate before the action; then the action shocks the

6   conscience if undertaken with the purpose to harm Tyler Woods

7   that was unrelated to legitimate law enforcement objectives.

8           All right.  Now, the next -- the last few

9   instructions deal with your conduct as jurors.  First, keep

10  an open mind throughout the trial and do not decide what the

11  verdict should be until you and your fellow jurors have

12  completed your deliberations at the end of the case.  Second,

13  because you must decide this case based only on the evidence

14  received in the case and on my instructions as to the law

15  that applies, you must not be exposed to any other

16  information about the case or to the issues it involves

17  during the course of your jury duty.

18          Thus, until the end of the case or unless I tell

19  you otherwise, do not communicate with anyone in any way and

20  do not let anyone else communicate with you in any way about

21  the merits of the case or anything having to do with it.

22  This includes discussing the case in person, in writing, by

23  telephone, or by electronic means, such as via e-mail, text

24  messaging, Facebook, any Internet chat room, blog, Web site,

25  Google plus, any other feature, or anything else that has
```

UNITED STATES DISTRICT COURT

1    been invented since we started this morning.  It's hard to

2    keep that instruction up to date, but it applies as broadly

3    as possible and it applies to communicating with your fellow

4    jurors until I give you the case for deliberation.  It

5    applies to communicating with everyone else, including your

6    family members, your employer, the media, the press, the

7    people involved in the trial, your friends -- that you may

8    notify your family and your employer that you've been seated

9    as a juror in a case in the United States district court and

10    the expected length of the trial but nothing else about your

11    service; nothing about the kind of case it is; nothing about

12    anything you hear in the courtroom.  If you are asked or

13    approached in any way about your jury service or anything

14    about this case, you must respond that you have been ordered

15    not to discuss the matter and then report that contact to the

16    Court.

17            Because you'll receive all the evidence in the

18    legal instruction that you properly may consider to return a

19    verdict, do not read, watch, or listen to any news or media

20    accounts or commentary about the case, if there is any, or

21    anything to do with it, anything to do with any persons

22    involved in the trial, the lawyers, the witnesses, courtroom

23    staff, anyone.  Do not do any research, such as consult in

24    dictionaries, encyclopedias, searching the Internet, using

25    Google -- you can't Google anyone, the lawyers, the

```
 1    witnesses, anything about anything you hear in the courtroom.

 2            Do not make any investigation or in any other way

 3    try to learn about the case on your own.  The law requires

 4    these instructions to ensure that both sides have a fair

 5    trial, based on the same evidence that each party has an

 6    opportunity to address.  So a juror who violates those

 7    restrictions, jeopardizes the fairness of these proceedings,

 8    and a mistrial could result that would require the entire

 9    trial process to start over.  So it's a terrible waste of the

10    jury's time when that happens -- the investment that you've

11    already made and that you will make over the next week or so.

12    Of course, it's a tremendous waste of time and money for all

13    the parties in the case when that happens.  So every once in

14    a while, we learn of a situation, and sometimes it's a very

15    lengthy trial.  There was one recently where the trial had

16    lasted about two months, and one of the jurors -- oh, I

17    forgot to mention Twitter -- you can't Tweet -- one of the

18    jurors Tweeted right before the end of the trial that they

19    were about to reach a verdict.  That caused a mistrial.  And

20    the six or eight weeks that the jury spent and all the work

21    that they did, was all wasted.  So it's really important you

22    think about these instructions all the time; interpret them

23    as broadly as possible.  And if anyone is exposed to any

24    outside information, please notify us right away.  The sooner

25    we hear about it, the more likely we can prevent any real
```

1    problems.

2           Now, during deliberations, you'll have to make your

3    decision based on what you recall of the evidence.  You won't

4    have a transcript of the trial.  So I urge you to pay close

5    attention to the testimony as it is given.  If you at any

6    time can't see or hear the testimony, maybe somebody is not

7    speaking up enough or if you can't see or hear any of the

8    evidence, anything that's being presented on the screen,

9    anything, please let me know.  Just raise your hand.  We have

10   very good equipment in this courtroom, but occasionally

11   things go out of focus.  So let me know if anyone has any

12   problems, so we can fix it.  If you wish, you may take notes

13   to help you remember the evidence.  If you do take notes,

14   please keep them to yourself until you and your fellow jurors

15   go to the jury room to decide the case.  And don't let

16   note-taking distract you, so that you neglect to observe the

17   witnesses while they testify.

18          Every time you leave the courtroom, your notebooks

19   should be left here in the courtroom.  No one will read your

20   notes, and they will be destroyed at the conclusion of the

21   case.  Whether or not you take notes, you should rely on your

22   own memory of the evidence.  Notes are only to assist your

23   memory.  You should not be overly influenced by your notes or

24   those of your fellow jurors.

25          Now, this almost never happens, although, you've

1    seen it once or twice today, but you may have heard about the

2    dreaded term "sidebar."  Well, we generally don't have those.

3    I meet with the attorneys before trial starts every morning

4    to make sure that we cover everything, so we don't waste your

5    time, but occasionally I may ask the attorneys to come to

6    sidebar, so I can talk to them.  Usually it's for the

7    purpose of -- I may have a suggestion about how to deal with

8    something a little more quickly, so that we use your time as

9    wisely as possible.  So if it is necessary -- and sometimes

10   the attorneys will ask for a sidebar.  Sometimes I'll grant

11   the request.  Other times, I'll deny it.  Don't hold that

12   against the attorneys for asking.

13          Please understand that while you're waiting, we're

14   working.  And the purpose of the conferences is not to keep

15   relevant information from you, but maybe to decide how

16   certain evidence is to be treated under the Rules of Evidence

17   or as I said, to maybe move things along more quickly.

18          Trials proceed in the following manner:  First,

19   each side may make an opening statement.  An opening

20   statement is not evidence.  It as an outline to help you

21   understand what that party expects the evidence will show.

22   The party is not required to make an opening statement, but

23   they have an opportunity to do so.  After opening statements,

24   then the plaintiffs will present evidence and counsel for the

25   defendants may cross-examine the plaintiffs witnesses.  After

1   the plaintiffs rest, then the defendants may present evidence

2   and counsel for the plaintiffs may cross-examine.

3          Now, that's the way it happens in theory, but

4   often, in order to accommodate a witness' schedule, witnesses

5   are put on what we call "out of order."  So you might hear

6   from a Defense witness during the plaintiff's case or vice

7   versa just to accommodate the witnesses schedules.  If that

8   happens, it's routine.  Don't attach any significance to it,

9   and in any event, as I've already instructed you, you

10  consider all the evidence in the case regardless of which

11  side produced it.

12         After all the evidence has been presented, I'll

13  instruct you on the law that applies to the case, and the

14  attorneys then present their closing arguments to you.  And

15  after that, you'll go to the jury room to deliberate on your

16  verdict.  And as I told you, this may happen in more than one

17  stage.

18         All right, ladies and gentlemen.  Do you want to

19  hand out the notebooks, Wendy.

20         Now, these notebooks that we're handing out to you,

21  they have a number of things and then they have these

22  preliminary instructions as I told you.  They have some blank

23  pages for you to take your notes, and then there's a tab that

24  says "witnesses."  During the trial, as witnesses testify, my

25  law clerks takes pictures of them, and we put the names

1    underneath the pictures and then we add those -- give those

2    to you to add to your notebooks usually at the end of the day

3    or the beginning of the following day that way after even

4    after a couple of days, sometimes it's hard to remember which

5    witness was which.  And so the pictures are designed to help

6    you remember who the witnesses were when they testified.

7              All right.  Plaintiffs, you may proceed with

8    opening statement.

9              MR. DUNN:  Thank you very much, Your Honor.

10                       **OPENING STATEMENTS**

11             MR. DUNN:  Good afternoon, ladies and gentlemen.

12   This case will call upon you to answer the question of

13   whether two officers of the Long Beach Police Department used

14   excessive force when they shot and killed 19-year-old,

15   Tyler Woods in the early morning hours of November 19th of

16   the year 2013.

17             And in answering this question, we are going to

18   deeply analyze the most awesome power that police officers

19   have, and we're going to look at the rules as to when

20   officers are allowed to use force that can kill and when they

21   are not allowed to use force that can kill.  And what we're

22   going to look at when we analyze this awesome power, is we're

23   going to look at the training that police officers receive,

24   and we're going to look at the standards that police officers

25   have to abide by, and we're going to hear from police

1    officers themselves and we're going to hear from expert

2    witnesses and we're going to test the actions of these

3    officers when they shot Tyler Woods against the standards

4    that they have to abide by when determining whether or not to

5    fire their guns at a human being.  And what we're going to

6    learn is that there are two general principles that are going

7    to be applicable here.  The first is that police officers are

8    not allowed to use deadly force, unless they are confronted

9    with an imminent threat of death or serious bodily injury.

10   In other words, they have to be faced with circumstances that

11   would lead an officer to believe that that officer is faced

12   with an immediate threat that the person that they're going

13   to kill is threatened -- is -- has the possibility of

14   inflicting serious bodily injury against someone or death.

15   That's the first rule.  And in that rule we're going to look

16   at many handbooks and training materials that officers use,

17   one of which is contained in what is called "a learning

18   domain," which is an instructional manual for police

19   officers.  And it talks about deadly force, and it says that

20   deadly force is one of the most awesome responsibilities that

21   a police officer can have; that it is to be guided by the

22   reverence for human life; that it is to be used only when

23   other means of control are unreasonable or have been

24   exhausted; that the use of deadly force is to be considered

25   as a last resort; not a first resort but a last resort.  And

1    it is only to be used in the direst of circumstances.

2          Now, the second set of principle that we're going

3    to look at concern the conduct of excessive force.  And what

4    those principles will tell us, concern the fact that if a

5    police officer makes a decision to use deadly force, that

6    police officer must account for every bullet that is fired

7    out of his or her weapon; that each bullet can kill and that

8    if a peace officer decides to use deadly force, that officer

9    is not allowed to use more force than necessary to accomplish

10   the goal that was originally intended.  And when we look at

11   those two principles, the first being that an officer is only

12   entitled to use deadly force when threatened with death or

13   serious bodily injury, and the second, that a peace officer

14   is not entitled to use more force than necessary.  We're

15   going to look at the actions on this particular morning

16   through the lens of what the police officers are entitled to

17   do and what they're not entitled to do.

18          Now, we brought this case because we strongly feel

19   that not even one bullet --

20          MR. RUSSELL:  It's improper for opening statement,

21   Your Honor.  I object.

22          THE COURT:  Refrain from argument or personal

23   vouching, Mr. Dunn.  Thank you.

24          MR. DUNN:  In this particular case, when we look to

25   the answers of the first prong, we're going to see that

 1    Mr. Woods was unarmed when he was shot upon.  He had no gun,

 2    and he had no weapon of any kind.  We're going to see that

 3    the police officers that fired upon Mr. Woods shot him from a

 4    distance of approximately 30 feet.  He was on a roof and that

 5    when they fired on him, he did nothing to the officers.  He

 6    had not injured any police officer; he had not injured any

 7    person; he had not physically threatened any police officer;

 8    and he had not physically threatened any person.  And when we

 9    look at the issue of the amount of shots fired, we're going

10    to see certain undisputed facts.  The first being that

11    between the two of these officers, they fired approximately

12    40 -- 40 shots at Mr. Woods; that Mr. Woods would be shot a

13    total of 19 times while he was on that roof unarmed; that

14    when we look at the concept of the rule being that each

15    bullet can kill and that a police officer must account for

16    each round fired.

17         We're going to see that in this particular case,

18    these officers fired so many times, that their guns ran out

19    of bullets.  And specifically, in discussing what they were

20    perceiving, we're going to see that there were three reloads.

21    And we're going to have to take about guns and the way guns

22    work to truly appreciate what happened; but essentially, if a

23    police officer is firing and the gun runs out of bullets,

24    they have to get what is called another magazine and put

25    another magazine in, in order to keep firing.

 1          And in this particular case, while shooting at

 2     Mr. Woods, each officer reloaded twice.  In other words, they

 3     emptied their entire magazine of bullets once; they reloaded;

 4     emptied their entire magazine of bullets again and reloaded

 5     again and continued firing, all while Mr. Woods was unarmed,

 6     on a roof at a distance of approximately 30 feet away.

 7          We're going to hear testimony from the

 8     pathologist -- the coroner that performed the autopsy in this

 9     case.  The coroner has retired.  So he won't be here to

10     testify live, but we did take his out-of-court statement and

11     it will be read to you.  He is going to talk about exactly

12     what these 19 bullets that hit Mr. Woods did to his body.  He

13     is going to be about his wounds, some of which were fatal,

14     some of which were not fatal; but one of the most interesting

15     things he's going to talk about, is where Mr. Woods' body was

16     in relation to the guns that were firing at his body.  And

17     what we're going to see is the majority of the bullets that

18     hit Mr. Woods, struck him from the back.  We have direct

19     entry wounds in his back, and we have a lot of rounds that

20     were fired at his body from an upward trajectory that skimmed

21     off of his body; that left marks off of his body, all of

22     which were fired from a back to front trajectory.  And when

23     we look at the testimony of the officers, they themselves are

24     going to tell us that as they were firing at Mr. Woods, they

25     knew that they had hit him, but they kept firing at him.

1  They knew that on that roof he had been struck, but they

2  continued to reload and keep firing at him.

3       You're going to hear one of the officers,

4  Officer Martinez, who will literally testify that he shot

5  Mr. Woods; he saw Mr. Woods fall face down flat, and he was

6  crawling forward on his stomach with his elbows, and as he

7  was crawling forward with his elbows, he continued to shoot

8  at him.  And in light of these facts, we go back to these

9  original justifications to answer the question, did Mr. Woods

10  pose a threat of death or serious bodily injury against any

11  person or did Mr. Woods have any possibility of being able to

12  escape once he was on that roof?  And most significantly, did

13  Mr. Woods engage in any actions that would justify being shot

14  at approximately 40 times and being shot 19 times.

15       You're going to hear that when Mr. Woods was on

16  that roof, he was contained.  There was a helicopter there

17  that was approximately 30 to 40 police officers that were in

18  the immediate vicinity of the apartment complex on which the

19  roof was that he was -- was on.  You're going to hear that

20  they had a K9 officer, a dog.  You're going to hear that the

21  department had less lethal alternatives available to them;

22  specifically, they had two officers that were designed to

23  provide what is called "less lethal apprehension techniques."

24  In this particular case, that came in the form of a bean bag

25  shotgun.  Yet, through the deliberate choice of these

1    officers, none of those less lethal means were employed.

2              Now, in addition to examining the events that

3    happened on the roof of the apartment complex, we're also

4    going to examine the events that led up to it.  And we're

5    going to talk about everything that happened before this

6    shooting.  And we're going to see that -- you're going to see

7    that the entire incident began at approximately 1:30 in the

8    morning.  Mr. Woods had been pulled over for a routine

9    traffic stop.  You're going to hear that he gave the officers

10   a false name and that the officers that were there, you'll

11   probably hear from one of the officers that was originally

12   there on the scene, they pulled him over and he told them he

13   was somebody that he wasn't.  And they ran his name and in

14   connection with their initial encounter, they patted him

15   down; in other words, they did what the police officers call

16   a "pat-down" where you stand up and they go over your body,

17   and they found that he had no weapons.  And they got on the

18   radio, and one of the things that we're going to learn about

19   police work, when one police officer puts something on the

20   radio, they all can hear it.  It's put on for -- it's

21   broadcast for everyone to hear.  They put on the radio that

22   we patted Mr. Woods down and he had no weapons.  That's

23   something that you're going to hear that was broadcast; but

24   in terms of the actions of Mr. Woods, what you're going to

25   hear is after several minutes in this detention, he bolted --

```
 1    just took off -- took off running.  And Mr. Woods was not a
 2    slow person.  He had a lot of athletic ability, and he ran
 3    and he ran into the adjoining neighborhood.  He was hopping
 4    fences.  Based on his actions the police called out all
 5    the -- all the officers that could get there.  They had to
 6    take him in.  They even had a -- a helicopter from the
 7    Los Angeles Police Department on loan, and tomorrow we're
 8    going to be hearing from the pilot of that helicopter, all in
 9    an effort to do what police work is designed to do, which is
10    to effect a detention of Mr. Woods, and in looking at the
11    role of the police in this case, we're going to look at one
12    of the central tenants of police practices which is that
13    their role is to apprehend, and their role is to catch
14    individuals, so that if those individuals are guilty of a
15    crime or have committed a crime, that they may be tried by a
16    judge and jury.
17          And in this particular case, you're going to hear
18    that shortly after they began to chase Mr. Woods and go after
19    Mr. Woods, they heard a very interesting thing over the
20    radio.  They heard that he had an old warrant for something
21    that happened in the past and that that warrant was for a
22    very serious crime; that crime being armed robbery and that
23    they believed that based on this old warrant, that Mr. Woods
24    may have been armed with a gun and that he may have posed a
25    threat to them.
```

1          Now, the facts of this case are going to

2     demonstrate undisputedly that Mr. Woods didn't have a gun,

3     but the officers are both going to take the stand and tell

4     you that they thought that he might have had one; but of one

5     of the things that we're going to see is that throughout all

6     of the encounters that Mr. Woods had with several officers,

7     none of them fired upon him, except for these two.

8          You're going to hear that even if an individual has

9     a warrant for a crime as serious as armed robbery, that does

10    not give police officers the legal authority to shoot that

11    person on sight.  It does not give police officers the

12    authority to use more force than is necessary, and it does

13    not give police officers the authority to use force that is

14    inconsistent with police practices.

15         After approximately one hour and 20 minutes of the

16    search, they caught up to Mr. Woods and when they caught up

17    to him, he was completely contained.  There was a parameter

18    set up.  There was nowhere for him to go.  There was a K9;

19    there was a helicopter.  When we look at what was facing

20    these officers in the situation facing, we ask, was it

21    necessary to use deadly force, and was it necessary to shoot

22    approximately 40 times at him?  What we believe the evidence

23    will show is that there were numerous, numerous other things

24    that they could have done to bring him in custody.  And if he

25    had committed a crime to have him tried by a judge and jury

```
 1    for those crimes.

 2              Thank you very much, ladies and gentlemen.

 3              (Pause in the proceedings.)

 4         MR. RUSSELL:  Earlier this morning, the judge told

 5    you that you're probably going to find this case interesting.

 6    And I think you will, because you're going to learn as

 7    Mr. Dunn mentioned, a lot about police work and a lot of what

 8    we know from police work or think we know, we've seen on TV

 9    or we've seen in the movies and maybe read in books, and

10    you're going to hear from police officers.  That's not the

11    way it always works.  You're going to hear about their

12    training, and they get trained on the law and they get

13    trained on the kinds of things that Mr. Dunn mentioned; but

14    they also get trained on behavior and how to react when they

15    see certain things and you're going to hear from

16    Officer Martinez and from Officer Fagan that they didn't

17    shoot Tyler Woods when they first saw him.  In fact,

18    Officer Martinez is going to tell you that he was involved in

19    the pursuit and the search for Mr. Woods, the one that lasted

20    more than an hour, and he had seen Mr. Woods several times

21    while the police were chasing Mr. Woods, but he didn't shoot

22    because Mr. Woods didn't pose an immediate threat at that

23    point and because it wasn't safe to shoot -- it wasn't safe

24    to the public to shoot, because you're going to hear the

25    concept of a background that when officers open fire, they
```

1    want to know that's behind the person they're shooting at, so

2    they don't injure somebody who's an innocent bystander.

3              You're going to hear from Officer Fagan that the

4    first time he saw Mr. Woods, he didn't shoot him either, even

5    though Mr. Woods was holding his hands in a position that

6    would indicate to a police officer that Mr. Woods might have

7    a gun.  Officer Fagan didn't shoot Mr. Woods because he

8    didn't have a clear background and because Officer Fagan will

9    tell you he believed that he could tell Mr. Woods there is

10   nowhere else to run; get on the ground.  You're under arrest.

11             And you'll hear that the reason that both of these

12   officers opened fire, is that Mr. Woods was not contained.

13   And, in fact, he from the third story of an apartment

14   building, stepped onto the railing and, essentially, leaped

15   out into space onto the roof of the apartment building with a

16   40- to 50-foot fall awaiting him if he didn't make it.  And

17   they'll tell you that when they saw that piece of

18   information, combined with the fact that during the hour-plus

19   chase, Mr. Woods had jumped from rooftop to rooftop.  He had

20   jumped from second-story roofs onto cars onto the street.

21   He'd encountered citizens in their apartments as he was

22   attempting to get in -- or it looked like he was attempting

23   to get in.

24             They will tell you that the information they had

25   was that there was a $50,000 warrant for Mr. Woods' arrest

1    involving an armed robbery and that a gun had been involved

2    in the robbery -- a blue steel handgun.  And they will tell

3    you that when Mr. Woods, who they and other officers on the

4    scene, felt was the most motivated person they had ever

5    chased -- motivated to get away, they were concerned about

6    what don't we know; why is this guy defying death to get away

7    from us, and if he is going to do that, what's he going to do

8    to us our fellow officers or citizens when he truly feels

9    trapped?  And they'll tell you that when he got on that roof,

10   Mr. Woods turned toward them; he had his hands in his waist

11   area and they opened fire.  And Officer Fagan will tell you

12   he opened fire even before then, because he realized the

13   danger to everybody if Mr. Woods made it to that roof.

14          And the officers will tell you and other officers

15   will tell you and experts will tell you that police officers

16   are behind the curve when it comes to shooting.  When the

17   suspect has a gun, you'll find out that the suspect can

18   produce that gun and point it on you and pull the trigger

19   before the officer has time to even process that that's

20   what's happening, because they have to perceive it; they have

21   to think about it; they have to analyze it in terms of all

22   the training and the law and what's behind them, and then

23   they have to react.  So they're trained to look for cues:

24   What's the person's body doing?  In order for them to shoot

25   me, where does their hand need to go?  Where does their body

1   need to turn?  Where do they need to be looking?  And when I

2   see these things, now I'm preparing.  And when everything I

3   know about this person is building on each step, I may have

4   to use deadly force.  It may be my last resort, because I

5   don't have time to do anything else.  You'll find out I don't

6   have time to get a K9 up onto the roof.  I don't have time to

7   fire a Taser 30-feet away onto a roof.  That's not how they

8   work.  I don't throw batons at people to trip them.  I don't

9   shoot guns out of people's hands.  These are all myths that

10  Hollywood has taught us, and you'll learn from real police

11  officers that's not how it works.  And you'll hear not only

12  from these officers but other officers -- the ones that

13  conducted the traffic stop, and I just want to give you some

14  names at this point -- I know you'll get the pictures, but I

15  want to give you some names, so you have a preview of what's

16  coming.

17          Officer Fagan and Officer Martinez are the officers

18  that shot that night.  They shot from the third story of an

19  apartment building at 441 Nebraska.  So when you hear that

20  information, you're going to know that's where the shooting

21  took place.

22          Other people you're going to hear from that were at

23  441 Nebraska include Sergeant James Richardson.  He was the

24  sergeant that was in charge of looking for Mr. Woods over the

25  hour-plus length of time.  You're going to hear, I expect

1    from Mike Parcells; he was the K9 officer.  You may hear from

2    Officer Chris Silva.  He was part of the search team.  You

3    may hear from Danny Hernandez and Omar De Leon.  These are

4    all officers that were there at 441.  You're also going to

5    hear from Mark Brunson and Paul Tovar, and they are the

6    officers that conducted the traffic stop.  And they're going

7    to tell you that they stopped the car and they saw Mr. Woods.

8            Mr. Woods gave them a false name.  They gave him an

9    opportunity to give them the correct name, and instead of

10   giving them the correct name, he took off running, and

11   Officer Brunson chased him.  And you're going to hear that

12   throughout this hour-plus time frame, Mr. Woods was contained

13   by officers multiple times and then jumped up and kept going.

14   You'll hear that there was an announcement made that said

15   "Tyler Woods, come out and surrender and you will not be

16   harmed.  We have a K9 and he may bite you."  And you'll hear

17   that Tyler Woods didn't give up.  You'll hear that the number

18   of times officers told Tyler Woods "Stop, get down," he

19   didn't give up.  And you'll hear from these two officers when

20   they tell you why they fired the number of shots that they

21   fired, is that Tyler Woods never physically did anything --

22   never verbally did anything; never gave them any indication

23   whatsoever that he was giving up.  His hands never went up.

24   He never said, Stop shooting.  I surrender.  Please stop,

25   anything like that.  Every behavior that Tyler Woods had,

1    they will tell you was a further indication that he was not

2    stopping -- that he was going to continue his resistance and

3    continue to pose a threat to them, the surrounding officers,

4    and people in the apartment building that the officers were

5    in.

6          You'll also hear from a couple of experts.  These

7    are retired law enforcement officers.  There is one on each

8    side.  One is named Scott Defoe.  He is a sergeant from the

9    LAPD.  He is going to be testifying on behalf of the

10   plaintiffs and will tell you they're perspective.

11         You'll hear from Robert Fonzi, who is a retired

12   undersheriff of San Bernardino county, who will testify on

13   behalf of the defendants.

14         And then there will be other people that come in

15   and out.  You'll see some pictures; but like I said, it's

16   interesting.  And then you've heard a little bit about the

17   law.  And I'm not going to talk to you about the law and the

18   facts right now, but one of the key questions that you need

19   to keep in mind as you go through this, is did they have time

20   to do anything else?  Were there any other options for these

21   officers?  And it allows you to get into their mindset a

22   little bit.  And they're going to talk to you about that, and

23   then you're going to have to decide, okay, Three years later

24   almost, did these officers do what they did with a legitimate

25   law enforcement purpose, to take Tyler Woods into custody if

```
 1    he gave up and if he didn't, to use force against him until
 2    the threat posed by Tyler Woods ended.
 3              So thank you for in advance for your close
 4    attention to the case, and we look forward to presenting our
 5    case to you.
 6              THE COURT:  Thank you.
 7              Mr. Dunn, you may call your first witness.
 8              MR. DUNN:  John Fagan, Your Honor.
 9    PLAINTIFF'S WITNESS, JOHN FAGAN, SWORN.
10              THE CLERK:  Please state your full name and spell
11    it for the record.
12              THE WITNESS:  John Bernard Fagan.  It's F-a-g-a-n.
13              THE COURT:  Thank you.  You may inquire.
14                        DIRECT EXAMINATION
15    BY MR. DUNN:
16    Q    Good afternoon.
17    A    Good afternoon, sir.
18    Q    You're currently employed by the Long Beach Police
19    Department; correct?
20    A    Yes, sir, I am.
21    Q    And you were involved in the shooting incident that
22    happened on November 19th of 2013; correct?
23    A    Yes, sir.
24    Q    And on that particular day, the shooting -- would you
25    agree, the shooting happened approximately at 4:00 in the
```

1    morning?

2    A    I -- I'm not sure about what time it happened.  I --

3    I don't even wear a wrist watch.  I would have to look at

4    the -- the report to know about what time.

5    Q    You would agree that your shift began that day at

6    approximately 10:00 p.m.; correct?

7    A    Yes, sir.

8    Q    And with regard to your role on the incident in

9    question, you first learned about the incident involving

10   Tyler Woods when you heard that there was a foot pursuit

11   going on in this particular neighborhood where the shooting

12   occurred; correct?

13   A    I -- I work east division.  This was occurring in what

14   we call the south division, and we work on different radio

15   channels; but they broadcasted on our channel to let us know

16   someone was in a foot pursuit, yes.

17   Q    So you drove to the location and you parked your car;

18   correct?

19   A    Yes, sir.

20   Q    And at some point, you got out of the car; correct?

21   A    Yes, sir.

22   Q    Now, you would agree that from the moment that you first

23   laid eyes on Mr. Woods -- from the moment that you first saw

24   him, it was approximately 10 to 15 seconds until the time of

25   the shooting; correct?

```
 1   A     Approximately 10, 15 seconds, yes, sir.

 2   Q     How much time would you say passed from the time in

 3   which you first got at the scene until the time in which you

 4   first saw Mr. Woods?

 5   A     Well, as you just stated, when I first saw Mr. Woods,

 6   the officer-involved shooting occurred 10 to 15 seconds

 7   later.  That was the very first time I had seen him.

 8   Q     And you had not seen him before this day; correct?

 9   A     No, sir.

10   Q     All right.  I'd like to back up a little bit and talk a

11   little bit about your training.

12            You're familiar with POST; correct?

13   A     Yes, sir.

14   Q     POST is that acronym P-O-S-T.  It stands for Peace

15   Officer Standards and Training; correct?

16   A     Yes, sir.

17   Q     And for every police officer in California to be able to

18   be a police officer, that officer must first pass a series of

19   tests that demonstrate that officer's familiarity with the

20   peace officer standards and training; correct?

21   A     Yes, sir.

22   Q     And one of the things that people commonly say when

23   referring to police work, is that a police officer is

24   post-certified if he has passed the curriculum -- or strike

25   that -- if he has passed a test demonstrating his or her
```

```
 1    familiarity with the POST guidelines; correct?

 2    A    Yes, sir.

 3    Q    And one of the things that POST, which specifically

 4    provides guidelines for all officers in California, -- one of

 5    the things that POST discusses, is it discusses the concept

 6    of deadly force; correct?

 7    A    Yes, sir.

 8    Q    And the -- the training curriculum that teaches concepts

 9    related to deadly force, is called -- they're called learning

10    domains; correct?

11    A    I think when I went to the academy, they were called

12    "knowledge domains."  I'm not sure what they're called now.

13    I think -- I think you're correct as what they call them now;

14    but years ago when I went to the police academy, they were

15    called "knowledge domains."

16    Q    And you're familiar with the fact whether we call them

17    knowledge domains or learning domains, they do discuss

18    specific guidelines as to when peace officers are authorized

19    to use deadly force and when they're not authorized to use

20    deadly force; correct?

21    A    Yes, sir.

22    Q    And one of the things that POST says is that deadly

23    force is always a last resort to be used in the direst of

24    circumstances; would you agree with that?

25    A    Yes, sir.
```

1    Q    And would you agree that another thing that POST says is

2    that deadly force is to be used only when other means of

3    control are unreasonable or have been exhausted; correct?

4    A    I am not sure exactly the verbiage, but that sounds

5    close enough.

6    Q    You would agree that with regard to what POST teaches

7    officers, it says that deadly force is to be guided by the

8    underlying principle of reverence for human life; correct?

9    A    Yes, sir.

10   Q    And with regard to this particular case, when you

11   approached Mr. Woods -- when you first saw him, which by your

12   estimation was 10 to 15 seconds prior to the shooting,

13   knowing everything that you knew then, you did not shoot at

14   that point; correct?

15   A    No, sir, I did not.

16   Q    And you did not shoot because when you saw him at that

17   point, despite everything that you knew, you realized that

18   Mr. Woods did not pose an imminent threat of death or serious

19   bodily injury to yourself or to others; correct?

20   A    At that moment, I didn't feel threatened, no, sir.

21   Q    And you knew at that point that he had a warrant for

22   armed robbery; correct?

23   A    Yes, sir.

24   Q    And you knew at that point that he had been alluding

25   police officers for approximately an hour and 20 minutes;

1   correct?

2   A    Approximately, yes, sir.

3   Q    And you knew at that point that he had not yielded to

4   police officers' repeated requests for him to surrender;

5   correct?

6   A    Yes, sir.

7   Q    Yet, you still did not use deadly force, because in your

8   mind, despite all of those things that you knew, the use of

9   deadly force would not have been appropriate when you first

10  saw him?

11  A    Well, when I first saw him, I was looking through a

12  window.  So 99 percent of the time, I'm not going to fire

13  through a closed window at any suspect, and I was looking up

14  at him.

15  Q    My apologies.  I believe you just told us that he did

16  not pose a threat to you at that time?

17  A    Well, at that time, he's -- I didn't know even if he had

18  seen me or not.  So at that point, he was making no

19  threatening motion toward me.  So at that point, I -- I

20  didn't feel threatened at that moment.

21  Q    Nevertheless, we can agree that at that particular

22  moment, you did not feel that the use of deadly force would

23  have been appropriate; correct?

24  A    That all depended on Mr. Woods' actions.

25  Q    Okay.  Can we agree that at the moment that you saw him,

```
 1    that one of the reasons why you didn't shoot when you saw

 2    him, was that you did not feel that Mr. Woods posed an

 3    imminent threat of death or serious bodily injury to you at

 4    that point?

 5    A    At that point, I did -- like I said, I don't even know

 6    if he saw me or not.  So at that point, no.

 7    Q    But you chose not to shoot at that point?

 8    A    Yes, sir.

 9    Q    You wouldn't shoot until approximately 10 to 15 seconds

10    later; correct?

11    A    Yes, sir.

12    Q    All right.  Now, if I may have a brief moment...

13         I'd like to talk a little bit about the particular

14    firearm that you had on this particular morning.  And I call

15    it the morning, because I am -- for the sake of these

16    questioning -- for the sake of these questions, I'm assuming

17    that the shooting happened at approximately 4:00 a.m.

18         Now, is that a fair assumption on your part?

19    A    That's a fair assumption.  Like I said, without looking

20    at the exact radio time stamps to hear at what point that I

21    let the dispatchers know we were involved in an

22    officer-involved shooting.  It would be a total estimation,

23    but I'll concede that what you're saying is correct.

24    Q    Now, you were armed with a firearm in that case -- in

25    this case; correct?
```

```
1    A    Yes, sir.

2              MR. DUNN:  Now, we have an agreement as to --

3                   (Pause in the proceedings.)

4              MR. DUNN:  Publishing with the Court's

5    permission -- it looks like we have 9-1 and Exhibit 10.  I

6    believe there's no objection.

7              THE COURT:  All right.  I believe those were

8    previously admitted; correct?

9              MR. DUNN:  I believe so.

10              MR. RUSSELL:  There's no objection regardless,

11    Your Honor.

12              THE COURT:  All right.  They're ordered admitted.

13    You may publish.

14    Whereupon Plaintiff's Exhibits 9-1, 10 are admitted hereto.)

15              MR. DUNN:  Thank you.

16    BY MR. DUNN:

17    Q    Now, does this photograph specifically the one that I'm

18    referring to here, does that appear to look like the firearm

19    that you discharged on the morning in question?

20    A    No, sir.  That's nothing like it.

21    Q    All right.  Forgive me.  Is it -- and, again, let's

22    see...

23              Is it this one?

24    A    That appears to be my weapon.  Yes, sir.

25              THE COURT:  All right.  And at this time, you're --
```

UNITED STATES DISTRICT COURT

```
 1              MR. DUNN:  And I apologize, Your Honor.  I jumped

 2    the gun.  Now I'm referencing Exhibit 8.  And I believe --

 3    and I apologize, Your Honor, but I believe there is no

 4    objection.

 5              THE COURT:  All right.

 6              No objection?

 7              MR. RUSSELL:  No.  There's no objection.

 8              THE COURT:  All right.  Ordered admitted.  Go

 9    ahead.

10    BY MR. DUNN:

11    Q    Publishing Exhibit 8...

12              Does this appear to be the firearm that you used on

13    the morning in question?

14    A    Yes, sir.

15    BY MR. DUNN:

16    Q    All right.  And this is a .45 caliber handgun.

17    A    Yes, sir.

18    Q    Can you tell us the difference between a .45 caliber

19    handgun for example and a handgun?

20    A    Only what I know.  I'm not a gun expert.  I know

21    that .45 caliber bullets is a larger bullet than a 9-mm

22    bullet but a 9-mm bullet travels a lot faster than a .45.

23    Q    Have you ever been told that a .45 caliber bullet is

24    more powerful than a 9-mm bullet?

25    A    I heard rumors, but I've never heard anything to prove
```

```
1    it or disprove it.

2    Q    All right.  Now, with regard to this particular firearm,

3    what is this rectangular object that we see here?

4    A    That's what would be referred to as a magazine.  That

5    holds the rounds or the bullets for the weapon.

6    Q    Now, how many bullets did your firearm hold on the

7    morning of the shooting?

8    A    It just depends how -- when it's in my holster there is

9    one round, one bullet in the chamber which is in the barrel

10   and then the magazine which is what you see there holds seven

11   more rounds in it.  So my weapon would hold eight at the time

12   it is in my hold sister.

13   Q    And you were familiar with this weapon prior to the

14   shooting; correct?

15   A    Yes, sir.

16   Q    You had fired it at the range several times?

17   A    Yes, sir.  It's -- I carried it ever since my first

18   year.

19   Q    And you had been required to qualify with that weapon

20   periodically; correct?

21   A    Yes, sir.

22   Q    Now, with regard to this -- I apologize -- there's a

23   button.  And, again, I don't know if I can zoom in enough;

24   but...

25   A    I can probably figure it out.
```

```
 1   Q    What -- what do we see here that I'm pointing my pen to,
 2   that -- that circular object right there?
 3   A    Okay.  That button that you see there is what's called a
 4   "magazine release."  That's when you need to either change
 5   magazines or if you've expended all of your rounds or
 6   bullets, you use the hand that's holding what's -- would be
 7   the back of the gun to drop the magazine with one hand.  That
 8   way it doesn't take two hands to drop the magazine.
 9   Q    So if you're firing this weapon -- and I believe you've
10   told us that it has seven rounds in the magazine, plus one in
11   the chamber; correct?  That's eight?
12   A    Yes, sir.
13   Q    Assuming that the gun is fully loaded, if you fire all
14   eight rounds, what's going to happen if you try to fire
15   again?
16   A    Once the final rounds expended, the slide which is the
17   top portion of the gun you see, the thing above the barrel,
18   that's considered the slide, it locks back in the fashion you
19   see right there in that picture.  So if you've lost count of
20   how many rounds or bullets you've -- you've expended, the gun
21   locks back, and it's in -- and that's the terminology.  It's
22   called "slide lock," meaning it locks back, so that way when
23   you put in a new magazine, you then have to hit the lever
24   that's -- well, it's going to be tough to point -- where
25   the -- where the magazine button is, then there is kind of a
```

```
 1    longer button, and then the one behind that, is the slide
 2    release.  That's what you would hit to then charge around
 3    into the barrel area from the magazine.
 4    Q    So if you shoot, for example, all eight bullets in a
 5    fully-loaded gun such as this, and you shoot one, two, three,
 6    four, five, six, seven, eight, and then the gun will just
 7    go -- shoot back -- it will click back, and you just won't be
 8    able to fire anymore; correct?
 9    A    Well, there's no more bullets.  Once it locks back in
10    slide lock, there is no more bullets left in the gun.
11    Q    And if you want to get -- if you want to keep firing at
12    that point, you have to press this button and the magazine
13    will fall out and then you have to get another magazine and
14    put the new magazine in, and then your gun can fire another
15    seven more shots; correct?
16    A    Well, it's all one motion.  While I'm dropping the
17    magazine out of the weapon -- dropping the empty magazine, I
18    already have the new magazine in my other hand.
19    Q    Well, where do you get the new Magazine from?
20    A    I wear my extra magazines on the left-hand side of my
21    utility belt.
22    Q    All right.  Let's see if we can get a photograph here.
23    You said the left side?
24    A    Yes, sir.  Because I'm right handed.  My holster is on
25    my right-hand side, and my spare magazines are on the left.
```

1    There should be a picture of me in your --

2    Q    Right.  I think I might be looking at -- okay.  Here we

3    go.  All right.  I'm going to turn your attention to

4    Exhibit 9-2, Your Honor?

5              THE COURT:  All right.  Any objection?

6              MR. RUSSELL:  No, Your Honor.

7              THE COURT:  Thank you.  Ordered admitted.  You may

8    publish.

9              MR. DUNN:  Thank you.

10       (Whereupon Plaintiff's Exhibit 9-2 is admitted hereto.)

11   BY MR. DUNN:

12   Q    All right.  Now, specifically, Officer, I'd like you to

13   look at this exhibit.  Does this photograph -- does this

14   photograph appear to be consistent with -- in terms of the

15   shooting here, is this what your uniform looked like in the

16   morning in question?

17   A    From behind, yes, sir.

18   Q    Are you able to show us on this photograph where you

19   would get your spare magazine from?

20   A    I -- I -- no, because it's obscured because it's in the

21   front left-hand side of my belt.  From this angle, you can't

22   see where my extra magazines are.

23   Q    Thank you.

24             MR. DUNN:  9-4.  I believe there's no objections to

25   any of these, Your Honor.

UNITED STATES DISTRICT COURT

```
1              THE COURT:  What's the number?

2              MR. DUNN:  9-4.

3              THE COURT:  Thank you.  It's ordered admitted.

4      (Whereupon Plaintiff's Exhibit 9-4 is admitted hereto.)

5  BY MR. DUNN:  Are we able to see here?

6  A    I'm sorry.  I interrupted you, sir.

7  Q    It's all right.

8  A    I apologize.

9              Where my left hand and right hand, they're resting

10 on top of the pouches that my magazines are held in.

11 Q    So -- and I -- with the understanding that this is not

12 the pouch that your magazines are held in, I'm referring to

13 at what looks like a stud here or a button on Exhibit 9-4?

14 A    Okay.

15 Q    Would it be correct to say that you have to undo a

16 button to a pouch and take out a magazine in order to reload

17 the firearm?

18 A    Well, those snaps that you pointed to are part of my

19 baton ring that holds the baton ring to my belt; but yes,

20 there is one snap on each -- there's -- I'll have to explain

21 it.  I carry four extra magazines, and my magazine pouch

22 carries two on each side.  So there's going to be two flaps,

23 and each flap has one snap.

24 Q    So this -- on this particular day, you would agree that

25 you had to use -- before you were done shooting, you went
```

52

```
 1   through approximately -- well, you went -- you used three
 2   magazines total; correct?
 3   A    I didn't deplete three magazines total, but once I
 4   finished shooting and I believed that Mr. Woods was staying
 5   down --
 6            MR. DUNN:  Objection, Your Honor.  It's
 7   nonresponsive at this point -- I believe that the answer is
 8   not responsive at this point, and I would move to strike.
 9            THE COURT:  The objection is sustained.  And you're
10   to disregard the answer to the last question.
11            Could you ask the question again, Mr. Dunn.
12   BY MR. DUNN:
13   Q    Specifically you'll agree that -- and I'll rephrase it.
14   You used the totality of two magazines, and you used a piece
15   of the third magazine; correct?
16   A    Yes, sir.
17   Q    Now, if we were going to itemize the total amount of
18   shots that you fired, you had to have fired eight times to
19   get through the first magazine; correct?
20   A    Yes, sir.
21   Q    And you would have had to have fired an additional seven
22   times to get through the second magazine; correct?
23   A    Yes, sir.
24   Q    How many bullets did you fire in the third magazine?
25   A    I believe I fired three because I think 18 total.  So I
```

UNITED STATES DISTRICT COURT

1    think I had four left in the third magazine.

2    Q    All right.  So with regard to the mechanism of what you

3    have to do to replace an old spent magazine with a new

4    magazine, after that magazine falls, would you agree that you

5    have to undo a pouch that is at your -- in the front of your

6    duty belt?

7    A    No, sir.  I wouldn't agree to that.

8    Q    Is the pouch already opened?

9    A    The -- by the time I'm dropping the -- the mag release

10   pressing the button, my -- I already have the new magazine in

11   my hand.  It's already out of my pouch and moving up toward

12   the -- the weapon.

13   Q    In order to get it out of your pouch, do you have to

14   unfasten any kind of a strap?

15   A    It's -- all I have to do is pop a snap.  It's -- it -- I

16   don't know how to explain it.  It's just a regular snap.

17   Q    Do you have to pop a snap for each magazine?

18   A    No, just for each pouch, and each pouch holds two

19   magazine.

20   Q    So with regard to the mechanism of shooting, in terms of

21   what you were trained as a police officer -- in connection

22   with your deadly force training, you would agree that you

23   were trained that any bullet that comes out of your gun, can

24   kill; is that correct?

25   A    Yes, sir.

54

1    Q    And you're also trained that with regard to the use of

2    deadly force, in order for your use of deadly force to be

3    consistent with POST standards, every single bullet that you

4    fire, independently, has to be consistent with POST

5    standards; would you agree with that?

6    A    Yes, sir.

7    Q    In other words, each and every time you fire, you have

8    to be firing at a subject that poses an imminent threat of

9    death or serious bodily injury either to yourself or to

10   another person; correct?

11   A    Yes, sir.

12   Q    And if you fire eight times, that means that all eight

13   shots were fired at a time in which a subject posed an

14   imminent threat of death or serious bodily injury to yourself

15   or to someone else?

16   A    Yes, sir.

17   Q    And if you go through another clip and if you fire 15

18   times, you would agree that all 15 shots for each of those

19   shots, the subject which is being fired upon, would have to

20   pose an imminent threat of death or serious bodily injury to

21   yourself or to someone else?

22   A    Yes, sir.  And I think you misspoke you said "clip," you

23   meant magazine; correct?

24   Q    My apologies.  And if you fired a total of 18 times,

25   that same rationale would apply for all 18; correct?

1   A     Yes, sir.

2   Q     Now, in terms of what you have to do to fire this gun,

3   you have to pull the trigger; correct?

4   A     Yes, sir.

5   Q     And turning your attention back to Exhibit 8...

6         This particular raised object that I'm referencing

7   with my pen, those -- that's a sight; correct?

8   A     Yes, sir.  That's the rear sight.

9   Q     And when you're shooting your gun, you're trained to

10  look through your rear sight because the object, that is --

11  -- I don't believe we have a clear picture of it, but would

12  you agree that the sight kind of forms like a V -- kind of

13  like this card?

14  A     I -- it's more like a -- a horseshoe, not quite a V.

15  Q     All right.  And whatever is in the middle of the

16  horseshoe, is what's going to be shot with a bullet from that

17  gun; correct?

18  A     Well, in best case scenario, yes.  You hope you're going

19  to hit what you're aiming at.

20  Q     And when you fire, you're trained to look through the

21  horseshoe at what you're shooting at to determine the

22  accuracy of the rounds that you fire; correct?

23  A     I'm -- I'm not sure -- I worry to answer because I'm not

24  really sure -- are you saying that we -- we watch the bullets

25  like what -- when they're going in the target or -- I'm

1    not -- I'm not -- I'm confused.

2    Q    Let me rephrase it.

3    A    Okay.

4    Q    You would consider yourself a better than average shot;

5    correct?

6    A    I would say I'm above average.

7    Q    And when you say "above average," what does that mean?

8    A    Um, I would assume average is 80 percentile and shooting

9    an 80 or higher would be above average.

10   Q    And would you agree with the statement that if you're

11   aiming at a target with this firearm that's 30 feet away,

12   that you would have an 80 percent or better chance of hitting

13   it when using your firearm and looking through the sights as

14   you've described?

15   A    In a perfect scenario, yes but not in -- in a fluid

16   situation, such as the night in question.

17   Q    Now, let's talk a little bit about some of the things

18   that you knew about Mr. Woods.

19        Were you ever given any training that as a police

20   officer, if you're seeking a subject that is wanted for the

21   crime of armed robbery, that you have the authority to shoot

22   that person on sight?

23   A    That -- that's a gray area.  It would be whether part of

24   the shooting/policy says that if you feel that the escape of

25   this person could have substantial risk or imminent danger to

```
 1    future victims or future police officers, then yes, you
 2    can -- you could shoot them, but it just depends.
 3    Q    Were you ever given training that -- by shoot-on-sight,
 4    I mean as soon as you see the person, you can just get out of
 5    your car and shoot them because they're wanted for this
 6    crime?
 7    A    I don't think, no.  No, sir.
 8    Q    Okay.  It's just -- it's a simple -- you're not allowed
 9    to shoot someone at a -- as a police officer, just because
10    they're wanted to for the crime of armed robbery standing
11    alone; correct?
12    A    No, sir.
13            THE COURT:  All right.  We need to take a recess.
14            MR. DUNN:  Yes.
15            THE COURT:  Is now a good breaking point?
16            MR. DUNN:  Absolutely.  Anytime, Your Honor.
17            THE COURT:  All right.  Thank you.  We'll be in
18    recess for 15 minutes this afternoon, Ladies and gentlemen.
19    Remember what I've instructed you before, the admonitions not
20    to talk to anyone about the case, not to talk amongst
21    yourselves or with anyone else or communicate in any way
22    about the case, anything having to do with the issues in the
23    case, the participants in the trial.  Don't do any research
24    or investigation; keep an open mind.  Thank you.  We'll see
25    you in 15 minutes.  And you may step down.
```

```
1        (The following held outside the presence of the jury:)

2              THE COURT:  We're on the record outside the

3   presence of the jury.

4              THE WITNESS:  And perhaps -- now, this is testimony

5   of Mr. -- Officer Martinez that we're going to be talking

6   about; right -- on the issue -- so let me ask him to wait

7   outside the courtroom.

8              THE COURT:  We're on the record outside the

9   presence of the jury.

10             Given -- and I don't know what his testimony is

11  going to be, of course; but it seems to me that even if the

12  officer -- I mean, and he can be cross-examined on why he

13  didn't use the word in his report -- and even if the radio

14  traffic didn't involve the use of the word "carjacking," if

15  once he heard that information, if his -- if his testimony is

16  that at that time based on what he had heard and knew, he

17  viewed it's Tyler Woods --

18             MR. DUNN:  Yes.

19             THE COURT:  -- as being a suspect in a carjacking.

20  He could testify to that effect, but I don't know if that's

21  an accurate characterization of his deposition testimony or

22  not; but if -- if in his mind, based on what he'd heard, he

23  was thinking about it that way, he can testify as to what was

24  going through his mind.  So that's my ruling on that issue.

25  All right.  We're in recess.
```

```
 1                        (Brief recess.)

 2              THE COURT:  Before we bring the jury in, is there

 3   anything to take up?

 4              MR. DUNN:  Very briefly, Your Honor.  We have this

 5   exhibit, it's 1-15.  There is an objection.  This is the

 6   exhibit of all the photographs that were taken.  We feel that

 7   this one best exemplifies the officer shooting.  The

 8   objection is as follows:  In the middle of the picture we see

 9   a representation of the corpse of Mr. Woods.

10              THE COURT:  And who -- that's the figure that is

11   standing on the roof.

12              MR. DUNN:  That is Long Beach Police Department

13   officer who was uninvolved with the scene.  And also, there's

14   a ladder in this picture that was not on the scene.

15              THE COURT:  Right.  So that officer wasn't there.

16   The jury is going to be asked to disregard that -- disregard

17   the ladder.

18              MR. DUNN:  Yeah.  Disregard the ladder and

19   disregard the officer.

20              THE COURT:  All right.  Okay.  So the objection --

21   what -- what -- do you intend to try to introduce this with

22   the next witness?

23              MR. DUNN:  Yes.  With the current witness.

24              THE COURT:  I'm sorry.  The current witness.  All

25   right.  And the objection?
```

```
1          MR. RUSSELL:  Your Honor, the objection goes to a
2    number of photos and the -- basically, it's a 403 objection
3    that by showing the dead body itself, its probative value is
4    substantially outweighed by the danger of unfair prejudice
5    because of the jury potentially being shocked by it; being
6    sympathetic, especially with people in the room that I
7    believe are family members.  And so I mentioned to the
8    plaintiff's counsel, if they want to cover the body with a
9    sticky and mark an X to represent where the body was, so they
10   can show the relationships, I'm fine with that.  And there
11   are other pictures that they want to show that are close-ups,
12   showing the wounds.
13         THE COURT:  Shouldn't you take care of this without
14   keeping the jury waiting.  So at the end of the day today, I
15   want to go through all of these, because this is not the time
16   to do this with the jury waiting outside; however, let me
17   just say -- to address this photograph, the -- the
18   depiction -- is that actually Mr. Woods's body that's being
19   depicted there, or is it --
20         MR. DUNN:  It's his body, Your Honor.
21         THE COURT:  Well, it's at such a distance.  I don't
22   think that there's a problem under Rule 403 with this
23   photograph.
24         MR. DUNN:  All right.
25         THE COURT:  Now, let me -- and I meant to say this
```

```
 1    earlier in the day, and it just escaped me.  The -- you have

 2    some of your clients' family members in this courtroom.

 3            MR. DUNN:  We do.  We do.  None of whom are

 4    witnesses.

 5            THE COURT:  All right.  Of course.  I just wanted

 6    to mention to you that because the rules differ from

 7    courtroom to courtroom on this point, if at any point, either

 8    during the testimony or because of photographs that are

 9    shown, you would like to leave the courtroom because what you

10    see is upsetting to you, feel free to do so.  Of course, just

11    leave quietly; but you're absolutely free to come and go, and

12    that may be a wise thing to do.  So I just -- I forgot to

13    tell you that earlier.  So I think -- of course, with that in

14    mind, I don't think we're going to have a 403 problem.

15            As to the number of -- of photographs, if there's

16    anything else you're going to show with this witness that

17    there's an objection to, let me see it very quickly and see

18    if I can --

19            MR. DUNN:  There are no more objectionable

20    photographs that I intend to show with this witness.

21            THE COURT:  All right.  Then let's move ahead, and

22    we'll take it -- if there is, we'll to take a -- as to the

23    next witness, we'll take a brief sidebar and let's take them

24    all up at the end of the day.

25            MR. DUNN:  Very well.  And just to clarify,
```

1   Your Honor, are we going to go straight to 4:30 or are we

2   going to save some time to look at the photos or how are we

3   going to --

4           THE COURT:  We're going to go straight to 4:30.

5           MR. DUNN:  Okay.

6           THE COURT:  All right.  So let's bring the jury in.

7   (Whereupon the following was held in the presence of the

8   jury:)

9           THE COURT:  Let the record reflect the presence of

10  all members of the jury.  All parties present.

11          I apologize for keeping you waiting, ladies and

12  gentlemen.

13          Also, we're trying to adjust the temperature in

14  here.  It's actually different in different parts of the

15  courtroom.  So my advice to you tomorrow is that you may want

16  to bring layers.  It may get cold.  It may get warm.  We try

17  to regulate it, but that's the wisest thing to do is dress

18  for a couple of different seasons.  Thank you.

19          All right.  You may continue.

20          MR. DUNN:  Thank you very much, Your Honor.

21  BY MR. DUNN:

22  Q    Did you ever see Mr. Woods armed with a gun?

23  A    No, sir.

24  Q    Did you ever see anything at all in Mr. Woods's hands?

25  A    What short period of time I saw his hands, no.

1    Q    Did you ever receive any information either by direct

2    knowledge or otherwise that Mr. Woods had been seen with any

3    kind of a weapon?

4    A    Only -- the only knowledge I had was that -- a blue

5    steel handgun that was used in the commission of the original

6    crime the warrant was for.

7    Q    Okay.  But you knew that that didn't happen this night;

8    correct?

9    A    No, that did not happen on this night.

10   Q    With regard to what happened on this particular night,

11   did you receive any information that on this night during

12   this incident, that anyone ever saw Mr. Woods armed with any

13   kind of a weapon?

14   A    No, sir.

15   Q    Did you ever receive any information that Mr. Woods

16   attempted to get into any apartment?

17   A    The only information that -- two -- two occasions when

18   I'm not sure the address -- he leaped off onto a balcony and

19   the helicopter pilot said that there was a woman on the

20   balcony and he didn't know if maybe he was trying to get in

21   there, and then what led me and Officer Martinez up to the

22   third floor in the first place was someone that had called

23   911, saying there was someone crouched outside her door and

24   that -- that's the only -- but as to breaking in, no.

25   Q    Did anyone specifically tell that you Mr. Woods forced

```
 1   entry into any apartment?

 2   A     No, sir.

 3   Q     Did anyone specifically tell you that Mr. Woods tried to

 4   take anybody hostage that evening?

 5   A     No, sir.

 6   Q     Now, with regard to the shooting incident, I believe

 7   that you've told us earlier -- you told us earlier that the

 8   shooting happened between 10 and 15 seconds after the moment

 9   in which you first saw; correct?

10   A     Yes, sir.

11   Q     And during that 10 to 15-second period, you saw

12   Mr. Woods emerge from a hiding position and propel himself up

13   onto the roof; correct?

14   A     From when I first saw Mr. Woods --

15   Q     Let me rephrase.  You would agree that after you saw

16   Mr. Woods, you saw him get on the roof and while he was in

17   the process of getting on the roof, that's when you first

18   shot at him; correct?

19   A     Yes, sir.

20   Q     Now, with regard to the photographs, I'd like to turn

21   your attention to Exhibit 1-5.  It's already been stipulated

22   to, Your Honor?

23             THE COURT:  All right.  It's ordered admitted.  You

24   may publish.

25      (Whereupon Plaintiff's Exhibit 1-5 is admitted hereto.)
```

1   BY MR. DUNN:

2   Q    Now, I'm showing you an exhibit that appears to be taken

3   on the morning of the day in question.

4           Now, this is the -- as far as you know, the

5   apartment complex where the shooting happened; correct?

6   A    Yes, sir.

7   Q    And this area that I'm referring to with my pen, would

8   be the third floor landing of that; correct?

9   A    Yes, sir.

10  Q    And you and Officer Martinez were standing on the third

11  floor landing when you fired your weapons that day; correct?

12  A    Yes, sir.

13  Q    And you were firing at Mr. Woods who was on this roof;

14  correct?

15  A    Um, I believe that's a portion of the roof but not --

16  not exactly where he was.

17  Q    All right.  I'd like to turn your attention to

18  Exhibit 1-15.

19          THE COURT:  All right.  And that is ordered

20  admitted.

21          MR. DUNN:  Thank you very much, Your Honor.  My

22  apologies.

23    (Whereupon Plaintiff's Exhibit 1-15 is admitted hereto.)

24  BY MR. DUNN:

25  Q    Obviously, the ladder that was here was not there when

1    you fired; correct?

2    A    Yes, sir, it was not there.

3    Q    And we see the back of a -- what appears to be an

4    officer standing on the roof.  He was not there when you

5    fired; correct?

6    A    No, sir.  He was not.

7    Q    In fact, just to clarify, there was no one else on that

8    roof besides Mr. Woods when you fired; correct?

9    A    No, sir.

10   Q    Okay.  In other -- he wasn't -- he wasn't close to any

11   other person when you fired; correct?

12   A    There was no one else on the roof.

13   Q    All right.  Now, does this view appear to approximate

14   your vantage point when you were shooting at Mr. Woods?

15   A    It's approximately where I was standing.

16   Q    Now, as we know, the shooting happened -- or as we don't

17   know -- as we are assuming at this point, that the shooting

18   happened at approximately 4:00 a.m.

19           Did you have any problems with lighting?

20   A    No, sir.  It was well-lit.

21   Q    Now, in terms of the manner in which you shot, would

22   you --

23           THE COURT:  Mr. Dunn, could you slow down a little,

24   please.

25           MR. DUNN:  I apologize, Your Honor.

1    BY MR. DUNN:

2    Q    Now in terms of the manner in which you shot, would you

3    agree that when you fired, you had both hands on your gun;

4    correct?

5    A    Yes, sir.

6    Q    And your arms were outstretched; correct?

7    A    Yes, sir.

8    Q    And you were firing upwards at an angle, correct,

9    because you were trying to shoot Mr. Woods, who was above you

10   on the roof; correct?

11   A    Yes, sir.

12   Q    And as far as you knew, there was nothing between the

13   muzzle of your gun and the person of Mr. Woods that

14   obstructed your view of him when you were firing; correct?

15   A    No, sir.

16   Q    Now, looking at the roof that we see in Exhibit 1-15,

17   when you fired your first four rounds at Mr. Woods, he was in

18   the process of climbing onto the roof; correct?

19   A    Yes, sir.

20   Q    And you were shooting at his back as he was in the

21   process of climbing onto the roof; correct?

22   A    The process took about a second, yes, sir.

23   Q    Well, my question was:  You were shooting at his back as

24   he was in the process of pulling himself up onto the roof;

25   correct?

```
1    A     Yes, sir.

2    Q     He was not threatening you with any kind of a firearm

3    when you shot those first four shots at Mr. Woods, was he?

4    A     No, sir.

5    Q     He was not reaching into his waistband in a manner that

6    caused you to fear that he was going to pull a gun out of his

7    waistband when you fired those first four shots at his back;

8    correct?

9    A     No, sir.

10   Q     He was not making a gesture that you interpreted to be

11   him arming himself with any kind of a weapon when you fired

12   those first four shots at Mr. Woods; correct?

13   A     I'm not -- was he making a motion as he -- at the first

14   four shots?

15   Q     Was he doing anything with his hands, for example, that

16   led you to believe when you were shooting at him at the

17   moment when you were shooting at him --

18   A     His action of getting --

19   Q     Hold on.  Hold on -- that he was in the process of

20   arming himself with a weapon?

21   A     I believed his actions were that of somebody that was

22   getting an -- in a position of advantage to be able to shoot

23   down at me, yes.

24   Q     I guess that's nonresponsive, Your Honor.  And I'm going

25   to move to strike.
```

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  All right.  The motion to strike is

 2    denied.

 3    BY MR. DUNN:

 4    Q    He wasn't grabbing for anything in his waistband when

 5    you shot at him; correct?

 6    A    No, sir.

 7    Q    He wasn't facing you when you shot at him; correct?

 8    A    No, sir.

 9    Q    He was not making -- doing anything with his hands that

10    led you to believe that there was anything at all in his

11    hands when you fired those first four shots at him; correct?

12    A    At that point, I believed he had nothing in his hands.

13    Q    Now, after those first four shots, would you say that

14    you had a continuous view of Mr. Woods?

15    A    Yes, I had a continuous view of him.

16    Q    And after you fired those four shots, you paused to look

17    at him to see what he was doing; correct?

18    A    Momentarily, yes, sir.

19    Q    And when you fired the second four shots at him, he was

20    on one knee; correct?

21    A    Yes, sir.

22    Q    And he -- he had one knee down and he had one foot down;

23    correct?

24    A    He had his -- his right foot was on the ground.  His

25    left knee was on the ground.
```

```
 1    Q    So he's kneeling?

 2    A    He has one knee on the ground and one foot on the

 3    ground.

 4    Q    At that point, when you fired the next four shots at

 5    him, after pausing, would you agree that you did not see

 6    anything in his hands?

 7    A    I couldn't see his hands.  His left hand was by his side

 8    and his right hand was at his waistband, but he had baggy

 9    clothes on.

10    Q    So you would agree that you didn't see anything in his

11    hands; correct?

12    A    I couldn't -- I can see a hand, but I couldn't tell

13    whether anything was in it or not.

14    Q    Did it appear to you as you were shooting your second

15    volley of shots at Mr. Woods, specifically, the second four

16    shots, that he had been struck with any of the first four?

17    A    I didn't know whether he had been struck or not.

18    Q    Would you agree with the fact that when you fired the

19    first four shots, Mr. Woods's back was facing you?

20    A    Yes, sir.

21    Q    And when you fired the second four shots as he was on

22    his knee and his foot as you've described, his right side was

23    facing you?

24    A    He was -- he was bladed towards me.  I could see his

25    face, his chest and his entire right side.
```

Q     Now, after you fired the second four shots at Mr. Woods,

at the point in which you got done firing those four shots,

your gun was not able to fire anymore bullets until you put

another magazine into it as we've described; correct?

A     That's correct.

Q     And you placed another magazine in, and you continued

firing?

A     Correct.  Yes, sir.

Q     At this point, did you understand that the building was

surrounded by police officers?

A     Well, I wasn't sure exactly where everyone was, but

there were several police officers around the building, yes,

sir.

Q     Did you understand that there was a helicopter

immediately overhead to where -- immediately overhead from

where this apartment building where you and Mr. Woods were?

A     Yes, sir.

Q     Did you understand that there was a K9 officer, meaning

a dog that was immediately next to where you and

Officer Martinez were?

A     He wasn't next to us.  Officer Martinez and I were by

ourselves on the third floor.

Q     But you knew that there was another K9 officer in the

immediate vicinity of the courtyard area of that apartment

building?

1    A    I had seen a K9 officer earlier, but at the time we ran

2    up the stairs, there wasn't one in my sight.

3    Q    Now, throughout this time specifically -- let's talk

4    about the time in which you're firing the second four shots

5    at Mr. Woods...

6              Was it your understanding that Officer Martinez was

7    also firing at Mr. Woods?

8    A    I believed he was.  Yes, sir.

9    Q    But you believe that you are the one who fired first at

10   Mr. Woods; correct?

11   A    I -- I believe I fired first.  Yes, sir.

12   Q    And if we were going to orient the relative positioning

13   of you and Officer Martinez, he would have been standing to

14   the left of you; correct?

15   A    Yes, sir.  He was directly to my left.

16   Q    Now, I'd like to turn your attention to Exhibit 2-8...

17             THE COURT:  Any objection?

18             MR. DUNN:  Oh, I apologize.  We --

19             MR. RUSSELL:  No.

20             THE COURT:  Thank you.  2-8 is admitted.  You may

21   publish.

22             MR. DUNN:  Thank you, Your Honor.

23      (Whereupon Plaintiff's Exhibit 2-8 is admitted hereto.)

24   BY MR. DUNN:

25   Q    So with regard to where you were, Officer Martinez would

1    have been to your left.  So you would have been more to the

2    right of Officer Martinez; correct?

3    A    Yes, sir.

4    Q    Can you show us the area where you were standing when

5    you fired?

6    A    I can show you approximately where I was standing.

7    These -- the little yellow things that you guys see, those

8    are indication of evidence markers for shell casings.  And I

9    believe right about here, where the little blue thing is, is

10   where I was, and Officer Martinez was right next to me.

11   Q    So although you started firing first and although you're

12   the first one who fired, Officer Martinez quickly joins in

13   and begins firing with you; correct?

14   A    I -- I assume instantaneously probably.

15   Q    So it was your understanding that after you had fired

16   those four shots -- the second round of four shots, which had

17   been eight, and you were reloading, that during the time in

18   which you had fired those eight shots, Officer Martinez was

19   also firing at Mr. Woods; correct?

20   A    I wasn't conscious to the fact, but I -- it's all

21   happening so quickly.  I was assuming he was shooting.

22   Q    Did you ever see Mr. Woods put his hands in his pockets?

23   A    He put his hand to his waistband, but I -- he never that

24   I saw, shoved his hand in his pocket.

25   Q    Do you recall testifying that you never saw Mr. Woods

1    put his hands in his waistband?

2    A    He put his hand -- I'm not sure exactly what I said.

3    It's been so long; but he put his hand either near his

4    waistband or in it.  I'm not sure the verbiage I used.

5    Q    All right.  I'd like to turn your attention to your

6    deposition.  Specifically --

7              THE COURT:  Wait.  Before you go any further, let

8    me tell the jury about depositions.

9              You'll probably hear this term during trial.  A

10   deposition is the sworn testimony of a witness that's taken

11   before trial.  The witness is placed under oath, the same

12   oath that is given here in the courtroom to tell the truth,

13   and then lawyers for each party may ask the witness

14   questions, and then the questions and answers are recorded,

15   and they're transcribed into a booklet.  You consider

16   deposition testimony presented to you in court, insofar as

17   possible in the same way as testimony presented given in the

18   courtroom.  Do not place any significance on the behavior or

19   tone of voice of any person who's reading into the record the

20   questions or the answers.

21             All right.  Have the original of the depositions

22   been lodged?

23             MR. DUNN:  I believe so, Your Honor.

24             MR. RUSSELL:  Yes.

25             THE COURT:  All right.  So the page and line number

```
 1    that you wish to read?

 2             MR. DUNN:  Specifically, we'll be reading from

 3    page 36, line six to line 11.

 4             THE COURT:  All right.  Any objection?

 5             MR. RUSSELL:  No.

 6             THE COURT:  Thank you.  Go ahead.

 7             MR. DUNN:  "Question, Did you, yourself at any time

 8    see Mr. Woods actually put his hand inside his waistband?

 9             "Answer, Inside his waistband, like, I am sorry,

10    tucking in his pants?

11             "Question, Yes.

12             "Like that, no, sir."

13             So in terms of -- of what you saw Mr. Woods doing

14    with his hands, you never saw his hands go out of view in a

15    sense that he tucked them inside his waistband; correct?

16             THE WITNESS:  I did not see him tuck them inside

17    his waistband, no, sir.

18    BY MR. DUNN:

19    Q    And to clarify, you never saw him put his hands in his

20    pockets; correct?

21    A    No, sir.

22    Q    You never saw anything at all in his hands at any time

23    during the time in which you were firing at him; correct?

24    A    No, sir.

25    Q    Now, after you finished firing eight shots, isn't it
```

```
 1    true that you saw Mr. Woods fall forward?

 2    A    Yes, sir.

 3    Q    And isn't it true that after you fired those eight shots

 4    and you saw Mr. Woods fall forward, that you thought he had

 5    probably been struck by a bullet?

 6    A    No, I was not sure.

 7    Q    Now, I'd like to turn your attention to your deposition,

 8    specifically at --

 9              THE COURT:  It's not back there, but are you -- are

10    you going -- want to read further deposition testimony?

11              MR. DUNN:  Yes.  For the sake of -- for the sake of

12    continuity, I'll pick this up probably within the next line

13    of questioning.

14              THE COURT:  Go ahead.

15    BY MR. DUNN:

16    Q    Now, with regard to your next set of shots, after you

17    fired the first eight and after you reloaded, you fired the

18    next seven shots without pausing or stopping at all; correct?

19    A    Correct.

20    Q    And you would agree that when you fired the next seven

21    shots in which you were firing continuously, Officer Martinez

22    was also firing at Mr. Woods from what you could hear?

23    A    Yes, sir.

24    Q    And with regard to those shots, were you counting and

25    did you know how many shots you were firing?
```

1    A     Yes, sir.

2    Q     And after you fired the first four shots and before you

3    fired the second shots, when you saw Mr. Woods fall forward,

4    did you think that one of the reasons why he fell forward was

5    because a bullet either fired from your self or fired from

6    Officer Martinez struck him?

7    A     I couldn't tell you as to -- it was all happening so

8    quickly.  I could have been thinking, is he just tripping --

9    I guess I didn't know whether he had hit him or not.

10   Q     Now, with regard to those seven shots, you fired them

11   all in one continuous burst, and you were looking at

12   Mr. Woods.  Did you see his hands when you were firing those

13   seven shots?

14   A     His right hand was near his, waistband and his left one

15   was down by his left leg.  I couldn't quite see it.

16   Q     Now, at any time, did you ever formulate the belief

17   during any of the times in which you were shooting at

18   Mr. Woods, that that he had a gun and that he was shooting at

19   you?

20   A     I believed that's why he had dropped to his knee was to

21   pull out a weapon and turn back toward us and fire on me.

22   Q     Well, that wasn't my question.  My question was, at any

23   time during the time in which you were firing at him, did you

24   ever formulate the opinion that you were being shot at?

25   A     Oh, no, sir.

1    Q    Did you ever see Mr. Woods pull anything out of any part

2    of his body?

3    A    No, sir.

4    Q    Now, you were not done firing even after those seven

5    shots; correct?

6    A    No, sir.

7    Q    After you fired the last of the seven, the gun wouldn't

8    fire, and you had to insert, yet, a third magazine of shots

9    to continue shooting at Mr. Woods; correct?

10   A    Yes, sir.

11   Q    And you fired three more shots -- or let me rephrase

12   that -- do you have knowledge as you sit here today, as to

13   how many additional shots you fired at Mr. Woods after that

14   first volley?

15   A    I -- I'm confused after this --

16   Q    I apologize.  After the second volley, do you have any

17   idea how many additional shots you fired out?

18   A    I believe I fired three more times.

19   Q    And in terms of what you were looking at when you fired

20   those three times -- those three more times, was Mr. Woods

21   lying on the roof at this point?

22   A    He was in sort of a push-up position pushing himself off

23   the roof.

24   Q    So in terms of what he was doing with his hands, you

25   fired three times at him, and he is pushing himself up with

1   his hands; correct?

2   A    Yes, sir.

3   Q    Is his stomach flat on the ground, such that he's doing

4   a push-up position move?

5   A    To almost like his hips and legs -- because the -- the

6   roof is -- is slanted, so it's almost like his hips and legs

7   were on the roof as he was pushing up with his hands.

8   Q    Now, because he was pushing himself up as you've

9   described, you would agree that he was not in the process of

10  doing anything with his hands that you would consider to be

11  him reaching for a weapon; correct?

12  A    No, sir.

13  Q    He wasn't reaching for a weapon.  He was rather just

14  pushing; correct?  He was using his hands to do a push-up

15  position; correct?

16  A    But he could have very easily gotten to a weapon just by

17  rolling onto his side.

18        MR. DUNN:  Move -- move to strike, Your Honor.

19  Nonresponsive.

20        THE COURT:  The motion to strike is granted.  You

21  are to disregard the witness' answer to the last question,

22  ladies and gentlemen.

23  BY MR. DUNN:

24  Q    And to clarify, when he is doing a push-up position as

25  you've described, he is not reaching for a weapon in your

1   mind; correct?

2   A    In my mind?

3   Q    Yes.  You don't see him reaching for a weapon while he

4   is on the ground pushing up while you're firing at him those

5   three times; correct?

6   A    No.  I did not see him reaching for a weapon as he was

7   pushing up.

8   Q    You didn't see anything in his hands when you fired

9   those three times at him because he was already on the

10  ground; correct -- strike that.  You didn't see anything in

11  his hands when you fired at him those three times because he

12  was using his hands to try to push himself up; correct?

13  A    Yes, sir.

14  Q    And to clarify, while you're firing this last three

15  shots at Mr. Woods, which would be the 15th time and the

16  16th -- -- oh, strike that -- the 16th time -- the 17th time

17  and the 18th time that you were shooting at him,

18  Officer Martinez was also shooting at him; correct?

19  A    I believe so.  Yes, sir.

20  Q    Now, would you agree that when you're firing at him

21  these last three times as he's on his knees trying to push

22  himself up as you described, isn't it true that his back was

23  facing you?

24  A    No.  He was looking back towards us.

25  Q    Okay.  Do you recall firing at his backside during that

1    last three shots?

2    A    I recall firing towards his backside.  Yes, sir.

3    Q    Okay.  So although his -- his head may have been looking

4    back, would you agree that generally speaking, he was facing

5    away from you when he was pushing up and when you were firing

6    those last three rounds?

7    A    No, sir.  I couldn't generalize that.  He was facing --

8    his face was looking right at me.

9    Q    Would you say that his head was closer to where you were

10   or his feet were closer to where you were on the roof when

11   you fired the last three shots?

12   A    I would say his feet were closer to my location.

13   Q    Would you say that his head was closer to you or his

14   buttocks were closer to you when you fired the last three

15   shots at him when he was in the push-up position?

16   A    I would say his buttocks was closer than his head was.

17   Q    So you wouldn't say, for example, that his chest was

18   facing you in the manner that my chest is facing you?

19   A    No, sir.

20   Q    In fact, you wouldn't even say that you were looking at

21   his chest when you fired those last three shots at him while

22   he is on the -- on the roof in a push-up position; correct?

23   A    I would -- I was looking just directly at him, sir.

24   Q    Now, did you ever see Mr. Woods stand up on his feet at

25   any time after you fired those first eight shots -- in other

1    words, we're going to backtrack briefly with the specific

2    idea of what Mr. Woods was doing with regard to standing or

3    not standing after you fired those first eight shots.

4           Did he ever stand back up again after you fired the

5    eight shots?

6    A    Stand totally back up?  I don't think it would be

7    possible as to the angle of that roof, but he only got his

8    right foot up under him and was on his left knee.

9    Q    So do you recall that after he got up onto the roof the

10   first time, that he was actually able to get onto his feet

11   and was standing?

12   A    I don't think he ever fully stood.  He got to his feet

13   but then immediately started heading up the roof.  So I --

14   I'm not sure exactly to the semantics of it, whether he's --

15   whether it would be considered standing or considered -- I

16   can't remember if he had his hands down on the -- the slant

17   of the roof or not, sir.

18   Q    Okay, but just to clarify, after those first eight shots

19   were fired, he was less on his feet, for lack of a better

20   term, than before -- and that was a poor question.

21          After you fired those first eight shots, he was no

22   longer standing upright; correct?

23   A    Correct.

24   Q    He had fallen after you fired the first eight shots;

25   correct?

1    A    I believed that -- he fell forward, yes, sir.

2    Q    Okay.  And in falling forward and stumbling, when you

3    fired the next set of seven total shots, was his chest facing

4    you in the manner that my chest is facing you?

5    A    He was not in the manner you're facing me, but it was

6    bladed back towards me where I could see his right side and

7    his chest, but it wasn't like you're facing me now, sir.

8    Q    When you fired the second seven shots at Mr. Woods, were

9    his feet closer to you or was his head closer to you, if you

10   recall?

11   A    I would say his feet were closer to me.

12   Q    When you fired the second seven shots at Mr. Woods, were

13   his buttocks facing you or was his head facing you from what

14   you recall?

15   A    To the best of my knowledge, they were both facing me.

16   He was looking back at me.

17   Q    Which would you say would have been closer to you, his

18   buttocks or his head?

19   A    His buttocks.

20   Q    So he was more -- to put it in the simplest possible

21   terms, he was -- his back was -- was more facing you than his

22   chest; correct?

23   A    I don't know how to quantify that which -- are you

24   wanting a percentage of how much of each or --

25   Q    No.  The question is simply, would you say that his back

84

1   was facing you more or was his chest facing you more?

2   A    I would say probably slightly more his back.

3   Q    Now, let's talk a little bit about the timing of all of

4   these shots.

5          If we're going to break down your sequence of

6   firing, you actually paused three times; correct?

7   A    I believe so.

8   Q    Yes.  You fired four shots; you paused.  You fired four

9   more; you paused.  You fired seven; you paused.  And then you

10  fired another three; correct?

11  A    Correct.

12  Q    So that's three moments of pausing while you're firing;

13  correct?

14  A    Correct.

15  Q    Now, in terms of real time, you would agree that the

16  time between the first four shots and the second four shots,

17  would have been a couple of seconds; correct?

18  A    Yes, sir, if that.

19  Q    And would you also agree that the time between the last

20  of the four shots and the first of the second seven, that --

21  or the first of the third -- the first of the next seven,

22  that would also be a couple of seconds; correct?

23  A    It's an approximating, yes, sir.

24  Q    And similarly, the time period from the last of the

25  seven shots to the first of the final three, that would also

1    be about two seconds before you fired that last volley;

2    correct?

3    A    Like I said, if two seconds.  It could have been one.

4    Q    One to two seconds?

5    A    Yes, sir.

6    Q    Now, did you ever at any time, give any kind of a

7    warning to Mr. Woods, something to the effect of, I will

8    shoot you? stop or I'll shoot? something that conveyed to him

9    that you had intended to shoot him?

10   A    No, sir.

11   Q    Did you believe that from where you were standing if you

12   had given a warning to Mr. Woods, such as if you had said at

13   the top of your voice, Stop or I'll shoot, that from the

14   distance that you were, that he would have been able to hear

15   you?

16   A    I doubt he would have been able to hear me.

17   Q    Okay.  I believe that you've estimated that your

18   distance to be 25 to 30 feet?

19   A    Yes, sir.

20          MR. DUNN:  Your Honor, may I leave the podium?

21          THE COURT:  Yes.

22          MR. DUNN:  Can you tell me where to stop -- well,

23   like where to stop when I get to about 25 or 30 feet.

24          THE WITNESS:  I'd say right about there.  I mean,

25   that's -- I could be way shorter.  I could be way long, but

1    that's -- I'd say that's about 30 feet from here.

2    BY MR. DUNN:

3    Q    Now, with regard to some of the events that happened

4    after the shooting, do you recall giving a statement -- in

5    other words, later that day giving a statement about some of

6    the things that you saw in connection with the shooting

7    incident?

8    A    Yes, sir.

9    Q    And do you recall the circumstances under which you gave

10   that statement?

11   A    Well, once the -- the entire situation is considered

12   safe and under control and everything, then later usually

13   sometime later you'll do a -- a -- just a brief walk-through

14   with whoever the supervisor is on the scene to just basically

15   let them know about what happened, and then later once the

16   homicide detectives show up -- in any officer-involved

17   shooting a homicide detective comes out, whether the

18   officer-involved shooting resulted in a death or not.  And

19   then my attorney for our union would have shown up by then,

20   and then myself, my attorney and the homicide detectives,

21   then we walk through step by step the scene and what was

22   going on.

23   Q    Now, when you gave that statement, is it something that

24   you, yourself typed, or is it something that someone else

25   typed?

1    A    That statement, none of that was recorded or typed down.

2    That's just a brief overview to give them kind of a -- a

3    minds eye picture of what was going on that night.

4    Q    But at some point, you actually wrote out a statement or

5    a caused there to be -- did you dictate a statement later on

6    that --

7    A    I -- I direct -- what we call direct-dictate to a

8    reporter, and it's -- it's the way I was trained years ago

9    to -- I hate to use the term "secretary," but we called them

10   homicide secretaries, and they would type just as fast as you

11   could talk almost like the court reporter is doing right now,

12   but they type it out in long hand as if I were typing it

13   myself.

14   Q    Did you ever recall reading that statement for accuracy?

15   A    Yes, sir.  I proofread it before I -- before I said it

16   was finalized.

17   Q    And did it appear to be accurate to you?

18   A    It appeared to be accurate.  Yes, sir.

19   Q    And did you also give a statement to -- a recorded

20   statement to the deputy chief about what happened in this

21   incident?

22            MR. RUSSELL:  Your Honor, may we have a sidebar?

23            THE COURT:  No, but move on to another area of

24   questioning at this point.  We can come back to this.

25   BY MR. DUNN:

```
1   Q    With regard to your remembrance of some of the events

2   that happened immediately after you fired at Mr. Woods, do

3   you ever recall uttering any words of a racial nature?

4   A    No, sir.

5   Q    Do you ever recall uttering any words in what you may

6   have used a derogatory racial term in reference to Mr. Woods?

7   A    No, sir.

8   Q    In terms of the positioning of his body, do you recall

9   giving a statement to the effect that after you -- during

10  the -- after the last round was fired at Mr. Woods, you saw

11  his right hand outstretched in front of him?

12  A    Yes, sir.  I believe so.

13  Q    Now, you knew that after Mr. Woods -- well, let me

14  rephrase that -- would you agree with this statement that

15  prior to the time in which you fired your third volley, after

16  Mr. Woods had fallen to the ground and after he was in the

17  process of pushing himself up, that in your mind there was a

18  good possibility that he had been shot?

19  A    I -- I had no clue whether he had been hit or not.

20  Q    You had seen him fall to the ground; correct?

21  A    Fall to the roof, yes, sir.

22  Q    You had heard, for lack of a better term, dozens of

23  shots being fired by yourself and Officer Martinez

24  collectively; correct?

25  A    I heard several shots, but I couldn't say as to, I heard
```

1    dozens.

2    Q    Did it occur to you that prior to the time in which you

3    fired that third volley of shots, that perhaps Mr. Woods had

4    been struck?

5    A    Perhaps.

6    Q    Would you say that it would have occurred to you that it

7    was more likely than not that he had been shot with at least

8    one bullet?

9    A    Are you talking after the -- the last volley?

10   Q    Before the -- before the last volley.  In other words --

11   A    I was not sure, sir.

12   Q    Okay.  The question specifically, is that did it appear

13   to you that it was more likely than not that Mr. Woods had

14   been shot with any bullet either yourself or from

15   Officer Martinez as he was doing that push-up position --

16   A    At the time --

17   Q    -- and before you fired your third volley -- or the last

18   three shots, please...

19   A    At that time, I had no clue whether he had been hit or

20   not, and I can't say as to my state of mind.  It was all

21   happening so fast, that -- I didn't have any idea why he went

22   down to the ground.  He showed no outward sign of being

23   struck.

24   Q    All right.  I'd like to take a brief moment, if

25   possible, Your Honor?

```
1              THE COURT:  To consult, certainly.

2              MR. DUNN:  Yes.  Thank you.

3    BY MR. DUNN:

4    Q    Were you familiar with this neighborhood prior to this

5    incident?

6    A    Yes, sir.  I've worked in Long Beach a long time.

7    I've -- I knew the neighborhood.  I can't say that I was -- I

8    knew every house and apartment building or whatever, but I'm

9    familiar with the neighborhood, yes, sir.

10   Q    Did it appear to you during the time in which you were

11   firing at Mr. Woods, that he was in the immediate vicinity,

12   if you will -- that's a poor question.

13              Did it appear to you while he was on the roof, that

14   he would have the ability to immediately get down and enter

15   someone's apartment?

16   A    Did he have that ability?

17   Q    Did it appear to you that he had the ability to

18   immediately get off that roof?

19   A    Yes, sir.

20   Q    Isn't it true that when we look at the photographs, that

21   if he were to get off the roof, he would have to have

22   essentially propelled his body off of here and stood -- and

23   such as to become standing -- this is somewhat awkward -- but

24   he would have somehow had to swing down and get to this third

25   floor landing?
```

1    A     No, I don't believe so.  I -- he could -- from right

2    where he was and given his ability and his actions that

3    night, I believe he could have done it in one -- one jump

4    without using his hands.

5    Q    Well, we've got a distance of approximately 50 feet

6    here; correct?

7    A     Correct.

8    Q    And after he gets up, you would agree that from the

9    position -- let me see here -- from the position that you are

10   here, that you would have the ability to engage him without

11   shooting him if he made it into this third floor landing

12   area?

13   A     Not necessarily.  It depends if he came towards us, yes.

14   Can you go back to that other picture.

15   Q    Actually, for this moment, I'm just going to continue

16   along a certain line of questioning.

17             Did you have any understanding of the role that the

18   K9 was to have in connection with the containment of this

19   particular location?

20   A     I -- I had no clue what his role was.

21   Q    Had you ever done any kind of a foot pursuit involving a

22   K9 before?

23   A     Me like chased with a K9?

24   Q    No.  In -- have you ever seen a K9 successfully

25   apprehend a suspect before?

```
 1    A    Yes, sir.

 2    Q    And in those situations, you were aware of the role of

 3    the K9 in connection with the surveillance; correct?

 4    A    With the surveillance?  I'm --

 5    Q    Let me rephrase that question.

 6    A    Yeah, I'm confused.

 7    Q    Did you even know that there ways K9 there?

 8    A    Yes, I had seen the K9.

 9    Q    What was your understanding as to why that K9 was there?

10    A    Originally to search the parking lot in the adjacent

11    area for the subject if he was hiding.

12    Q    Are you familiar with a beanbag shotgun?

13    A    Yes, sir.

14    Q    Do you have any knowledge as to whether or not any

15    officer was equipped with a beanbag shotgun?

16    A    At the time, I did not know.  Now three years later

17    after reading different reports and stuff, yes, now I know

18    there was a couple beanbag shotguns deployed.

19    Q    Okay.  Are you aware of the fact that there was a

20    dispatch over the radio which stated that a pat-down search

21    was conducted of Mr. Woods at the initial traffic stop and no

22    weapons were found on his person?

23    A    No, sir, I was not aware of that.

24    Q    As you sit here today, are you aware of that fact?

25    A    As I sit here today, I am aware of the fact, yes, sir.
```

```
1    Q    Do you dispute that it was reported over the channel

2    that was accessible to you that Mr. Woods was patted down and

3    that no weapons were found on his person?

4    A    It was not mentioned on my channel.  It was on a -- the

5    channel that the incident originated on.

6    Q    Are you familiar with channel one?

7    A    Yes, sir.

8    Q    And you were not on channel one that evening?

9    A    No, sir.  I was on channel two.

10   Q    Now, do you recall hearing any information that

11   suggested to you that Mr. Woods had been convicted of any

12   crime?

13   A    No, sir.

14   Q    Did you have any information at all concerning any

15   criminal convictions -- in other words, situations in which

16   Mr. Woods was found to have been guilty of something?

17   A    Convictions?  No, sir.

18   Q    Would you agree that -- I'll withdraw that.

19             MR. DUNN:  Thank you very much, Your Honor.

20             I believe that -- oh, oh, hold on.

21             All right.  I'd like to -- with regard to my

22   earlier question, specifically we were referring to whether

23   or not you were on channel one...

24             I'd like to turn your attention to your sworn

25   deposition testimony at page 49, lines 8 through 14.
```

1          THE COURT:  Any objection?

2          MR. RUSSELL:  No, Your Honor.

3          MR. DUNN:  Actually, I apologize, Your Honor.

4    That's going to be 49, line four through line 14.

5          MR. RUSSELL:  No objection.

6          THE COURT:  Thank you.  Go ahead.

7    BY MR. DUNN:

8    Q    All right.  You endeavored to tell the truth in your

9    deposition; correct?

10   A    Yes, sir.

11   Q    All right.  Reading at page 49, line four, "Question,

12   And where was your vehicle positioned?

13          "Answer, It was positioned in a north-south alley.

14   I want to say north of 4th Street, but it might have been

15   5th Street between Walnut and Nebraska.

16          "Question, Is that during the time you were

17   monitoring both stations 1 and 2?

18          "Answer, Once I took up a stationery position, I

19   would have switched my radio strictly to the channel it was

20   on, which was channel one."

21          Now, what is channel one just to clarify?

22   A    Well, we -- well, we had four divisions in Long Beach.

23   Three years ago, I'm not sure if we still -- because we used

24   to have a south division and a west division and they merged

25   those into one big west division, which now they're going to

```
1    split them apart again; but the busier it is during the time
2    of day, depended, south division was considered area one.
3    East division is considered area two.  North division is
4    considered area three and west division is considered area
5    four.  And each one is -- is designated a radio channel.  So
6    south gets radio channel one.  East gets radio channel two
7    and so on and so forth.  Then at a certain time of night, our
8    north division, our east division share channel two, and
9    they -- they -- that clears up channel three which is called
10   car-to-car, if somebody needs to talk to somebody else.  And
11   the west division would switch from channel four to channel
12   one and would share a radio channel with area one.  And then
13   at about 2:00 in -- 2:00 a.m. every morning as long as no big
14   incident is going on, the entire city goes to channel one,
15   but because this incident was occurring, only the incident
16   would have been on channel one.  All routine traffic, even
17   for south and west division would have switched to channel
18   two and shared with east division, leaving strictly this
19   incident for that one channel.
20   BY MR. DUNN:
21   Q    Now, do you have any estimate as to how long -- strike
22   that -- how much time passed from the time in which you first
23   parked your vehicle until the time in which you got out of
24   the vehicle -- in other words, how long were you there just
25   sitting before you exited the vehicle?
```

1    A    Sir, I -- I have no clue.  It could have been ten

2    minutes.  It could have been 25.  It was a long time ago.

3    Q    Well, to refresh your recollection briefly -- and I only

4    have a few more questions, Your Honor.  After you first

5    parked the vehicle, you made contact with a sergeant by the

6    name of Sergeant Richardson; correct?

7    A    Yes, sir.  It wasn't right away, but he came by later.

8    Q    And after you exited your vehicle, this is a different

9    estimate I am asking you to give -- how much time would you

10   say passed from the time in which you first exited your

11   vehicle and the time in which you first made contact with

12   Mr. Woods?

13   A    Oh, goodness, it was quite a while.  From when I first

14   exited my car --

15   Q    Yes.

16   A    -- till the first time I saw him coming -- when I was

17   coming up the stairs with Officer Martinez, it's a total

18   estimate, but it could have been a 30 minutes.  It could have

19   been an hour.  I'm not sure.

20   Q    Now, I'd like to turn your attention to Exhibit 157.

21          THE COURT:  Is this -- oh, is there any objection

22   to Exhibit 157?

23          MR. RUSSELL:  I'm trying to find it, Your Honor.

24   I'm sorry.

25          MR. DUNN:  Your Honor, it's not being --

```
1              THE COURT:  You're not offering it at this time?

2              MR. DUNN:  I'm not offering it.  I'm just trying to

3      refresh his recollection.

4              THE COURT:  So if you look in the notebooks behind

5      you, you'll be able to see it there.

6              THE WITNESS:  Which one?  This bigger one or this

7      one?

8              THE COURT:  It would be in the bigger one.  You're

9      looking for number 157.

10             Okay.  You found it?

11             THE WITNESS:  I believe so.

12     BY MR. DUNN:

13     Q    Okay.  It's at the very back of the exhibit binder, if

14     you could turn your attention to page 2...

15     A    Yes, sir.

16     Q    And specifically, there is a reference that corresponds

17     to 0200 hours, 55 minutes and 49 seconds.

18             If you could scroll down to that.

19     A    Yes, sir.

20     Q    Your call sign was 2 Adam 15; correct?

21     A    Yes, sir.

22     Q    Is there any significance to that reference that we see

23     at that time that may refresh your recollection as to when

24     you arrived at the scene?

25     A    No, sir.  I -- I -- because a lot of times this is all
```

1    added, it's not realtime.  It's when it's been typed in, but

2    I'm not even sure -- sometimes it has us in the wrong spot or

3    the wrong place.  So it doesn't help my recollection --

4    Q    Very well.

5    A    -- about the timeline and all.

6    Q    Well, at the time that we have remaining, if you could

7    explain to us how is it that this radio works.  In other

8    words, how is it that you receive information?  Is it through

9    the car or is it through a handheld device or is it a

10   combination thereof?

11   A    It's a combination.  We carry a handheld radio.  It's

12   called a handheld, but it's what you see most everywhere, the

13   shoulder mic with the -- a cord that goes down to a radio

14   that's on your hip, and then there's also what's called the

15   stationary radio which is permanently affixed in the car and

16   runs off the car battery.

17   Q    Now, with regard to the channel that your handheld radio

18   on -- was on, would you agree that from the time that you

19   exited your car until the time of the shooting, that handheld

20   radio remained on channel one?

21   A    I would -- I would assume so.  Yes, sir.

22   Q    Now, after the shooting, do you ever recall making any

23   kind of a dispatch or any kind of a -- any kind of a

24   broadcast that would have gone on channel one?

25   A    Yes, sir.

99

```
1    Q    And do you recall what time that was?

2    A    No, sir.  I do not recall.

3    Q    Do you recall what the nature of that transmission was?

4    A    Immediately after the officer-involved shooting, yes,

5    sir.

6    Q    And what was that transmission?

7    A    I transmitted to our dispatchers our police code for an

8    officer-involved shooting.

9    Q    And what is that police code?

10   A    That police code is 998.

11   Q    Have you ever seen a transcript of the dispatch from

12   channel one that evening?

13   A    I -- I -- I've seen it.  Yes, sir.

14            MR. DUNN:  Finally and briefly, I believe this

15   could be done in the time we have remaining, Your Honor.  If

16   we could please get to Exhibit 156...

17            THE WITNESS:  All right.  I'm there, sir.

18   BY MR. DUNN:

19   Q    All right.  Have you ever seen -- I apologize -- have

20   you ever seen this before?

21   A    Yes.  I've -- I was given a copy of this.

22   Q    I'd like to turn your attention to page 25.  On this

23   page -- I apologize -- do you see a reference to the dispatch

24   that you made, affirming the 998 or officer-involved

25   shooting?
```

UNITED STATES DISTRICT COURT

```
 1    A    Yes, sir.

 2    Q    And at what time did you make that dispatch?

 3    A    I don't see a time --

 4    Q    If you could look at the top of the page.

 5    A    Oh.  Oh, I got it.  404 and 56 seconds.  4:00 in the

 6    morning -- four minutes after 4:00 a.m.

 7    Q    Does that mean that the shooting happened at or around

 8    4:04 in the morning?

 9    A    Yes, because I -- I got on the air immediately.

10         MR. DUNN:  All right.  Thank you, Your Honor.  At

11    this point, I have no further questions.

12         THE COURT:  Thank you.  All right.  You may step

13    down.

14         All right.  Ladies and gentlemen, we're adjourned

15    as far as you're concerned until tomorrow morning at

16    9 o'clock.  You can, of course, arrive earlier than that.  I

17    urge you to do so.  Allow yourselves plenty of time, so that

18    we can start promptly with you at 9 o'clock in the morning.

19         Remember the admonitions.  It is very important

20    that you don't discuss the case or anything about the case

21    with anyone; that you don't do any research in any fashion or

22    communicate to anyone in any fashion, electronically, in

23    person or otherwise, about the case.  Don't make up your

24    minds about the case or any issue in the case.  And we'll see

25    you tomorrow morning no later than 9 o'clock.  Thank you
```

1    you're excused.

2        (The following held outside the presence of the jury:)

3            THE COURT:  We're on the record, outside the

4    presence of the jury.  I do have a criminal matter to take

5    up.  And the parties are here for that.

6            So -- let's first of all, lets's take up -- we may

7    have to take up some of the issues tomorrow morning before we

8    bring the jury in, but the -- the issue that you requested a

9    sidebar on was about -- was it a question -- it was a

10   question Mr. Dunn asked about whether the witness had given a

11   recorded statement to the deputy chief.  So what's the issue

12   with that?

13           MR. RUSSELL:  Well, Your Honor, that's part of the

14   administrative investigation that was precluded by motion in

15   limine that --

16           THE COURT:  You're misstating my ruling.  And I

17   have already ruled on that issue.  Any recorded statement if

18   it meets the requirements of the Rules of Evidence can be

19   used to impeach.  The finding from the administrative

20   proceedings, I ruled that's not admissible, but a witness can

21   be impeached with an inconsistent statement.  So there wasn't

22   anything improper about the question.

23           MR. RUSSELL:  Well, Your Honor, I -- I -- first, I

24   misunderstood the Court's ruling, but more importantly, I

25   didn't know where that line of questioning was going which is

1  why I wanted the sidebar before we got into something that

2  may have been precluded.

3      THE COURT:  I almost never allow sidebars, just so

4  you know, because I'm not going to keep the jury waiting.

5  That is one of my most important principles.  So I assume

6  that when I've made a ruling, in particular, in writing as I

7  did, that both sides are aware of it and that neither side is

8  going to flout that ruling.  So if there had -- if Mr. Dunn

9  was intending to question a witness about an inconsistent

10  statement, I've already ruled he can do that.

11      MR. RUSSELL:  I understand Your Honor.  I

12  apologize, again.  I did not know where he was going with

13  that line of questioning.  And I know you've got another

14  matter.  There is something else I want to address, but I can

15  wait till tomorrow morning.

16      THE COURT:  No.  Go ahead.

17      MR. RUSSELL:  I -- Mr. Dunn asked Officer Fagan if

18  he had made any racial statements in connection to the

19  incident:  We're not aware of any evidence that a racial

20  statement was made, and I would just ask for a proffer

21  because if there is not a good faith basis for that

22  statement, then it's -- it's absolutely improper.  The jury

23  should be instructed to disregard the question and counsel

24  should be admonished.

25      THE COURT:  All right.  Let's take this up one at a

1   time.  First of all, questions aren't evidence and the jury

2   has already been told that.  But Mr. Dunn...

3           MR. DUNN:  We have a very distinct proffer...

4           Patience...  Is it Douglas, who's going to be here

5   on Tuesday has -- was standing right there.  It happened

6   right in front of her apartment and she made a very clear

7   reference to a very clear racial epithet that was uttered by

8   what she described as the older white officer after the

9   shooting.

10          THE COURT:  All right.  That's a proffer.  I'll

11  accept.  We'll see how the evidence unfolds.  All right.

12          MR. RUSSELL:  That's fine, Your Honor.

13          THE COURT:  Now, as to the photographs -- well, as

14  to the exhibits, in general, but particularly as to these

15  photographs, tomorrow morning let's meet at 8:15 before we

16  bring the jury in, and I want the plaintiffs to at that time

17  state which of the photographs they want to introduce.  There

18  shouldn't be too many under Rule 403, photographs that show

19  the body of Mr. Woods.  And then I'll take up the objections.

20  All right?

21          MR. DUNN:  And this would be with any witness

22  throughout the whole trial?

23          THE COURT:  Yes.  Any of those -- any of those --

24  any of the exhibits to which there is a 403 objection on the

25  grounds that it's inflammatory, et cetera.  All right?

1          Thank you very much.

2          MR. DUNN:   Thank you.

3               (Whereupon proceeding adjourned.)

4                    - - -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3

4

5      TREVOR WOODS, et al.                :

6                   vs.                     :   No. CV 14-08374-VAP

7      JOHN B. FAGAN, et al.                :

8

9

10   I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN AND FOR THE

11   UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

12   CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

13   TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

14   CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

15   PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

16   TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

17   OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

18   FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

19   REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

20   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

21

22   _____/S/_____            08/24/2016

23   MARIA R. BUSTILLOS                 DATE
     OFFICIAL REPORTER
24

25
```

## $

**$50,000** [1] - 33:25

## /

**/S** [1] - 105:22

## 0

**0200** [1] - 97:17
**08/24/2016** [1] - 105:22

## 1

**1** [2] - 1:16, 94:17
**1-15** [5] - 4:5, 59:5, 65:18, 65:23, 67:16
**1-5** [3] - 4:5, 64:21, 64:25
**10** [10] - 4:3, 39:24, 40:1, 40:6, 42:12, 44:9, 45:5, 45:14, 64:8, 64:11
**1010** [1] - 2:6
**10:00** [1] - 39:6
**11** [1] - 75:3
**11TH** [1] - 2:16
**12254** [1] - 1:21
**14** [4] - 1:18, 5:1, 93:25, 94:4
**14-08374-VAP** [2] - 1:10, 105:6
**14th** [3] - 16:5, 16:7, 16:12
**15** [11] - 39:24, 40:1, 40:6, 42:12, 44:9, 54:17, 54:18, 57:18, 57:25, 64:8, 97:20
**15-second** [1] - 64:11
**156..** [1] - 99:16
**157** [3] - 96:20, 96:22, 97:9
**15th** [1] - 80:15
**16th** [2] - 80:16
**17th** [1] - 80:16
**18** [3] - 52:25, 54:24, 54:25
**18th** [1] - 80:17
**19** [3] - 26:13, 27:12, 28:14
**19-year-old** [1] - 23:14
**1983** [3] - 14:21, 15:1, 15:20
**19th** [3] - 8:20, 23:15, 38:22
**1:15** [1] - 5:3
**1:30** [1] - 29:7

## 2

**2** [3] - 94:17, 97:20
**2-8** [3] - 4:6, 72:20, 72:23
**2-8..** [1] - 72:16
**2..** [1] - 97:14
**20** [2] - 31:15, 42:25
**2013** [3] - 8:20, 23:16, 38:22
**2016** [2] - 1:18, 5:1
**213** [1] - 1:23
**25** [4] - 85:18, 85:23, 96:2, 99:22
**28** [1] - 105:13
**2:00** [1] - 95:13

## 3

**30** [8] - 26:4, 27:6, 28:17, 56:11, 85:18, 85:23, 86:1, 96:18
**30-feet** [1] - 35:7
**312** [1] - 1:22
**323)435-8205** [1] - 2:7
**333** [1] - 2:16
**36** [1] - 75:3

## 4

**40** [6] - 26:12, 28:14, 28:17, 31:22, 33:16
**403** [5] - 60:2, 60:22, 61:14, 103:18, 103:24
**404** [2] - 1:22, 100:5
**41** [1] - 3:6
**42** [1] - 14:20
**441** [3] - 35:19, 35:23, 36:4
**45** [5] - 46:16, 46:18, 46:21, 46:22, 46:23
**48** [2] - 4:3, 4:3
**49** [4] - 93:25, 94:4, 94:11, 97:17
**4929** [1] - 2:5
**4:00** [5] - 38:25, 44:17, 66:18, 100:5, 100:6
**4:04** [1] - 100:8
**4:30** [2] - 62:1, 62:4
**4th** [1] - 94:14

## 5

**5** [1] - 3:3
**50** [1] - 91:5
**50-foot** [1] - 33:16
**500** [1] - 2:10
**53** [1] - 4:4
**535** [1] - 2:10
**54** [1] - 4:4
**55** [1] - 97:17
**56** [1] - 100:5

## 562)570-2200 [1] - 2:17

**5th** [1] - 94:15

## 6

**67** [1] - 4:5
**68** [1] - 4:5

## 7

**75** [1] - 4:6
**753** [1] - 105:12

## 8

**8** [2] - 46:2, 93:25
**8..** [2] - 46:11, 55:5
**80** [3] - 56:8, 56:9, 56:12
**818)839-1983** [1] - 2:11
**894-2739** [1] - 1:23
**8:15** [1] - 103:15

## 9

**9** [4] - 8:20, 100:16, 100:18, 100:25
**9-1** [3] - 4:3, 45:5, 45:14
**9-2** [3] - 4:4, 50:4, 50:10
**9-4** [5] - 4:4, 50:24, 51:2, 51:4, 51:13
**9-mm** [3] - 46:21, 46:22, 46:24
**90010** [1] - 2:6
**90012** [1] - 1:22
**90802** [1] - 2:17
**911** [1] - 63:23
**91203** [1] - 2:11
**99** [1] - 43:12
**998** [2] - 99:10, 99:24

## A

**a.m** [5] - 5:4, 44:17, 66:18, 95:13, 100:6
**abide** [2] - 23:25, 24:4
**ability** [7] - 13:14, 30:2, 90:14, 90:16, 90:17, 91:2, 91:10
**able** [11] - 28:11, 40:17, 49:8, 50:18, 51:5, 68:22, 71:3, 82:10, 85:14, 85:16, 97:5
**ABOVE** [1] - 105:15
**ABOVE-ENTITLED** [1] - 105:15
**absolutely** [2] - 57:16,

61:11, 102:22
**academy** [2] - 41:11, 41:14
**accept** [2] - 14:2, 103:11
**accessible** [1] - 93:2
**accommodate** [2] - 22:4, 22:7
**accomplish** [1] - 25:9
**account** [3] - 13:14, 25:6, 26:15
**accounts** [1] - 18:20
**accuracy** [2] - 55:22, 87:14
**accurate** [3] - 58:21, 87:17, 87:18
**acronym** [1] - 40:14
**act** [2] - 15:6, 15:10
**acted** [4] - 9:6, 15:5, 15:14, 16:13
**acting** [1] - 14:12
**action** [6] - 16:22, 16:25, 17:5, 68:18
**actions** [9] - 16:20, 24:2, 25:15, 28:13, 29:24, 30:4, 43:24, 68:21, 91:2
**acts** [4] - 15:6, 15:9, 15:10, 15:25
**Adam** [1] - 97:20
**add** [2] - 23:1, 23:2
**added** [1] - 98:1
**addition** [2] - 10:18, 29:2
**additional** [2] - 52:21, 78:13, 78:17
**address** [4] - 19:6, 60:17, 63:18, 102:14
**adjacent** [1] - 92:10
**adjoining** [1] - 30:3
**adjourned** [2] - 100:14, 104:3
**adjust** [1] - 62:13
**administrative** [2] - 101:14, 101:19
**admissible** [1] - 101:20
**admitted** [17] - 6:2, 12:2, 12:4, 45:8, 45:12, 45:14, 46:8, 50:7, 50:10, 51:3, 51:4, 64:23, 64:25, 65:20, 65:23, 72:20, 72:23
**admonished** [1] - 102:24
**admonitions** [2] - 57:19, 100:19
**advance** [1] - 38:3
**advantage** [1] - 68:22
**advice** [1] - 62:15
**affirming** [1] - 99:24
**affixed** [1] - 98:15
**afternoon** [5] - 5:17, 23:11, 38:16, 38:17,

57:18
**ago** [4] - 41:14, 87:8, 94:23, 96:2
**agree** [34] - 8:9, 14:8, 38:25, 39:5, 39:22, 41:24, 42:1, 42:6, 43:21, 43:25, 51:24, 53:2, 53:4, 53:7, 53:22, 54:5, 54:18, 55:12, 56:10, 64:15, 67:3, 70:5, 70:10, 70:18, 76:20, 79:9, 80:20, 81:4, 84:15, 84:19, 88:14, 91:8, 93:18, 98:18
**agreed** [3] - 9:23, 14:9, 15:13
**agreement** [1] - 45:2
**ahead** [6] - 46:9, 61:21, 75:6, 76:14, 94:6, 102:16
**aiming** [2] - 55:19, 56:11
**air** [1] - 100:9
**al** [7] - 1:7, 1:12, 2:4, 2:14, 105:5, 105:7
**allege** [1] - 16:3
**alley** [1] - 94:13
**allow** [2] - 100:17, 102:3
**allowed** [7] - 5:14, 7:21, 23:20, 23:21, 24:8, 25:9, 57:8
**allows** [1] - 37:21
**alluding** [1] - 42:24
**almost** [6] - 20:25, 37:24, 79:5, 79:6, 87:11, 102:3
**alone** [1] - 57:11
**alternatives** [1] - 28:21
**amendment** [5] - 6:22, 7:2, 16:5, 16:7, 16:12
**amount** [2] - 26:9, 52:17
**analyze** [3] - 23:18, 23:22, 34:21
**AND** [3] - 105:10, 105:13, 105:15
**AND/OR** [1] - 105:19
**Angeles** [1] - 30:7
**ANGELES** [4] - 1:17, 1:23, 2:6, 5:1
**angle** [3] - 50:21, 67:8, 82:7
**announcement** [1] - 36:14
**answer** [12] - 12:11, 12:14, 12:17, 12:24, 13:1, 23:12, 28:9, 52:7, 52:10, 55:23, 75:9, 79:21, 94:13, 94:18
**answering** [1] - 23:17
**answers** [3] - 25:25,

74:14, 74:20
**ANY** [1] - 105:18
**anytime** [1] - 57:16
**apart** [1] - 95:1
**apartment** [14] -
28:18, 29:3, 33:13,
33:15, 35:19, 37:4,
63:16, 64:1, 65:5,
71:16, 71:24, 90:8,
90:15, 103:6
**apartments** [1] - 33:21
**apologies** [3] - 43:15,
54:24, 65:22
**apologize** [12] - 46:1,
46:3, 47:22, 51:8,
62:11, 66:25, 72:18,
78:16, 94:3, 99:19,
99:23, 102:12
**appear** [10] - 45:18,
46:12, 50:14, 66:13,
70:14, 87:17, 89:12,
90:10, 90:13, 90:17
**appeared** [1] - 87:18
**applicable** [1] - 24:7
**applies** [7] - 9:10,
14:18, 17:15, 18:2,
18:3, 18:5, 22:13
**apply** [5] - 7:16, 8:8,
9:16, 16:19, 54:25
**appreciate** [1] - 26:22
**apprehend** [2] - 30:13,
91:25
**apprehension** [1] -
28:23
**approached** [2] -
18:13, 42:11
**appropriate** [2] - 43:9,
43:23
**approximate** [1] -
66:13
**approximating** [1] -
84:23
**ARE** [1] - 105:19
**area** [14] - 34:11, 49:3,
56:23, 65:7, 71:24,
73:4, 87:23, 91:12,
92:11, 95:2, 95:3,
95:4, 95:12
**argument** [1] - 25:22
**arguments** [3] - 10:3,
10:6, 22:14
**armed** [11] - 5:11,
30:22, 30:24, 31:9,
34:1, 42:22, 44:24,
56:21, 57:10, 62:22,
63:12
**arming** [2] - 68:11,
68:20
**arms** [1] - 67:6
**arrest** [2] - 33:10,
33:25
**arrive** [1] - 100:16
**arrived** [1] - 97:24
**assist** [1] - 20:22
**association** [1] - 16:5
**assume** [4] - 56:8,

73:14, 98:21, 102:5
**assuming** [4] - 44:16,
48:13, 66:17, 73:21
**assumption** [2] -
44:18, 44:19
**AT** [1] - 5:3
**athletic** [1] - 30:2
**attach** [1] - 22:8
**attempted** [1] - 63:16
**attempting** [2] - 33:22
**attention** [14] - 5:7,
20:5, 38:4, 50:3,
55:5, 64:21, 65:17,
72:16, 74:5, 76:7,
93:24, 96:20, 97:14,
99:22
**attorney** [2] - 86:19,
86:20
**ATTORNEY'S** [1] -
2:14
**attorneys** [7] - 10:12,
14:7, 21:3, 21:5,
21:10, 21:12, 22:14
**authority** [4] - 31:10,
31:12, 31:13, 56:21
**authorized** [2] - 41:18,
41:19
**autopsy** [1] - 27:8
**available** [1] - 28:21
**average** [5] - 56:4,
56:6, 56:7, 56:8,
56:9
**awaiting** [1] - 33:16
**aware** [9] - 5:11, 5:12,
92:2, 92:19, 92:23,
92:24, 92:25, 102:7,
102:19
**awesome** [3] - 23:18,
23:22, 24:20
**awkward** [1] - 90:23

---

**B**

**background** [2] -
32:25, 33:8
**backside** [2] - 80:25,
81:2
**backtrack** [1] - 82:1
**bag** [1] - 28:24
**baggy** [1] - 70:8
**balcony** [2] - 63:18,
63:20
**barrel** [3] - 47:9,
48:17, 49:3
**base** [1] - 9:12
**based** [7] - 17:13,
19:5, 20:3, 30:4,
30:23, 58:16, 58:22
**basis** [1] - 102:21
**baton** [2] - 51:19
**batons** [1] - 35:8
**battery** [1] - 98:16
**Beach** [7] - 8:19,
14:14, 23:13, 38:18,
59:12, 90:6, 94:22

**BEACH** [2] - 2:4,
2:17
**bean** [1] - 28:24
**beanbag** [3] - 92:12,
92:15, 92:18
**bear** [1] - 13:21
**become** [1] - 90:23
**began** [3] - 29:7,
30:18, 39:5
**beginning** [1] - 23:3
**begins** [1] - 73:13
**behalf** [2] - 37:9,
37:13
**BEHALF** [2] - 2:4, 2:13
**behavior** [3] - 32:14,
36:25, 74:18
**behind** [6] - 33:1,
34:16, 34:22, 49:1,
50:17, 97:4
**belief** [1] - 77:16
**believability** [1] -
13:21
**belt** [4] - 49:21, 50:21,
51:19, 53:6
**BERNARD** [1] - 3:5
**Bernard** [1] - 38:12
**Bernardino** [1] - 37:12
**best** [3] - 55:18, 59:7,
83:15
**better** [4] - 56:4,
56:12, 82:19, 88:22
**between** [8] - 11:23,
26:11, 46:18, 64:8,
67:12, 84:16, 84:19,
94:15
**bias** [1] - 13:18
**big** [2] - 94:25, 95:13
**bigger** [2] - 97:6, 97:8
**binder** [1] - 97:13
**bit** [7] - 37:16, 37:22,
40:10, 40:11, 44:13,
56:17, 84:3
**bite** [1] - 36:16
**bladed** [2] - 70:24,
83:6
**blank** [1] - 22:22
**blog** [1] - 17:24
**blue** [3] - 34:2, 63:4,
73:9
**bodily** [5] - 24:9,
24:14, 25:13, 28:10,
42:19, 44:3, 54:9,
54:14, 54:20
**body** [18] - 27:12,
27:15, 27:16, 27:20,
27:21, 29:16, 34:24,
34:25, 60:3, 60:8,
60:9, 60:18, 60:20,
78:2, 88:8, 90:22,
103:19
**bolted** [1] - 29:25
**booklet** [1] - 74:15
**books** [1] - 32:9
**BOULEVARD** [3] -
2:5, 2:10, 2:16

**BRAND** [1] - 2:10
**break** [2] - 6:6, 84:5
**breaking** [2] - 57:15,
63:24
**BRIAN** [2] - 2:5, 3:6
**brief** [6] - 8:17, 44:12,
61:23, 86:13, 87:2,
89:24
**Brief** [1] - 59:1
**briefly** [4] - 59:4, 82:1,
96:3, 99:14
**bring** [8] - 5:6, 14:20,
31:24, 59:2, 62:6,
62:16, 101:8, 103:16
**broadcast** [3] - 29:21,
29:23, 98:24
**broadcasted** [1] -
39:15
**broadly** [2] - 18:2,
19:23
**brought** [1] - 25:18
**Brunson** [2] - 36:5,
36:11
**building** [10] - 33:14,
33:15, 35:3, 35:19,
37:4, 71:9, 71:12,
71:16, 71:25, 90:8
**bullet** [17] - 25:6, 25:7,
25:19, 26:15, 46:21,
46:22, 46:23, 46:24,
47:9, 53:23, 54:3,
55:16, 76:5, 77:5,
89:8, 89:14
**bullets** [17] - 26:19,
26:23, 27:3, 27:4,
27:12, 27:17, 46:21,
47:5, 47:6, 48:6,
48:20, 49:4, 49:9,
49:10, 52:24, 55:24,
71:3
**burden** [5] - 9:3, 9:7,
9:8, 15:25, 16:10
**burst** [1] - 77:11
**busier** [1] - 95:1
**BUSTILLOS** [1] - 1:20,
105:10, 105:23
**but..** [1] - 47:24
**buttocks** [5] - 81:14,
81:16, 83:13, 83:18,
83:19
**button** [8] - 47:23,
48:3, 48:25, 49:1,
49:12, 51:13, 51:16,
53:10
**BY** [28] - 2:5, 2:9, 2:15,
3:6, 5:4, 38:15,
45:16, 46:10, 46:15,
50:11, 51:5, 52:12,
62:21, 65:1, 65:24,
67:1, 69:3, 72:24,
75:18, 76:15, 79:23,
86:2, 87:25, 90:3,
94:7, 95:20, 97:12,
99:18
**bystander** [1] - 33:2

---

**C**

**C.S.R** [1] - 1:21
**CA** [3] - 2:6, 2:11, 2:17
**caliber** [4] - 46:16,
46:18, 46:21, 46:23
**CALIFORNIA** [5] - 1:2,
1:17, 1:23, 5:1,
105:12
**California** [2] - 40:17,
41:4
**cannot** [2] - 12:14
**car** [11] - 36:7, 39:17,
39:20, 57:5, 95:10,
96:14, 98:9, 98:15,
98:16, 98:19
**car-to-car** [1] - 95:10
**card** [1] - 55:13
**care** [1] - 60:13
**carjacking** [5] - 5:11,
5:22, 5:25, 58:14,
58:19
**carried** [1] - 47:17
**carries** [1] - 51:22
**carry** [2] - 51:21,
98:11
**cars** [1] - 33:20
**case** [61] - 6:10, 7:2,
7:13, 8:7, 8:12, 8:18,
9:14, 10:22, 12:20,
13:6, 13:8, 13:18,
14:6, 14:8, 14:19,
15:13, 16:2, 17:12,
17:13, 17:14, 17:16,
17:18, 17:21, 17:22,
18:4, 18:9, 18:11,
18:14, 18:20, 19:3,
19:13, 20:15, 20:21,
22:6, 22:10, 22:13,
23:12, 25:18, 25:24,
26:17, 27:1, 27:9,
28:24, 30:11, 30:17,
31:1, 32:5, 38:4,
38:5, 42:10, 44:24,
44:25, 55:18, 57:20,
57:22, 57:23,
100:20, 100:23,
100:24
**CASE.....................**
[1] - 3:3
**casings** [1] - 73:8
**catch** [1] - 30:13
**caught** [2] - 31:16
**caused** [4] - 16:17,
19:19, 68:6, 87:5
**central** [1] - 30:12
**CENTRAL** [2] - 1:2,
105:11
**certain** [6] - 10:1,
21:16, 26:10, 32:15,
91:16, 95:7
**certainly** [1] - 90:1
**certified** [1] - 40:24
**CERTIFY** [1] - 105:12
**cetera** [1] - 103:25

**chamber** [2] - 47:9, 48:11
**chance** [1] - 56:12
**change** [1] - 48:4
**channel** [27] - 39:15, 93:1, 93:4, 93:5, 93:6, 93:8, 93:9, 93:23, 94:19, 94:20, 94:21, 95:5, 95:6, 95:8, 95:9, 95:11, 95:12, 95:14, 95:16, 95:17, 95:19, 98:17, 98:20, 98:24, 99:12
**channels** [1] - 39:15
**characterization** [1] - 58:21
**charge** [2] - 35:24, 49:2
**CHARGED** [1] - 105:18
**chase** [2] - 30:18, 33:19
**chased** [3] - 34:5, 36:11, 91:23
**chasing** [1] - 32:21
**chat** [1] - 17:24
**cheating** [2] - 12:22, 12:25
**chest** [9] - 70:25, 81:17, 81:18, 81:21, 83:3, 83:4, 83:7, 83:22, 84:1
**chief** [2] - 87:20, 101:11
**child** [1] - 16:9
**choice** [1] - 28:25
**chose** [1] - 44:7
**Chris** [1] - 36:2
**CIRCUIT** [1] - 105:18
**circular** [1] - 48:2
**circumstances** [4] - 24:10, 25:1, 41:24, 86:9
**circumstantial** [4] - 10:24, 11:2, 11:23, 11:24
**citizens** [2] - 33:21, 34:8
**city** [2] - 14:13, 95:14
**CITY** [1] - 2:14
**civil** [1] - 7:17
**claim** [10] - 7:2, 9:8, 9:11, 14:19, 14:20, 14:25, 15:1, 15:20, 16:12
**claims** [2] - 9:4, 9:5
**clarify** [7] - 61:25, 66:7, 75:19, 79:24, 80:14, 82:18, 94:21
**clear** [4] - 33:8, 55:11, 103:6, 103:7
**clears** [1] - 95:9
**CLERK** [1] - 38:10
**clerks** [1] - 22:25
**click** [1] - 49:7
**clients** [1] - 10:12

**clients'** [1] - 61:2
**climbing** [2] - 67:18, 67:21
**clip** [2] - 54:17, 54:22
**close** [5] - 20:4, 38:3, 42:5, 60:11, 66:10
**close-ups** [1] - 60:11
**closed** [1] - 43:13
**closer** [10] - 81:9, 81:10, 81:12, 81:13, 81:14, 81:16, 83:9, 83:11, 83:17
**closing** [2] - 10:6, 22:14
**clothes** [1] - 70:9
**clue** [4] - 88:19, 89:19, 91:20, 96:1
**COCHRAN** [1] - 2:4
**Code** [1] - 14:21
**code** [3] - 99:7, 99:9, 99:10
**CODE** [1] - 105:13
**cold** [1] - 62:16
**collectively** [1] - 88:24
**color** [6] - 14:12, 14:22, 15:5, 15:9, 15:14, 16:14
**combination** [2] - 98:10, 98:11
**combined** [1] - 33:18
**coming** [3] - 35:16, 96:16, 96:17
**commentary** [1] - 18:20
**commission** [1] - 63:5
**committed** [2] - 30:15, 31:25
**commonly** [1] - 40:22
**communicate** [4] - 17:19, 17:20, 57:21, 100:22
**communicating** [2] - 18:3, 18:5
**companionship** [1] - 16:8
**compensation** [1] - 9:2
**completed** [1] - 17:12
**completely** [1] - 31:17
**complex** [3] - 28:18, 29:3, 65:5
**concede** [1] - 44:23
**concept** [3] - 26:14, 32:25, 41:5
**concepts** [1] - 41:8
**concern** [1] - 25:3, 25:4
**concerned** [2] - 34:5, 100:15
**concerning** [1] - 93:14
**conclusion** [1] - 20:20
**conduct** [4] - 16:15, 16:16, 17:9, 25:3
**conducted** [3] - 35:13, 36:6, 92:21

**CONFERENCE** [2] - 105:17, 105:20
**conferences** [1] - 21:14
**CONFORMANCE** [2] - 105:16, 105:19
**confronted** [1] - 24:8
**confused** [3] - 56:1, 78:15, 92:6
**confusing** [1] - 7:6
**confusion** [1] - 7:5
**connection** [6] - 29:14, 53:21, 86:6, 91:18, 92:3, 102:18
**conscience** [4] - 16:16, 16:21, 17:1, 17:6
**conscious** [3] - 6:18, 17:2, 73:20
**consider** [12] - 9:17, 9:19, 9:24, 10:1, 11:22, 12:5, 13:7, 18:18, 22:10, 56:4, 74:15, 79:10
**considered** [10] - 10:17, 24:24, 48:18, 82:15, 86:11, 95:2, 95:3, 95:4
**considering** [2] - 13:13, 14:4
**consist** [1] - 9:20
**consistent** [3] - 50:14, 54:3, 54:4
**consists** [1] - 9:18
**Constitution** [4] - 14:24, 15:8, 16:2, 16:8
**Constitutional** [1] - 8:24
**constitutionally** [1] - 16:6
**consult** [2] - 18:23, 90:1
**contact** [3] - 18:15, 96:5, 96:11
**contained** [5] - 24:17, 28:16, 31:17, 33:12, 36:12
**containment** [1] - 91:18
**contend** [2] - 8:23, 9:6
**continue** [5] - 37:2, 37:3, 62:19, 78:9, 91:15
**continued** [4] - 27:5, 28:2, 28:7, 71:6
**continuity** [1] - 76:12
**continuous** [3] - 69:14, 69:15, 77:11
**continuously** [1] - 76:21
**contradicted** [1] - 13:19
**control** [4] - 12:6, 24:23, 42:3, 86:12
**controls** [2] - 7:7,

10:10
**conveyed** [1] - 85:8
**convicted** [1] - 93:11
**convictions** [2] - 93:15, 93:17
**copy** [2] - 7:20, 99:21
**cord** [1] - 98:13
**coroner** [2] - 27:8, 27:9
**corpse** [1] - 59:9
**CORRECT** [1] - 105:14
**correct** [125] - 6:13, 36:9, 36:10, 38:19, 38:22, 39:6, 39:12, 39:18, 39:20, 39:25, 40:8, 40:12, 40:15, 40:20, 41:1, 41:6, 41:10, 41:13, 41:20, 42:3, 42:8, 42:14, 42:19, 42:22, 43:1, 43:5, 43:23, 44:10, 44:23, 44:25, 45:8, 47:14, 47:20, 48:11, 49:8, 49:15, 51:15, 52:2, 52:15, 52:19, 52:22, 53:24, 54:10, 54:23, 54:25, 55:3, 55:7, 55:17, 55:22, 56:5, 57:11, 63:8, 64:9, 64:13, 64:18, 65:5, 65:8, 65:11, 65:14, 66:1, 66:5, 66:8, 66:11, 67:4, 67:6, 67:8, 67:10, 67:14, 67:18, 67:21, 67:25, 68:8, 68:12, 69:5, 69:7, 69:11, 69:17, 69:20, 69:23, 70:11, 71:4, 71:5, 71:8, 72:10, 72:14, 73:2, 73:13, 73:19, 75:15, 75:20, 75:23, 76:18, 76:19, 78:5, 78:9, 79:1, 79:11, 79:14, 79:15, 80:1, 80:5, 80:10, 80:12, 80:18, 81:22, 82:22, 82:23, 82:25, 83:22, 84:6, 84:10, 84:11, 84:13, 84:14, 84:17, 84:22, 85:2, 88:20, 88:24, 91:6, 91:7, 92:3, 94:9, 96:6, 97:20
**corrected** [1] - 6:1
**corresponds** [1] - 97:16
**counsel** [5] - 7:11, 21:24, 22:2, 60:8, 102:23
**count** [1] - 48:19
**counting** [1] - 76:24
**county** [2] - 15:11, 37:12
**couple** [8] - 14:15,

14:17, 23:4, 37:6, 62:18, 84:17, 84:22, 92:18
**course** [9] - 7:24, 14:13, 17:17, 19:12, 58:11, 61:5, 61:10, 61:13, 100:16
**Court** [2] - 10:21, 18:16
**court** [4] - 18:9, 27:10, 74:16, 87:11
**COURT** [76] - 1:1, 1:20, 5:3, 5:16, 5:21, 6:5, 6:13, 6:19, 6:25, 7:4, 7:10, 25:22, 38:6, 38:13, 45:7, 45:12, 45:25, 46:5, 46:8, 50:5, 50:7, 51:1, 51:3, 52:9, 57:13, 57:15, 57:17, 58:2, 58:8, 58:19, 59:2, 59:10, 59:15, 59:20, 59:24, 60:13, 60:21, 60:25, 61:5, 61:21, 62:4, 62:6, 62:9, 64:23, 65:19, 66:23, 69:17, 72:17, 72:20, 74:7, 74:25, 75:4, 75:6, 76:9, 76:14, 79:20, 85:21, 87:23, 90:1, 94:1, 94:6, 96:21, 97:1, 97:4, 97:8, 100:12, 101:3, 101:16, 102:3, 102:16, 102:25, 103:10, 103:13, 103:23, 105:10, 105:11
**Court's** [4] - 5:6, 10:15, 45:4, 101:24
**COURTHOUSE** [1] - 1:21
**courthouse** [2] - 11:6, 11:11
**courtroom** [16] - 7:23, 7:25, 18:12, 18:22, 19:1, 20:10, 20:18, 20:19, 58:7, 61:2, 61:7, 61:9, 62:15, 74:12, 74:18
**courtyard** [1] - 71:24
**cover** [2] - 21:4, 60:8
**crawling** [2] - 28:6, 28:7
**crime** [11] - 30:15, 30:22, 31:9, 31:25, 56:21, 57:6, 57:10, 63:6, 93:12
**crimes** [1] - 32:1
**criminal** [2] - 93:15, 101:4
**cross** [3] - 21:25, 22:2, 58:12
**CROSS** [1] - 3:4
**cross-examine** [2] - 21:25, 22:2

cross-examined [1] - 58:12
crouched [1] - 63:23
cues [1] - 34:23
current [2] - 59:23, 59:24
curriculum [2] - 40:24, 41:8
curve [1] - 34:16
custody [2] - 31:24, 37:25
CV [2] - 1:10, 105:6

**D**

danger [4] - 7:5, 34:13, 56:25, 60:4
Daniel [14] - 8:20, 8:22, 14:11, 15:2, 15:14, 15:23, 16:1, 16:4, 16:13, 16:15, 16:17, 16:20, 16:24, 17:4
Danny [1] - 36:3
DARRYL [1] - 2:15
date [1] - 18:2
DATE [1] - 105:23
DAY [1] - 1:16
days [1] - 23:4
De [1] - 36:3
dead [1] - 60:3
deadly [22] - 24:8, 24:19, 24:20, 24:24, 25:5, 25:8, 25:12, 31:21, 35:4, 41:6, 41:9, 41:19, 41:20, 41:22, 42:2, 42:7, 43:7, 43:9, 43:22, 53:22, 54:2
deal [3] - 14:18, 17:9, 21:7
dealing [1] - 5:12
death [13] - 8:18, 16:18, 24:9, 24:14, 25:12, 28:10, 34:6, 42:18, 44:3, 54:9, 54:14, 54:20, 86:18
decedent [4] - 5:12, 8:18, 9:1, 16:6
decedent's [1] - 8:21
decide [10] - 8:11, 9:14, 10:22, 11:25, 13:8, 17:10, 17:13, 20:15, 21:15, 37:23
decides [1] - 25:8
deciding [5] - 9:17, 9:19, 10:2, 13:6, 13:8
decision [3] - 9:13, 20:3, 25:5
deeply [1] - 23:18
defendant [7] - 9:15, 15:25, 16:15, 16:16, 16:20, 16:23, 17:3
defendants [15] -

8:22, 8:24, 9:2, 9:5, 9:7, 14:12, 15:5, 15:6, 15:13, 15:22, 16:3, 16:13, 21:25, 22:1, 37:13
Defendants [1] - 1:13
DEFENDANTS [1] - 2:13
defendants' [1] - 15:1
Defense [1] - 22:6
defense [5] - 9:9, 9:12
defenses [1] - 9:8
defined [1] - 15:4
Defoe [1] - 37:8
defying [1] - 34:6
deliberate [7] - 6:16, 16:22, 16:25, 17:1, 17:5, 22:15, 28:25
deliberation [1] - 18:4
deliberations [3] - 8:2, 17:12, 20:2
demonstrate [2] - 31:2, 40:19
demonstrating [1] - 40:25
denied [1] - 69:2
deny [2] - 9:5, 21:11
department [1] - 28:21
Department [4] - 23:13, 30:7, 38:19, 59:12
depended [2] - 43:24, 95:2
depicted [1] - 60:19
depiction [1] - 60:18
deplete [1] - 52:3
deployed [1] - 92:18
DEPOSIT [1] - 105:19
deposition [5] - 5:10, 6:2, 58:21, 74:6, 74:10, 74:16, 76:7, 76:10, 93:25, 94:9
depositions [2] - 74:8, 74:21
deprive [1] - 15:6
deprived [2] - 16:1, 16:4
deprives [1] - 14:22
deputy [2] - 87:20, 101:11
derogatory [1] - 88:6
described [7] - 56:14, 70:22, 71:4, 79:9, 79:25, 80:22, 103:8
deserves [1] - 14:4
designated [1] - 95:5
designed [3] - 23:5, 28:22, 30:9
despite [2] - 42:17, 43:8
destroyed [1] - 20:20
detective [1] - 86:17
detectives [2] - 86:16, 86:20
detention [2] - 29:25,

30:10
determine [3] - 6:11, 16:19, 55:21
determining [1] - 24:4
device [1] - 98:9
dictate [2] - 87:5, 87:7
dictionaries [1] - 18:24
differ [2] - 10:9, 61:6
difference [1] - 46:18
different [6] - 39:14, 62:14, 62:18, 92:17, 96:8
direct [11] - 10:24, 10:25, 11:7, 11:18, 11:22, 11:24, 27:18, 63:1, 87:7
DIRECT [2] - 3:4, 38:14
direct-dictate [1] - 87:7
directly [2] - 72:15, 81:23
direst [2] - 25:1, 41:23
discharged [1] - 45:19
discuss [3] - 18:15, 41:17, 100:20
discusses [2] - 41:5
discussing [2] - 17:22, 26:19
dislikes [1] - 8:10
dispatch [6] - 6:3, 92:20, 98:23, 99:11, 99:23, 100:2
dispatchers [2] - 44:21, 99:7
disprove [1] - 47:1
dispute [1] - 93:1
disregard [12] - 6:18, 10:17, 13:5, 13:7, 17:2, 52:10, 59:16, 59:18, 59:19, 79:21, 102:23
distance [6] - 26:4, 27:6, 60:21, 85:14, 85:18, 91:5
distinct [1] - 103:3
distinction [1] - 11:23
distract [1] - 20:16
district [1] - 18:9
DISTRICT [5] - 1:1, 1:2, 1:5, 105:11
division [14] - 39:13, 39:14, 94:24, 94:25, 95:2, 95:3, 95:4, 95:8, 95:11, 95:17, 95:18
DIVISION [1] - 1:3
divisions [1] - 94:22
DO [1] - 105:12
dog [2] - 28:20, 71:19
domain [1] - 24:18
domains [5] - 41:10, 41:12, 41:15, 41:17
done [2] - 31:24,

51:25, 71:2, 78:4, 91:3, 91:21, 99:15
door [1] - 63:23
doubt [1] - 85:16
Douglas [1] - 103:4
down [23] - 28:5, 29:15, 29:16, 29:22, 36:18, 52:5, 57:25, 66:23, 68:23, 69:22, 77:15, 82:16, 84:5, 87:1, 89:22, 90:14, 90:24, 92:20, 93:2, 97:18, 98:13, 100:13
dozens [2] - 88:22, 89:1
draw [2] - 11:17, 11:21
dreaded [1] - 21:2
dress [1] - 62:17
drop [2] - 48:7, 48:8
dropped [1] - 77:20
dropping [3] - 49:16, 49:17, 53:9
drove [1] - 39:17
DUNN [77] - 2:5, 3:6, 5:5, 5:23, 6:9, 6:14, 23:9, 23:11, 25:24, 38:8, 38:15, 45:2, 45:4, 45:9, 45:15, 45:16, 46:1, 46:10, 46:15, 50:9, 50:11, 50:24, 51:2, 51:5, 52:6, 52:12, 57:14, 57:16, 58:18, 59:4, 59:12, 59:18, 59:23, 60:20, 60:24, 61:3, 61:19, 61:25, 62:5, 62:20, 62:21, 65:1, 65:21, 65:24, 66:25, 67:1, 69:3, 72:18, 72:22, 72:24, 74:23, 75:2, 75:7, 75:18, 76:11, 76:15, 79:18, 79:23, 85:20, 85:22, 86:2, 87:25, 90:2, 90:3, 93:19, 94:3, 94:7, 95:20, 96:25, 97:2, 97:12, 99:14, 99:18, 100:10, 103:3, 103:21, 104:2
Dunn [10] - 5:21, 25:23, 32:7, 32:13, 38:7, 52:11, 66:23, 101:10, 102:8, 102:17
Dunn.. [1] - 103:2
during [22] - 8:4, 10:7, 10:23, 12:7, 17:17, 20:2, 22:6, 22:24, 33:18, 61:8, 63:11, 64:11, 73:17, 74:9, 75:23, 77:17, 77:23, 80:25, 88:9, 90:10, 94:16, 95:1
During [1] - 5:9
duties [1] - 15:11
duty [5] - 7:13, 8:6,

10:12, 17:17, 53:6

**E**

e-mail [1] - 17:23
early [1] - 23:15
easily [1] - 79:16
east [5] - 39:13, 95:3, 95:6, 95:8, 95:18
education [2] - 13:24, 14:4
effect [4] - 30:10, 58:20, 85:7, 88:9
effort [1] - 30:9
eight [20] - 19:20, 47:11, 48:11, 48:14, 49:4, 49:6, 52:18, 54:12, 73:17, 73:18, 75:25, 76:3, 76:17, 81:25, 82:3, 82:5, 82:18, 82:21, 82:24
either [11] - 10:14, 10:24, 11:24, 33:4, 48:4, 54:9, 61:7, 63:1, 74:3, 77:5, 89:14
elbows [2] - 28:6, 28:7
electronic [1] - 17:23
electronically [1] - 100:22
element [2] - 15:18, 15:21
elements [3] - 15:3, 15:16, 16:11
emerge [1] - 64:12
employed [2] - 29:1, 38:18
employer [2] - 18:6, 18:8
employment [1] - 14:13
emptied [2] - 27:3, 27:4
empty [1] - 49:17
encounter [1] - 29:14
encountered [1] - 33:21
encounters [1] - 31:6
encyclopedias [1] - 18:24
end [8] - 7:25, 10:6, 17:12, 17:18, 19:18, 23:2, 60:14, 61:24
endeavored [1] - 94:8
ended [1] - 38:2
enforcement [3] - 17:7, 37:7, 37:25
engage [2] - 28:13, 91:10
ensure [1] - 19:4
enter [1] - 90:14
entire [7] - 19:8, 27:3, 27:4, 29:7, 70:25, 86:11, 95:14
ENTITLED [1] - 105:15

110

**entitled** [4] - 25:12, 25:14, 25:16, 25:17
**entry** [2] - 27:19, 64:1
**epithet** [1] - 103:7
**equally** [1] - 8:15
**equipment** [1] - 20:10
**equipped** [1] - 92:15
**escape** [2] - 28:12, 56:24
**escaped** [1] - 61:1
**especially** [1] - 60:6
**ESQ** [3] - 2:5, 2:9, 2:15
**essentially** [3] - 26:22, 33:14, 90:22
**estimate** [3] - 95:21, 96:9, 96:18
**estimated** [1] - 85:17
**estimation** [2] - 42:12, 44:22
**et** [7] - 1:7, 1:12, 2:4, 2:14, 103:25, 105:5, 105:7
**evening** [3] - 64:4, 93:8, 99:12
**event** [1] - 22:9
**events** [4] - 29:2, 29:4, 86:3, 88:1
**everywhere** [2] - 11:13, 98:12
**Evidence** [5] - 10:14, 12:6, 12:10, 21:16, 101:18
**evidence** [67] - 7:17, 8:5, 8:7, 8:12, 8:16, 9:9, 9:11, 9:13, 9:17, 9:19, 9:22, 9:25, 10:1, 10:4, 10:8, 10:12, 10:17, 10:22, 10:23, 10:24, 11:2, 11:7, 11:13, 11:18, 11:22, 11:25, 12:1, 12:4, 12:7, 12:8, 12:12, 12:15, 12:24, 13:3, 13:4, 13:6, 13:7, 13:18, 13:20, 13:22, 14:5, 14:17, 15:3, 15:5, 16:11, 17:13, 18:17, 19:5, 20:3, 20:8, 20:13, 20:22, 21:16, 21:20, 21:21, 21:24, 22:1, 22:10, 22:12, 31:22, 73:8, 102:19, 103:1, 103:11
**exact** [1] - 44:20
**exactly** [6] - 27:11, 42:4, 65:16, 71:11, 74:2, 82:14
**EXAMINATION** [1] - 38:14
**examine** [3] - 21:25, 22:2, 29:4
**examined** [1] - 58:12
**examining** [1] - 29:2
**example** [6] - 11:4,

**Exhibit** [18] - 45:5, 46:2, 46:11, 50:4, 50:10, 51:4, 51:13, 55:5, 64:21, 64:25, 65:18, 65:23, 67:16, 72:16, 72:23, 96:20, 96:22, 99:16
**exhibits** [5] - 9:21, 9:25, 10:18, 103:14, 103:24
**Exhibits** [1] - 45:14
**exited** [5] - 95:25, 96:8, 96:10, 96:14, 98:19
**expect** [1] - 35:25
**expected** [1] - 18:10
**expects** [1] - 21:21
**expended** [3] - 48:5, 48:16, 48:20
**experience** [2] - 13:25, 14:4
**experienced** [1] - 11:9
**expert** [2] - 24:1, 46:20
**experts** [2] - 34:15, 37:6
**explain** [4] - 15:18, 51:20, 53:16, 98:7
**explained** [1] - 15:8
**explanation** [1] - 11:15
**exposed** [2] - 17:15, 19:23
**extra** [3] - 49:20, 50:22, 51:21
**eye** [1] - 87:3
**eyes** [1] - 39:23

### F

**F-a-g-a-n** [1] - 38:12
**face** [3] - 28:5, 70:25, 81:8
**Facebook** [1] - 17:24
**faced** [2] - 24:10, 24:11
**facing** [20] - 31:19,

12:17, 46:19, 49:4, 68:15, 81:17
**exceeds** [1] - 7:1
**excellent** [1] - 12:19
**except** [1] - 31:7
**excessive** [6] - 6:11, 6:20, 6:21, 6:25, 23:14, 25:3
**excluded** [1] - 10:16
**excuse** [1] - 9:18
**excused** [1] - 101:1
**exemplifies** [1] - 59:7
**exhausted** [2] - 24:24, 42:3
**exhibit** [8] - 12:8, 12:12, 12:14, 50:13, 59:5, 59:6, 65:2, 97:13

31:20, 69:7, 70:19, 70:23, 80:23, 81:4, 81:7, 81:18, 83:3, 83:4, 83:5, 83:7, 83:13, 83:15, 83:21, 84:1
**fact** [20] - 9:22, 10:25, 11:3, 13:11, 13:22, 14:8, 14:9, 14:10, 25:4, 32:17, 33:13, 33:18, 41:16, 66:7, 70:18, 73:20, 81:20, 92:19, 92:24, 92:25
**factors** [1] - 13:21
**facts** [15] - 8:6, 8:7, 9:18, 9:20, 10:2, 10:8, 10:10, 11:2, 11:20, 11:21, 13:8, 26:10, 28:8, 31:1, 37:18
**FAGAN** [5] - 1:12, 2:14, 3:5, 38:9, 105:7
**Fagan** [24] - 8:19, 8:22, 8:24, 14:11, 15:1, 15:14, 15:22, 15:25, 16:3, 16:13, 16:15, 16:17, 16:20, 16:24, 17:3, 32:16, 33:3, 33:7, 33:8, 34:11, 35:17, 38:8, 38:12, 102:17
**failed** [1] - 15:21
**failures** [1] - 15:6
**fair** [3] - 19:4, 44:18, 44:19
**fairness** [1] - 19:7
**faith** [1] - 102:21
**fall** [8] - 28:5, 33:16, 49:13, 76:1, 76:4, 77:3, 88:20, 88:21
**fallen** [2] - 82:24, 88:16
**falling** [1] - 83:2
**falls** [1] - 53:4
**false** [2] - 29:10, 36:8
**familial** [2] - 8:25, 16:5
**familiar** [7] - 40:12, 41:16, 47:13, 90:4, 90:9, 92:12, 93:6
**familiarity** [2] - 40:19, 41:1
**family** [4] - 18:6, 18:8, 60:7, 61:2
**far** [3] - 65:4, 67:12, 100:15
**fashion** [4] - 48:18, 100:21, 100:22
**fast** [2] - 87:10, 89:21
**faster** [1] - 46:22
**fatal** [2] - 27:13, 27:14
**FATTAHI** [2] - 2:9, 2:9
**fear** [1] - 68:6
**feature** [1] - 17:25
**federal** [1] - 14:20
**FEE** [1] - 105:18

**FEES** [1] - 105:18
**feet** [15] - 26:4, 27:6, 56:11, 81:10, 81:12, 81:24, 82:10, 82:12, 82:19, 83:9, 83:11, 85:18, 85:23, 86:1, 91:5
**fell** [2] - 77:4, 83:1
**fellow** [5] - 17:11, 18:3, 20:14, 20:24, 34:8
**felt** [1] - 34:4
**fences** [1] - 30:4
**few** [4] - 7:19, 10:5, 17:8, 96:4
**figure** [2] - 47:25, 59:10
**final** [4] - 8:1, 48:16, 84:25
**finalized** [1] - 87:16
**finally** [1] - 99:14
**fine** [2] - 60:10, 103:12
**finished** [2] - 52:4, 75:25
**fire** [22] - 24:5, 32:25, 33:12, 34:11, 34:12, 35:7, 43:12, 48:13, 48:14, 49:8, 49:14, 52:24, 54:4, 54:7, 54:12, 54:17, 55:2, 55:20, 55:22, 71:3, 77:21, 78:8
**firearm** [10] - 44:14, 44:24, 45:18, 46:12, 47:2, 47:6, 51:17, 56:11, 56:13, 68:2
**fired** [83] - 25:6, 26:3, 26:5, 26:9, 26:11, 26:16, 26:18, 27:20, 27:22, 31:7, 36:20, 36:21, 47:16, 52:18, 52:21, 52:25, 54:13, 54:19, 54:24, 65:11, 66:1, 66:5, 66:8, 66:11, 67:3, 67:17, 68:7, 68:11, 69:11, 69:16, 69:19, 70:4, 70:18, 70:21, 71:1, 72:9, 72:11, 73:5, 73:12, 73:15, 73:18, 76:3, 76:17, 76:20, 77:2, 77:3, 77:5, 77:10, 78:7, 78:11, 78:13, 78:17, 78:18, 78:19, 78:25, 80:8, 80:11, 81:11, 81:14, 81:21, 81:25, 82:3, 82:4, 82:19, 82:21, 82:24, 83:3, 83:8, 83:12, 84:8, 84:9, 84:10, 85:1, 88:2, 88:10, 88:15, 88:23, 89:3, 89:17
**firing** [37] - 26:23, 26:25, 27:5, 27:16, 27:24, 27:25, 28:2,

48:9, 49:11, 54:8, 65:13, 67:8, 67:14, 71:2, 71:7, 72:4, 72:7, 73:11, 73:13, 73:19, 75:23, 75:25, 76:21, 76:22, 76:25, 77:12, 77:23, 78:4, 80:4, 80:14, 80:20, 80:25, 81:2, 81:5, 84:6, 84:12, 90:11
**FIRM** [1] - 2:4
**first** [68] - 5:16, 5:19, 6:2, 6:6, 17:9, 21:18, 24:7, 24:15, 24:25, 25:11, 25:25, 26:10, 32:17, 33:4, 38:7, 39:9, 39:22, 39:23, 40:3, 40:4, 40:5, 40:7, 40:18, 42:11, 43:9, 43:11, 47:17, 52:19, 63:22, 64:9, 64:14, 64:17, 67:17, 68:3, 68:7, 68:12, 68:13, 69:11, 69:13, 70:16, 70:19, 72:9, 72:11, 73:11, 73:12, 76:17, 77:2, 78:14, 81:25, 82:3, 82:10, 82:18, 82:21, 82:24, 84:16, 84:20, 84:21, 84:25, 95:22, 96:4, 96:10, 96:11, 96:13, 96:16, 101:6, 101:23, 103:1
**five** [2] - 13:18, 49:6
**fix** [1] - 20:12
**flap** [1] - 51:23
**flaps** [1] - 51:22
**flat** [2] - 28:5, 79:3
**floor** [6] - 63:22, 65:8, 65:11, 71:22, 90:25, 91:11
**FLOOR** [1] - 2:16
**flout** [1] - 102:8
**fluid** [1] - 56:15
**focus** [1] - 20:11
**follow** [4] - 8:8, 8:14, 8:16, 10:20
**following** [11] - 7:8, 8:13, 9:20, 14:9, 15:3, 16:11, 21:18, 23:3, 58:1, 62:7, 101:2
**follows** [2] - 16:23, 59:8
**Fonzi** [1] - 37:11
**foot** [8] - 39:10, 39:16, 69:22, 69:24, 70:2, 70:22, 82:8, 91:21
**FOR** [3] - 105:10, 105:11, 105:18
**force** [36] - 6:11, 6:15, 6:16, 6:21, 6:24, 23:14, 23:20, 23:21, 24:8, 24:19, 24:20, 24:24, 25:3, 25:5,

25:8, 25:9, 25:12,
25:14, 31:12, 31:13,
31:21, 35:4, 38:1,
41:6, 41:9, 41:19,
41:20, 41:23, 42:2,
42:7, 43:7, 43:9,
43:22, 53:22, 54:2
**forced** [1] - 63:25
**FOREGOING** [1] -
105:13
**forgive** [1] - 45:21
**forgot** [2] - 19:17,
61:12
**form** [1] - 28:24
**FORMAT** [1] - 105:16
**forms** [1] - 55:12
**formulate** [2] - 77:16,
77:24
**forth** [2] - 14:17, 95:7
**forward** [9] - 28:6,
28:7, 38:4, 76:1,
76:4, 77:3, 77:4,
83:1, 83:2
**four** [36] - 10:21,
13:17, 49:6, 51:21,
53:1, 67:17, 68:3,
68:7, 68:12, 68:14,
69:11, 69:13, 69:16,
69:19, 70:4, 70:15,
70:16, 70:19, 70:21,
71:1, 71:2, 72:4,
73:16, 77:2, 84:8,
84:16, 84:20, 94:4,
94:11, 94:22, 95:5,
95:11, 100:6
**fourth** [2] - 6:22, 7:2
**frame** [1] - 36:12
**free** [3] - 8:25, 61:10,
61:11
**friends** [1] - 18:7
**front** [5] - 27:22,
50:21, 53:5, 88:11,
103:6
**full** [1] - 38:10
**fully** [3] - 48:13, 49:5,
82:12
**fully-loaded** [1] - 49:5
**future** [2] - 57:1

## G

**garden** [1] - 11:16
**general** [4] - 7:16,
14:16, 24:6, 103:14
**generalize** [1] - 81:7
**generally** [2] - 21:2,
81:4
**gentlemen** [8] - 7:12,
22:18, 23:11, 32:2,
57:18, 62:12, 79:22,
100:14
**gesture** [1] - 68:10
**given** [12] - 11:24,
14:5, 20:5, 56:19,
57:3, 58:10, 74:12,

74:17, 85:12, 91:2,
99:21, 101:10
**GLENDALE** [1] - 2:11
**goal** [1] - 25:10
**goodness** [1] - 96:13
**Google** [3] - 17:25,
18:25
**govern** [1] - 8:2
**grabbing** [1] - 69:4
**grant** [1] - 21:10
**granted** [1] - 79:20
**grass** [1] - 11:12
**gray** [1] - 56:23
**ground** [11] - 33:10,
69:24, 69:25, 70:2,
70:3, 79:3, 80:4,
80:10, 88:16, 88:20,
89:22
**grounds** [1] - 103:25
**guess** [3] - 12:16,
68:24, 77:9
**guided** [2] - 24:21,
42:7
**guidelines** [3] - 41:1,
41:4, 41:18
**guilty** [2] - 30:14,
93:16
**gun** [29] - 26:1, 26:23,
30:24, 31:2, 33:7,
34:1, 34:17, 34:18,
46:2, 46:20, 48:7,
48:13, 48:17, 48:20,
49:5, 49:6, 49:10,
49:14, 53:23, 55:2,
57:3, 67:13, 68:6,
71:3, 77:18, 78:7
**guns** [6] - 24:5, 26:18,
26:21, 27:16, 35:9
**guy** [1] - 34:6
**guys** [1] - 73:7

## H

**hand** [25] - 7:19,
15:21, 20:9, 22:19,
34:25, 48:6, 48:7,
49:18, 49:20, 49:25,
50:21, 51:9, 53:11,
70:7, 70:8, 70:12,
73:23, 73:24, 74:2,
74:3, 75:8, 77:14,
87:12, 88:11
**handbooks** [1] - 24:16
**handed** [1] - 49:24
**handgun** [5] - 34:2,
46:16, 46:19, 63:5
**handheld** [5] - 98:9,
98:11, 98:12, 98:17,
98:19
**handing** [1] - 22:20
**hands** [32] - 33:5,
34:10, 35:9, 36:23,
48:8, 62:24, 62:25,
67:3, 68:15, 69:9,

69:11, 69:12, 70:6,
70:7, 70:11, 73:22,
74:1, 75:14, 75:19,
75:22, 77:12, 78:24,
79:1, 79:7, 79:10,
79:14, 80:8, 80:11,
80:12, 82:16, 91:4
**harm** [3] - 6:17, 6:24,
17:6
**harmed** [1] - 36:16
**hate** [1] - 87:9
**head** [7] - 81:3, 81:9,
81:13, 81:16, 83:9,
83:13, 83:18
**heading** [1] - 82:13
**hear** [48] - 10:21,
13:15, 18:12, 19:1,
19:25, 20:6, 20:7,
22:5, 23:25, 24:1,
27:7, 28:3, 28:15,
28:19, 28:20, 29:9,
29:11, 29:20, 29:21,
29:23, 29:25, 30:17,
31:8, 32:10, 32:11,
32:15, 32:24, 33:3,
33:11, 35:11, 35:19,
35:22, 35:25, 36:1,
36:3, 36:5, 36:11,
36:14, 36:16, 36:17,
36:19, 37:6, 37:11,
44:20, 74:9, 76:22,
85:14, 85:16
**heard** [14] - 11:1, 21:1,
30:19, 30:20, 37:16,
39:10, 46:25, 58:15,
58:16, 58:22, 88:22,
88:25
**hearing** [2] - 30:8,
93:10
**HELD** [1] - 105:15
**held** [6] - 7:8, 51:10,
51:12, 58:1, 62:7,
101:2
**helicopter** [6] - 28:16,
30:6, 30:8, 31:19,
63:19, 71:14
**help** [8] - 7:15, 7:17,
8:16, 10:7, 20:13,
21:20, 23:5, 98:3
**HEREBY** [1] - 105:12
**hereto** [6] - 45:14,
50:10, 51:4, 64:25,
65:23, 72:23
**Hernandez** [1] - 36:3
**hiding** [1] - 64:12,
92:11
**higher** [1] - 56:9
**himself** [10] - 64:12,
67:24, 68:11, 68:20,
78:22, 78:25, 79:8,
80:12, 80:22, 88:17
**hip** [1] - 98:14
**hips** [2] - 79:5, 79:6
**hit** [9] - 27:12, 27:18,
27:25, 48:23, 49:2,

69:11, 69:12, 70:6,
70:7, 70:11, 73:22,
74:1, 75:14, 75:19,
75:22, 77:12, 78:24,
79:1, 79:7, 79:10,
79:14, 80:8, 80:11,
80:12, 82:16, 91:4
**hitting** [1] - 56:12
**hold** [7] - 21:11, 47:6,
47:11, 47:12, 68:19,
93:20
**holding** [2] - 33:5,
48:6
**holds** [4] - 47:5,
47:10, 51:19, 53:18
**Hollywood** [1] - 35:10
**holster** [2] - 47:8,
49:24
**home** [1] - 7:24
**homicide** [4] - 86:16,
86:17, 86:20, 87:10
**Honor** [39] - 6:22,
23:9, 25:21, 38:8,
45:11, 46:1, 46:3,
50:4, 50:6, 50:25,
52:6, 57:16, 59:4,
60:1, 60:20, 62:1,
62:20, 64:22, 65:21,
66:25, 68:24, 72:22,
74:23, 79:18, 85:20,
87:22, 89:25, 93:19,
94:2, 94:3, 96:4,
96:23, 96:25, 99:15,
100:10, 101:13,
101:23, 102:11,
103:12
**HONORABLE** [1] - 1:5
**hope** [1] - 55:18
**hopping** [1] - 30:3
**horseshoe** [3] - 55:14,
55:16, 55:21
**hose** [1] - 11:16
**hostage** [1] - 64:4
**hour** [7] - 31:15,
32:20, 33:18, 35:25,
36:12, 42:25, 96:19
**hour-plus** [2] - 33:18,
35:25, 36:12
**hours** [2] - 23:15,
97:17
**house** [1] - 90:8
**HOWARD** [1] - 2:15
**human** [3] - 24:5,
24:22, 42:8

## I

**idea** [3] - 78:17, 82:2,
89:21
**ignore** [4] - 8:15,
12:16, 13:2, 13:5
**immediate** [5] - 24:12,
28:18, 32:22, 71:24,
90:11
**immediately** [10] -
5:24, 71:15, 71:19,
82:13, 88:2, 90:14,
90:18, 99:4, 100:9
**imminent** [7] - 24:9,
42:18, 44:3, 54:8,

55:19, 77:9, 88:19,
89:19
**hitting** [1] - 56:12
**hold** [7] - 21:11, 47:6,
47:11, 47:12, 68:19,
93:20
**holding** [2] - 33:5,
48:6
**holds** [4] - 47:5,
47:10, 51:19, 53:18
**Hollywood** [1] - 35:10
**holster** [2] - 47:8,
49:24
**home** [1] - 7:24
**homicide** [4] - 86:16,
86:17, 86:20, 87:10
**Honor** [39] - 6:22,
23:9, 25:21, 38:8,
45:11, 46:1, 46:3,
50:4, 50:6, 50:25,
52:6, 57:16, 59:4,
60:1, 60:20, 62:1,
62:20, 64:22, 65:21,
66:25, 68:24, 72:22,
74:23, 79:18, 85:20,
87:22, 89:25, 93:19,
94:2, 94:3, 96:4,
96:23, 96:25, 99:15,
100:10, 101:13,
101:23, 102:11,
103:12
**HONORABLE** [1] - 1:5
**hope** [1] - 55:18
**hopping** [1] - 30:3
**horseshoe** [3] - 55:14,
55:16, 55:21
**hose** [1] - 11:16
**hostage** [1] - 64:4
**hour** [7] - 31:15,
32:20, 33:18, 35:25,
36:12, 42:25, 96:19
**hour-plus** [2] - 33:18,
35:25, 36:12
**hours** [2] - 23:15,
97:17
**house** [1] - 90:8
**HOWARD** [1] - 2:15
**human** [3] - 24:5,
24:22, 42:8

54:14, 54:20, 56:25
**immunity** [1] - 14:23
**impeach** [1] - 101:19
**impeached** [1] -
101:21
**important** [4] - 8:15,
19:21, 100:19, 102:5
**importantly** [1] -
101:24
**improper** [4] - 10:13,
15:20, 101:22,
102:22
**IN** [4] - 105:10,
105:15, 105:16,
105:19
**incident** [16] - 5:24,
29:7, 38:21, 39:8,
39:9, 63:12, 64:6,
86:7, 87:21, 90:5,
93:5, 95:14, 95:15,
95:19, 102:19
**include** [1] - 35:23
**includes** [1] - 17:22
**including** [1] - 18:5
**inconsistent** [3] -
31:14, 101:21, 102:9
**independently** [1] -
54:4
**indicate** [1] - 33:6
**indication** [3] - 36:22,
37:1, 73:8
**indifference** [1] - 17:1
**indisputably** [1] - 5:24
**individual** [1] - 31:8
**individuals** [2] - 30:14
**infer** [1] - 8:2
**inference** [2] - 11:17,
11:21
**inflammatory** [1] -
103:25
**inflicting** [1] - 24:14
**influenced** [3] - 8:10,
10:14, 20:23
**information** [14] -
17:16, 19:24, 21:15,
33:18, 33:24, 35:20,
58:15, 63:1, 63:11,
63:15, 63:17, 93:10,
93:14, 98:8
**initial** [2] - 29:14,
92:21
**injure** [1] - 33:2
**injured** [3] - 14:25,
26:6
**injury** [9] - 24:9,
24:14, 25:13, 28:10,
42:19, 44:3, 54:9,
54:14, 54:20
**innocent** [1] - 33:2
**inquire** [1] - 38:13
**insert** [1] - 78:8
**inside** [3] - 75:8,
75:15, 75:16
**Inside** [1] - 75:9
**insofar** [1] - 74:16
**instantaneously** [1] -

73:14
**instead** [1] - 36:9
**instruct** [5] - 7:13, 10:16, 12:3, 22:13
**instructed** [4] - 15:12, 22:9, 57:19, 102:23
**instruction** [5] - 10:20, 15:9, 15:19, 18:2, 18:18
**instructional** [1] - 24:18
**instructions** [19] - 7:7, 7:14, 7:15, 7:20, 7:22, 7:23, 8:1, 8:3, 8:14, 9:16, 14:16, 14:18, 17:9, 17:14, 19:4, 19:22, 22:22
**intend** [2] - 59:21, 61:20
**intended** [4] - 7:15, 10:7, 25:10, 85:9
**intending** [1] - 102:9
**interest** [2] - 13:17, 16:7
**interesting** [4] - 27:14, 30:19, 32:5, 37:16
**interference** [1] - 8:25
**Internet** [2] - 17:24, 18:24
**interpret** [2] - 10:7, 19:22
**interpreted** [1] - 68:10
**interrupted** [1] - 51:6
**introduce** [2] - 59:21, 103:17
**invented** [1] - 18:1
**investigation** [3] - 19:2, 57:24, 101:14
**investment** [1] - 19:10
**involve** [1] - 58:14
**involved** [13] - 18:7, 18:22, 32:18, 34:1, 38:21, 40:6, 44:21, 44:22, 86:16, 86:18, 99:4, 99:8, 99:24
**involves** [2] - 8:18, 17:16
**involving** [4] - 6:10, 34:1, 39:9, 91:21
**IS** [2] - 105:13, 105:16
**issue** [7] - 26:9, 58:6, 58:24, 100:24, 101:8, 101:11, 101:17
**issue..** [1] - 5:22
**issues** [3] - 17:16, 57:22, 101:17
**item** [1] - 12:4
**itemize** [1] - 52:17
**itself** [2] - 6:16, 60:3

---

**J**

**James** [1] - 35:23
**jeopardizes** [1] - 19:7

---

John [16] - 8:19, 8:22, 14:11, 15:1, 15:14, 15:22, 15:25, 16:3, 16:13, 16:15, 16:17, 16:20, 16:24, 17:3, 38:8, 38:12
**JOHN** [7] - 1:12, 2:8, 2:9, 2:14, 3:5, 38:9, 105:7
**joins** [1] - 73:12
**JUDGE** [1] - 1:5
**judge** [3] - 30:16, 31:25, 32:4
**judged** [1] - 14:1
**JUDICIAL** [2] - 105:17, 105:20
**jump** [1] - 91:3
**jumped** [4] - 33:19, 33:20, 36:13, 46:1
**JUNE** [2] - 1:18, 5:1
**juror** [2] - 18:9, 19:6
**jurors** [7] - 17:9, 17:11, 18:4, 19:16, 19:18, 20:14, 20:24
**jury** [32] - 6:7, 7:5, 7:9, 7:11, 7:13, 11:25, 17:17, 18:13, 19:20, 20:15, 22:15, 30:16, 31:25, 58:1, 58:3, 58:9, 59:2, 59:16, 60:5, 60:14, 60:16, 62:6, 62:8, 62:10, 74:8, 101:2, 101:4, 101:8, 102:4, 102:22, 103:1, 103:16
**JURY** [1] - 1:15
**jury's** [1] - 19:10
**justifications** [1] - 28:9
**justify** [1] - 28:13

---

**K**

**K9** [16] - 28:20, 31:18, 35:6, 36:1, 36:16, 71:18, 71:23, 72:1, 91:18, 91:22, 91:23, 91:24, 92:3, 92:7, 92:8, 92:9
**keep** [11] - 7:21, 17:9, 18:2, 20:14, 21:14, 26:25, 28:2, 37:19, 49:11, 57:24, 102:4
**keeping** [2] - 60:14, 62:11
**kept** [2] - 27:25, 36:13
**key** [1] - 37:18
**kill** [6] - 23:20, 23:21, 24:13, 25:7, 26:15, 63:18
**killed** [1] - 23:14
**kind** [16] - 18:11, 26:2, 48:25, 53:14, 55:12, 63:3, 63:13, 68:2,

---

68:11, 85:6, 91:2, 91:21, 98:23
**kinds** [2] - 11:22, 32:13
**knee** [7] - 69:20, 69:22, 69:25, 70:2, 70:22, 77:20, 82:8
**kneeling** [1] - 70:1
**knees** [1] - 80:21
**knowing** [1] - 42:13
**knowledge** [8] - 41:12, 41:15, 41:17, 63:2, 63:4, 78:12, 83:15, 92:14

---

**L**

**lack** [2] - 82:19, 88:22
**ladder** [4] - 59:14, 59:17, 59:18, 65:25
**ladies** [7] - 7:12, 22:18, 23:11, 32:2, 62:11, 79:22, 100:14
**Ladies** [1] - 57:18
**laid** [1] - 39:23
**landing** [4] - 65:8, 65:11, 90:25, 91:11
**LAPD** [1] - 37:9
**larger** [1] - 46:21
**last** [22] - 17:8, 24:25, 35:4, 41:23, 52:10, 78:7, 79:21, 80:14, 80:21, 81:1, 81:6, 81:11, 81:14, 81:21, 84:19, 84:24, 85:1, 88:10, 89:9, 89:10, 89:17
**lasted** [2] - 19:16, 32:19
**LAW** [1] - 2:8
**law** [23] - 7:14, 8:8, 11:23, 14:12, 14:18, 14:22, 15:6, 15:9, 15:11, 15:14, 16:14, 17:7, 17:14, 19:3, 22:13, 22:25, 32:12, 34:22, 37:7, 37:17, 37:25
**lawfully** [1] - 9:6
**laws** [1] - 14:24
**lawsuit** [1] - 14:11
**lawyer** [4] - 12:7, 12:8, 12:10, 12:22
**lawyers** [10] - 9:23, 10:3, 10:4, 10:9, 10:11, 12:20, 12:21, 18:22, 18:25, 74:13
**layers** [1] - 62:16
**lead** [1] - 24:11
**leaped** [2] - 33:14, 63:18
**learn** [6] - 19:3, 19:14, 24:6, 29:18, 32:6, 35:10
**learned** [1] - 39:9

---

**learning** [3] - 24:17, 41:9, 41:17
**least** [1] - 89:7
**leave** [5] - 7:23, 20:18, 61:9, 61:11, 85:20
**leaving** [1] - 95:18
**led** [4] - 29:4, 63:21, 68:16, 69:10
**left** [18] - 11:16, 20:19, 27:21, 49:10, 49:20, 49:23, 49:25, 50:21, 51:9, 53:1, 69:25, 70:7, 72:14, 72:15, 73:1, 77:14, 77:15, 82:8
**left-hand** [2] - 49:20, 50:21
**leg** [1] - 77:15
**legal** [3] - 14:19, 18:18, 31:10
**legitimate** [2] - 17:7, 37:24
**legs** [2] - 79:5, 79:6
**length** [2] - 18:10, 35:25
**lengthy** [1] - 19:15
**lens** [1] - 25:16
**Leon** [1] - 36:3
**LESS** [1] - 105:18
**less** [4] - 28:21, 28:23, 29:1, 82:19
**lethal** [3] - 28:21, 28:23, 29:1
**let's** [1] - 101:6
**lever** [1] - 48:23
**liable** [1] - 14:24
**liberty** [1] - 16:7
**life** [2] - 24:22, 42:8
**light** [3] - 13:20, 28:8
**lighting** [1] - 66:19
**likely** [4] - 7:6, 19:25, 89:7, 89:13
**limine** [1] - 29:11
**limited** [4] - 10:19, 12:2, 12:4, 12:5
**limiting** [1] - 10:19
**line** [10] - 74:25, 75:3, 76:12, 91:16, 94:4, 94:11, 101:25, 102:13
**lines** [1] - 93:25
**list** [1] - 10:2
**listen** [2] - 7:18, 18:19
**lit** [1] - 66:20
**literally** [1] - 28:4
**live** [1] - 27:10
**loaded** [2] - 48:13, 49:5
**loan** [1] - 30:7
**location** [3] - 39:17, 81:12, 91:19
**lock** [2] - 48:22, 49:10
**locks** [4] - 48:18, 48:21, 48:22, 49:9
**lodged** [1] - 74:22

---

**LONG** [2] - 2:14, 2:17
**look** [26] - 23:19, 23:22, 23:23, 23:24, 24:15, 25:3, 25:10, 25:15, 25:24, 26:9, 26:14, 27:23, 30:11, 31:19, 34:23, 38:4, 39:3, 45:18, 50:13, 55:10, 55:20, 62:2, 69:16, 90:20, 97:4, 100:4
**looked** [2] - 33:22, 50:15
**looking** [18] - 30:10, 35:1, 35:24, 43:11, 43:13, 44:19, 50:2, 56:13, 67:16, 77:11, 78:19, 80:24, 81:3, 81:8, 81:20, 81:23, 83:16, 97:9
**looks** [2] - 45:5, 51:13
**LOS** [4] - 1:17, 1:23, 2:6, 5:1
**Los** [1] - 30:7
**loss** [1] - 9:2
**lost** [1] - 48:19
**lunch** [1] - 5:9
**lying** [1] - 78:21

---

**M**

**MADAMREPORTER. COM** [1] - 1:24
**mag** [1] - 53:9
**magazine** [37] - 26:24, 26:25, 27:3, 27:4, 47:4, 47:10, 48:4, 48:7, 48:8, 48:10, 48:23, 48:25, 49:3, 49:12, 49:13, 49:14, 49:17, 49:18, 50:19, 51:16, 51:21, 52:15, 52:19, 52:22, 52:24, 53:1, 53:3, 53:4, 53:10, 53:17, 53:19, 54:23, 71:4, 71:6, 78:8
**Magazine** [1] - 49:19
**magazines** [10] - 48:5, 49:20, 49:25, 50:22, 51:10, 51:12, 51:21, 52:2, 52:3, 52:14
**mail** [1] - 17:23
**majority** [1] - 27:17
**manner** [8] - 13:16, 21:18, 66:21, 67:2, 68:5, 81:18, 83:4, 83:5
**manual** [1] - 24:18
**MARIA** [3] - 1:20, 105:10, 105:23
**Mark** [1] - 36:5
**mark** [1] - 60:9
**MARKED** [1] - 4:2
**markers** [1] - 73:8

113

**marks** [1] - 27:21
**Martinez** [38] - 5:10, 8:20, 8:22, 8:24, 14:11, 15:2, 15:14, 15:23, 16:1, 16:4, 16:13, 16:15, 16:17, 16:20, 16:24, 17:4, 28:4, 32:16, 32:18, 35:17, 58:5, 63:21, 65:10, 71:20, 71:21, 72:6, 72:13, 72:25, 73:2, 73:10, 73:12, 73:18, 76:21, 77:6, 80:18, 88:23, 89:15, 96:17
**materials** [2] - 5:13, 24:16
**matter** [3] - 18:15, 101:4, 102:14
**MATTER** [1] - 105:15
**mean** [5] - 56:7, 57:4, 58:12, 85:24, 100:7
**meaning** [2] - 48:22, 71:18
**means** [11] - 8:11, 9:10, 12:11, 12:13, 12:25, 13:6, 17:23, 24:23, 29:1, 42:2, 54:12
**meant** [2] - 54:23, 60:25
**mechanism** [2] - 53:2, 53:20
**media** [2] - 18:6, 18:19
**meet** [2] - 21:3, 103:15
**meets** [1] - 101:18
**members** [7] - 7:11, 11:25, 18:6, 60:7, 61:2, 62:10
**memory** [4] - 10:10, 13:16, 20:22, 20:23
**mention** [2] - 19:17, 61:6
**mentioned** [6] - 5:10, 14:7, 32:7, 32:13, 60:7, 93:4
**merged** [1] - 94:24
**merits** [1] - 17:21
**messaging** [1] - 17:24
**mic** [1] - 98:13
**middle** [2] - 55:15, 59:8
**might** [7] - 12:17, 12:18, 22:5, 31:4, 33:6, 50:2, 94:14
**Mike** [1] - 36:1
**mind** [11] - 17:10, 37:19, 43:8, 57:24, 58:22, 58:24, 61:14, 80:1, 80:2, 88:17, 89:20
**minds** [2] - 87:3, 100:24
**mindset** [2] - 5:15, 37:21
**minor** [2] - 6:24, 7:1

**minutes** [9] - 29:25, 31:15, 42:25, 57:18, 57:25, 96:2, 96:18, 97:17, 100:6
**misspoke** [1] - 54:22
**misstating** [1] - 101:16
**mistrial** [2] - 19:8, 19:19
**misunderstood** [1] - 101:24
**moment** [10] - 39:22, 39:23, 42:20, 43:20, 43:22, 43:25, 64:8, 68:17, 89:24, 91:15
**moment..** [1] - 44:12
**momentarily** [1] - 69:18
**moments** [3] - 7:19, 10:5, 84:12
**money** [1] - 19:12
**monitoring** [1] - 94:17
**months** [1] - 19:16
**morning** [25] - 11:5, 11:11, 18:1, 21:3, 23:15, 25:15, 29:8, 32:4, 39:1, 44:14, 44:15, 45:19, 46:13, 47:7, 50:16, 65:3, 95:13, 100:6, 100:8, 100:15, 100:18, 100:25, 101:7, 102:15, 103:15
**most** [7] - 23:18, 24:20, 27:14, 28:12, 34:4, 98:12, 102:5
**motion** [6] - 43:19, 49:16, 68:13, 69:1, 79:20, 101:14
**motivated** [2] - 34:4, 34:5
**move** [9] - 21:17, 52:8, 61:21, 68:25, 79:4, 79:18, 87:23
**movies** [1] - 32:9
**moving** [1] - 53:11
**MR** [98] - 5:5, 5:6, 5:18, 5:23, 6:9, 6:14, 6:15, 6:21, 7:3, 23:9, 23:11, 25:20, 25:24, 32:4, 38:8, 38:15, 45:2, 45:4, 45:9, 45:10, 45:15, 45:16, 46:1, 46:7, 46:10, 46:15, 50:6, 50:9, 50:11, 50:24, 51:2, 51:5, 52:6, 52:12, 57:14, 57:16, 58:18, 59:4, 59:12, 59:18, 59:23, 60:1, 60:20, 60:24, 61:3, 61:19, 61:25, 62:5, 62:20, 62:21, 65:1, 65:21, 65:24, 66:25, 67:1, 69:3, 72:18, 72:19, 72:22, 72:24, 74:23,

74:24, 75:2, 75:5, 75:7, 75:18, 76:11, 76:15, 79:18, 79:23, 85:20, 85:22, 86:2, 87:22, 87:25, 90:2, 90:3, 93:19, 94:2, 94:3, 94:5, 94:7, 95:20, 96:23, 96:25, 97:2, 97:12, 99:14, 99:18, 100:10, 101:13, 101:23, 102:11, 102:17, 103:3, 103:12, 103:21, 104:2
**multiple** [1] - 36:13
**municipal** [1] - 15:11
**must** [19] - 8:2, 8:8, 8:10, 8:11, 8:14, 9:10, 10:17, 10:20, 12:5, 12:16, 13:7, 15:2, 17:13, 17:15, 18:14, 25:6, 26:15, 40:18
**muzzle** [1] - 67:13
**myths** [1] - 35:9

**N**

**name** [7] - 29:10, 29:13, 36:8, 36:9, 36:10, 38:10, 96:6
**named** [1] - 37:8
**names** [2] - 22:25, 35:14, 35:15
**nature** [2] - 88:3, 99:3
**near** [2] - 74:3, 77:14
**Nebraska** [3] - 35:19, 35:23, 94:15
**necessarily** [3] - 13:11, 13:22, 91:13
**necessary** [6] - 21:19, 25:9, 25:14, 31:12, 31:21
**need** [6] - 34:25, 35:1, 37:18, 48:4, 57:13
**needs** [1] - 95:10
**neglect** [1] - 20:16
**neighborhood** [5] - 30:3, 39:11, 90:4, 90:7, 90:9
**never** [13] - 20:25, 36:21, 36:22, 36:23, 36:24, 46:25, 73:23, 73:25, 75:14, 75:19, 75:22, 102:3
**nevertheless** [1] - 43:21
**new** [6] - 48:23, 49:14, 49:18, 49:19, 53:3, 53:10
**news** [1] - 18:19
**next** [17] - 14:17, 15:8, 15:19, 17:8, 19:11, 59:22, 61:23, 70:4, 71:19, 71:21, 73:10,

76:12, 76:16, 76:18, 76:20, 83:3, 84:21
**night** [9] - 35:18, 56:16, 63:7, 63:9, 63:10, 63:11, 87:3, 91:3, 95:7
**none** [5] - 13:11, 29:1, 31:7, 61:3, 87:1
**nonresponsive** [2] - 52:7, 68:24
**Nonresponsive** [1] - 79:19
**NORTH** [1] - 1:22
**north** [4] - 94:13, 94:14, 95:3, 95:8
**north-south** [1] - 94:13
**note** [1] - 20:16
**note-taking** [1] - 20:16
**notebooks** [8] - 7:19, 7:21, 7:22, 20:18, 22:19, 22:20, 23:2, 97:4
**notes** [7] - 20:12, 20:13, 20:20, 20:21, 20:22, 20:23, 22:23
**nothing** [8] - 12:25, 18:10, 18:11, 26:5, 45:20, 67:12, 69:12
**notify** [2] - 18:8, 19:24
**November** [3] - 8:20, 23:15, 38:22
**nowhere** [2] - 31:18, 33:10
**number** [18] - 9:20, 10:3, 10:11, 13:12, 13:14, 13:23, 15:5, 16:12, 16:14, 16:23, 22:21, 36:17, 36:20, 51:1, 60:2, 61:15, 74:25, 97:9
**numerous** [1] - 31:23

**O**

**o'clock** [3] - 100:16, 100:18, 100:25
**oath** [3] - 8:13, 74:11, 74:12
**object** [8] - 10:13, 12:10, 12:23, 25:21, 47:3, 48:2, 55:6, 55:10
**objection** [27] - 10:15, 12:11, 12:13, 12:15, 12:23, 13:2, 45:6, 45:10, 46:4, 46:6, 46:7, 50:5, 52:6, 52:9, 59:5, 59:8, 59:20, 59:25, 60:1, 60:2, 61:17, 72:17, 75:4, 94:1, 94:5, 96:21, 103:24
**objectionable** [1] - 61:19

**objections** [3] - 10:11, 50:24, 103:19
**objectives** [1] - 17:7
**obscured** [1] - 50:20
**observe** [1] - 20:16
**obstructed** [1] - 67:14
**obviously** [1] - 65:25
**occasionally** [2] - 20:10, 21:5
**occasions** [1] - 63:17
**occur** [1] - 89:2
**occurred** [3] - 39:12, 40:6, 89:6
**occurring** [2] - 39:13, 95:15
**OCEAN** [1] - 2:16
**OF** [11] - 1:2, 1:15, 2:4, 2:8, 2:13, 105:11, 105:14, 105:17, 105:20
**offering** [2] - 97:1, 97:2
**offers** [1] - 12:8
**OFFICE** [1] - 2:14
**Officer** [34] - 5:10, 28:4, 32:16, 32:18, 33:3, 33:7, 33:8, 34:11, 35:17, 36:2, 36:11, 40:15, 50:12, 58:5, 63:21, 65:10, 71:20, 71:21, 72:6, 72:13, 72:25, 73:2, 73:10, 73:12, 73:18, 76:21, 77:6, 80:18, 88:23, 89:15, 96:17, 102:17
**officer** [46] - 5:14, 24:11, 24:21, 25:5, 25:6, 25:8, 25:11, 25:13, 26:6, 26:7, 26:15, 26:23, 27:2, 28:20, 29:19, 33:6, 34:19, 36:1, 40:6, 40:17, 40:18, 40:20, 40:23, 44:22, 53:21, 56:20, 57:9, 58:12, 59:7, 59:13, 59:15, 59:19, 66:4, 71:18, 71:23, 72:1, 86:16, 86:18, 92:15, 99:4, 99:8, 99:24, 103:8
**officer's** [1] - 40:19
**officer-involved** [7] - 40:6, 44:22, 86:16, 86:18, 99:4, 99:8, 99:24
**officers** [62] - 8:19, 14:14, 23:13, 23:18, 23:20, 23:23, 23:24, 24:1, 24:3, 24:7, 24:16, 24:19, 25:16, 26:3, 26:5, 26:11, 26:18, 27:23, 28:3, 28:17, 28:22, 29:1, 29:9, 29:10, 29:11, 29:15, 30:5, 31:3,

31:6, 31:10, 31:11, 31:13, 31:20, 32:10, 32:25, 33:12, 34:3, 34:8, 34:14, 34:15, 35:11, 35:12, 35:17, 36:4, 36:6, 36:13, 36:18, 36:19, 37:3, 37:4, 37:7, 37:21, 37:24, 41:4, 41:18, 42:7, 42:25, 57:1, 71:10, 71:12
**officers'** [1] - 43:4
**OFFICES** [1] - 2:8
**OFFICIAL** [3] - 1:20, 105:10, 105:23
**official** [1] - 15:10
**often** [1] - 22:4
**old** [3] - 30:20, 30:23, 53:3
**older** [1] - 103:8
**Omar** [1] - 36:3
**ON** [2] - 2:4, 2:13
**Once** [1] - 94:18
**once** [10] - 19:13, 21:1, 27:3, 28:12, 48:16, 49:9, 52:3, 58:15, 86:11, 86:15
**one** [87] - 9:21, 10:3, 11:2, 11:9, 12:21, 13:14, 15:5, 16:12, 16:23, 19:15, 19:16, 19:17, 20:19, 22:16, 24:17, 24:20, 25:19, 27:14, 28:3, 29:11, 29:18, 29:19, 30:11, 31:4, 31:15, 32:19, 37:7, 37:8, 37:18, 40:22, 41:3, 41:4, 41:22, 44:1, 45:17, 45:23, 47:9, 48:7, 48:10, 49:1, 49:5, 49:16, 51:20, 51:23, 59:7, 66:7, 66:12, 69:20, 69:22, 70:2, 72:2, 72:9, 73:12, 77:4, 77:11, 77:14, 85:3, 85:4, 89:8, 91:3, 93:6, 93:8, 94:20, 94:21, 94:25, 95:2, 95:5, 95:6, 95:12, 95:14, 95:16, 95:19, 97:6, 97:7, 97:8, 98:20, 98:24, 99:12, 102:5, 102:25
**one..** [1] - 93:23
**ones** [1] - 35:12
**open** [3] - 17:10, 32:25, 57:24
**opened** [4] - 33:12, 34:11, 34:12, 53:8
**opening** [8] - 6:9, 10:5, 21:19, 21:22, 21:23, 23:8, 25:20
**OPENING** [1] - 23:10
**opinion** [4] - 8:4, 14:1, 14:5, 77:24

**opinions** [3] - 8:11, 13:25, 14:1
**opportunity** [8] - 5:7, 13:14, 16:22, 16:24, 17:4, 19:6, 21:23, 36:9
**options** [1] - 37:20
**order** [9] - 13:4, 14:25, 22:4, 22:5, 26:25, 34:24, 51:16, 53:13, 54:2
**ordered** [7] - 18:14, 45:12, 46:8, 50:7, 51:3, 64:23, 65:19
**ordinance** [1] - 15:11
**orient** [1] - 72:12
**original** [3] - 28:9, 63:5, 74:21
**originally** [3] - 25:10, 29:11, 92:10
**originated** [1] - 93:5
**otherwise** [4] - 9:15, 17:19, 63:2, 100:23
**ourselves** [1] - 71:22
**out-of-court** [1] - 27:10
**outcome** [1] - 13:17
**outline** [1] - 21:20
**outside** [10] - 11:5, 19:24, 58:1, 58:2, 58:7, 58:8, 60:16, 63:23, 101:2, 101:3
**outstretched** [2] - 67:6, 88:11
**outward** [1] - 89:22
**outweighed** [1] - 60:4
**overhead** [2] - 71:15
**overly** [1] - 20:23
**overrule** [1] - 12:11
**overview** [1] - 87:2
**own** [2] - 19:3, 20:22

**P**

**P-O-S-T** [1] - 40:14
**P.M** [2] - 1:16, 5:3
**p.m** [1] - 39:6
**page** [8] - 74:25, 75:3, 93:25, 94:11, 97:14, 99:22, 99:23, 100:4
**PAGE** [2] - 3:2, 105:16
**pages** [1] - 22:23
**pants** [1] - 75:10
**parameter** [1] - 31:17
**Parcells** [1] - 36:1
**parent** [1] - 16:6
**parents** [1] - 8:21
**parked** [3] - 39:17, 95:23, 96:5
**parking** [1] - 11:6, 92:10
**part** [8] - 5:15, 13:10, 36:2, 44:18, 51:18, 56:23, 78:1, 101:13
**PARTIAL** [1] - 1:15

**participants** [1] - 57:23
**particular** [21] - 12:19, 15:7, 16:1, 25:15, 25:24, 26:17, 27:1, 28:24, 30:17, 38:24, 39:11, 42:10, 43:21, 44:13, 44:14, 47:2, 51:24, 55:6, 63:10, 91:19, 102:6
**particularly** [1] - 103:14
**parties** [8] - 7:11, 8:17, 9:16, 14:8, 15:12, 19:13, 62:10, 101:5
**parts** [1] - 62:14
**party** [7] - 9:8, 9:14, 14:25, 19:5, 21:21, 21:22, 74:13
**pass** [1] - 40:18
**passed** [5] - 40:2, 40:24, 40:25, 95:22, 96:10
**past** [1] - 30:21
**pat** [2] - 29:16, 92:20
**pat-down** [2] - 29:16, 92:20
**pathologist** [1] - 27:8
**Patience..** [1] - 103:4
**patted** [3] - 29:14, 29:22, 93:2
**Paul** [1] - 36:5
**Pause** [2] - 32:3, 45:3
**paused** [5] - 69:16, 84:6, 84:8, 84:9
**pausing** [3] - 70:5, 76:18, 84:12
**pay** [1] - 20:4
**peace** [4] - 25:8, 25:13, 40:20, 41:18
**Peace** [1] - 40:14
**pen** [3] - 48:1, 55:7, 65:7
**people** [7] - 18:7, 35:8, 35:22, 37:4, 37:14, 40:22, 60:6
**people's** [1] - 35:9
**perceive** [1] - 34:20
**perceiving** [1] - 26:20
**percent** [2] - 43:12, 56:12
**percentage** [1] - 83:24
**percentile** [1] - 56:8
**perfect** [1] - 56:15
**performance** [1] - 15:10
**performed** [1] - 27:8
**perhaps** [3] - 58:4, 89:3, 89:5
**period** [3] - 62:25, 64:11, 84:24
**periodically** [1] - 47:20
**permanently** [1] - 98:15

**permission** [1] - 45:5
**permitted** [2] - 12:9, 13:25
**person** [23] - 14:22, 15:9, 15:10, 17:22, 24:12, 26:7, 26:8, 28:11, 30:2, 31:11, 33:1, 34:4, 35:3, 54:10, 56:22, 56:25, 57:4, 66:11, 67:13, 74:19, 92:22, 93:3, 100:23
**person's** [1] - 34:24
**personal** [2] - 8:10, 25:22
**personally** [4] - 11:1, 11:8, 11:18, 11:19
**persons** [2] - 14:22, 18:21
**perspective** [1] - 37:10
**persuaded** [1] - 9:11
**PHILLIPS** [1] - 1:5
**photograph** [7] - 45:17, 49:22, 50:13, 50:14, 50:18, 60:17, 60:23
**photographs** [10] - 59:6, 61:8, 61:15, 61:20, 64:20, 90:20, 103:13, 103:15, 103:17, 103:18
**photos** [2] - 60:2, 62:2
**PHYLLIS** [1] - 5:4
**physically** [3] - 26:7, 26:8, 36:21
**pick** [1] - 76:12
**picture** [7] - 48:19, 50:1, 55:11, 59:8, 59:14, 87:3, 91:14
**pictures** [6] - 22:25, 23:1, 23:5, 35:14, 37:15, 60:11
**piece** [2] - 33:17, 52:14
**pilot** [2] - 30:8, 63:19
**place** [4] - 35:21, 63:22, 74:18, 98:3
**placed** [2] - 71:6, 74:11
**plaintiff's** [3] - 9:5, 22:6, 60:8
**PLAINTIFF'S** [4] - 3:3, 3:4, 4:2, 38:9
**Plaintiff's** [6] - 45:14, 50:10, 51:4, 64:25, 65:23, 72:23
**plaintiffs** [24] - 5:12, 8:20, 8:23, 9:1, 9:3, 14:19, 15:2, 15:7, 15:17, 15:20, 15:21, 15:24, 16:1, 16:3, 16:4, 16:10, 21:24, 21:25, 22:1, 22:2, 23:7, 37:10, 103:16
**Plaintiffs** [1] - 1:8

**PLAINTIFFS** [1] - 2:4
**plan** [1] - 6:9
**please..** [1] - 89:18
**plenty** [1] - 100:17
**plus** [5] - 17:25, 33:18, 35:25, 36:12, 48:10
**pocket** [1] - 73:24
**pockets** [2] - 73:22, 75:20
**podium** [1] - 85:20
**point** [33] - 32:23, 34:18, 35:14, 39:20, 42:14, 42:17, 42:21, 42:24, 43:3, 43:18, 43:19, 44:4, 44:5, 44:6, 44:7, 44:20, 48:24, 49:12, 52:7, 52:8, 57:15, 61:7, 66:14, 66:17, 69:12, 70:4, 71:2, 71:9, 78:17, 87:4, 87:24, 100:11
**pointed** [1] - 51:18
**pointing** [1] - 48:1
**police** [52] - 8:19, 14:14, 23:18, 23:23, 23:24, 23:25, 24:7, 24:18, 24:21, 25:5, 25:6, 25:16, 26:3, 26:6, 26:7, 26:15, 26:23, 28:17, 29:15, 29:19, 30:4, 30:9, 30:11, 30:12, 31:10, 31:11, 31:13, 31:14, 32:7, 32:8, 32:10, 32:21, 33:6, 34:15, 35:10, 40:17, 40:18, 40:23, 41:14, 42:25, 43:4, 53:21, 56:19, 57:1, 57:9, 71:10, 71:12, 99:7, 99:9, 99:10
**Police** [4] - 23:13, 30:7, 38:18, 59:12
**poor** [2] - 82:20, 90:12
**pop** [2] - 53:15, 53:17
**portion** [2] - 48:17, 65:15
**pose** [6] - 28:10, 32:22, 37:3, 42:18, 43:16, 54:20
**posed** [4] - 30:24, 38:2, 44:2, 54:13
**poses** [1] - 54:8
**position** [13] - 33:5, 64:12, 68:22, 78:22, 79:4, 79:15, 79:24, 81:15, 81:22, 89:15, 91:9, 94:18
**positioned** [2] - 94:12, 94:13
**positioning** [2] - 72:12, 88:8
**positions** [1] - 8:17
**possibility** [3] - 24:13, 28:11, 88:18

114

**possible** [7] - 18:3, 19:23, 21:9, 74:17, 82:7, 83:20, 89:25
**POST** [10] - 40:12, 40:14, 41:1, 41:3, 41:5, 41:22, 42:1, 42:6, 54:3, 54:4
**post** [1] - 40:24
**post-certified** [1] - 40:24
**potentially** [1] - 60:5
**pouch** [9] - 51:12, 51:16, 51:21, 53:5, 53:8, 53:11, 53:13, 53:18
**pouches** [1] - 51:10
**power** [2] - 23:18, 23:22
**powerful** [1] - 46:24
**practices** [2] - 30:12, 31:14
**precluded** [2] - 101:14, 102:2
**prejudice** [2] - 13:18, 60:4
**prejudices** [1] - 8:11
**preliminary** [2] - 7:15, 22:22
**preparing** [1] - 35:2
**preponderance** [4] - 9:9, 15:3, 15:4, 16:11
**presence** [9] - 7:8, 7:10, 58:1, 58:3, 58:9, 62:7, 62:9, 101:2, 101:4
**present** [6] - 5:25, 7:11, 21:24, 22:1, 22:14, 62:10
**presented** [5] - 9:14, 20:8, 22:12, 74:16, 74:17
**presenting** [1] - 38:4
**PRESIDING** [1] - 1:5
**press** [2] - 18:6, 49:12
**pressing** [1] - 53:10
**PRESTON** [1] - 5:4
**prevail** [1] - 14:25
**prevent** [1] - 19:25
**preview** [1] - 35:15
**previously** [2] - 15:24, 45:8
**principle** [2] - 25:2, 42:8
**principles** [5] - 7:16, 24:6, 25:4, 25:11, 102:5
**privileges** [1] - 14:23
**probative** [1] - 60:3
**problem** [2] - 60:22, 61:14
**problems** [3] - 20:1, 20:12, 66:19
**proceed** [3] - 6:8, 21:18, 23:7
**proceeding** [1] - 104:3

**PROCEEDINGS** [2] - 1:15, 105:15
**proceedings** [4] - 19:7, 32:3, 45:3, 101:20
**process** [10] - 19:9, 34:19, 64:17, 67:18, 67:21, 67:22, 67:24, 68:19, 79:9, 88:17
**produce** [1] - 34:18
**produced** [1] - 22:11
**proffer** [2] - 102:20, 103:10
**proffer..** [1] - 103:3
**promptly** [1] - 100:18
**prong** [1] - 25:25
**proof** [5] - 9:7, 9:8, 10:25, 11:2, 13:11
**proofread** [1] - 87:15
**propel** [1] - 64:12
**propelled** [1] - 90:22
**properly** [1] - 18:18
**protected** [1] - 16:7
**prove** [5] - 15:2, 15:17, 15:21, 15:25, 46:25
**proved** [1] - 15:18
**proven** [1] - 14:10
**provide** [1] - 28:23
**provides** [2] - 14:21, 41:4
**proving** [2] - 9:4, 16:10
**public** [1] - 32:24
**publish** [4] - 45:13, 50:8, 64:24, 72:21
**publishing** [2] - 45:4, 46:11
**puddles** [1] - 11:13
**pull** [5] - 34:18, 55:3, 68:6, 77:21, 78:1
**pulled** [2] - 29:8, 29:12
**pulling** [1] - 67:24
**purports** [1] - 15:10
**purpose** [10] - 6:17, 6:24, 10:19, 12:2, 12:4, 12:5, 17:6, 21:7, 21:14, 37:25
**PURSUANT** [1] - 105:12
**pursuit** [4] - 32:19, 39:10, 39:16, 91:21
**push** [9] - 78:22, 79:4, 79:14, 79:24, 80:12, 80:21, 81:15, 81:22, 89:15
**push-up** [7] - 78:22, 79:4, 79:14, 79:24, 81:15, 81:22, 89:15
**pushing** [9] - 78:22, 78:25, 79:7, 79:8, 79:14, 80:4, 80:7, 81:5, 88:17
**put** [16] - 22:5, 22:25, 26:24, 29:20, 29:21,

48:23, 49:19, 71:3, 73:22, 73:23, 74:1, 74:2, 74:3, 75:8, 75:19, 83:20
**puts** [1] - 29:19

**Q**

**qualify** [1] - 47:19
**quantify** [1] - 83:23
**questioning** [6] - 44:16, 76:13, 87:24, 91:16, 101:25, 102:13
**questions** [9] - 10:11, 37:18, 44:16, 74:14, 74:20, 96:4, 100:11, 103:1
**quickly** [6] - 21:8, 21:17, 61:17, 73:12, 73:21, 77:8
**quietly** [1] - 61:11
**quite** [3] - 55:14, 77:15, 96:13

**R**

**racial** [5] - 88:3, 88:6, 102:18, 102:19, 103:7
**radio** [21] - 5:14, 6:3, 29:18, 29:20, 29:21, 30:20, 39:14, 44:20, 58:13, 92:20, 94:19, 95:5, 95:6, 95:12, 98:7, 98:11, 98:13, 98:15, 98:17, 98:20
**railing** [1] - 33:14
**rain** [1] - 11:19
**rained** [3] - 11:7, 11:15, 11:18
**raining** [1] - 11:6
**raise** [2] - 6:1, 20:9
**raised** [1] - 55:6
**ran** [5] - 26:18, 29:13, 30:2, 30:3, 72:1
**range** [1] - 47:16
**rather** [1] - 79:13
**rationale** [1] - 54:25
**reach** [1] - 19:19
**reaching** [7] - 9:24, 68:5, 79:11, 79:13, 79:25, 80:3, 80:6
**react** [2] - 32:14, 34:23
**read** [7] - 14:15, 18:19, 20:19, 27:11, 32:9, 75:1, 76:10
**reading** [5] - 74:19, 75:2, 87:14, 92:17, 94:11
**ready** [1] - 6:8
**real** [3] - 19:25, 35:10, 84:15
**realized** [2] - 34:12,

42:17
**really** [2] - 19:21, 55:24
**realtime** [1] - 98:1
**rear** [2] - 55:8, 55:10
**reason** [2] - 5:20, 33:11
**reasonableness** [2] - 6:22, 13:19
**reasonably** [1] - 9:6
**reasons** [4] - 13:25, 14:5, 44:1, 77:4
**receive** [6] - 18:17, 23:23, 63:1, 63:11, 63:15, 98:8
**RECEIVED** [1] - 4:2
**received** [8] - 5:13, 9:22, 9:25, 10:18, 10:23, 12:7, 12:12, 12:15, 17:14
**recently** [1] - 19:15
**recess** [5] - 5:9, 57:13, 57:18, 58:25, 59:1
**recollection** [4] - 96:3, 97:3, 97:23, 98:3
**RECONVENED** [1] - 5:3
**record** [8] - 7:10, 13:5, 38:11, 58:2, 58:8, 62:9, 74:19, 101:3
**recorded** [5] - 74:14, 87:1, 87:19, 101:11, 101:17
**RECROSS** [1] - 3:4
**rectangular** [1] - 47:3
**REDIRECT** [1] - 3:4
**REDUCTION** [1] - 105:19
**reference** [5] - 88:6, 97:16, 97:22, 99:23, 103:7
**references** [1] - 5:25
**referencing** [2] - 46:2, 55:6
**referred** [1] - 47:4
**referring** [5] - 40:23, 45:18, 51:12, 65:7, 93:22
**reflect** [2] - 7:10, 62:9
**refrain** [1] - 25:22
**refresh** [3] - 96:3, 97:3, 97:23
**regard** [22] - 14:17, 16:12, 39:8, 42:6, 42:10, 47:2, 47:22, 53:2, 53:20, 54:1, 63:10, 64:6, 64:20, 72:25, 76:16, 76:24, 77:10, 82:2, 86:3, 88:1, 93:21, 98:17
**regarding** [1] - 8:4
**regardless** [3] - 9:13, 22:10, 45:10
**regular** [1] - 53:16
**regulate** [1] - 62:17
**regulation** [1] - 15:12

**REGULATIONS** [2] - 105:16, 105:20
**reject** [1] - 14:3
**related** [1] - 41:9
**relation** [1] - 27:16
**relationship** [2] - 9:1, 9:3
**relationships** [1] - 60:10
**relative** [1] - 72:12
**release** [3] - 48:4, 49:2, 53:9
**relevant** [3] - 14:10, 15:15, 21:15
**reload** [1] - 28:2, 51:16
**reloaded** [4] - 27:2, 27:3, 27:4, 76:17
**reloading** [1] - 73:17
**reloads** [1] - 26:20
**rely** [1] - 20:21
**remain** [1] - 7:24
**remained** [1] - 98:20
**remaining** [2] - 98:6, 99:15
**remember** [8] - 10:9, 15:16, 20:13, 23:4, 23:6, 57:19, 82:16, 100:19
**remembrance** [1] - 88:1
**reminded** [1] - 5:9
**repeated** [1] - 43:4
**rephrase** [6] - 52:13, 56:2, 64:15, 78:11, 88:14, 92:5
**replace** [1] - 53:3
**report** [8] - 5:5, 5:23, 5:24, 6:1, 6:3, 18:15, 39:4, 58:13
**reported** [1] - 93:1
**REPORTED** [2] - 5:4, 105:14
**reporter** [2] - 87:8, 87:11
**REPORTER** [3] - 1:20, 105:10, 105:23
**REPORTER'S** [1] - 1:15
**reports** [1] - 92:17
**represent** [1] - 60:9
**representation** [1] - 59:9
**request** [1] - 21:11
**requested** [1] - 101:8
**requests** [1] - 43:4
**require** [2] - 6:10, 19:8
**required** [3] - 11:16, 21:22, 47:19
**requirements** [1] - 101:18
**requires** [1] - 19:3
**research** [3] - 18:23, 57:23, 100:21
**resistance** [1] - 37:2

**resort** [5] - 24:25, 35:4, 41:23
**respond** [1] - 18:14
**responsibilities** [1] - 24:20
**responsive** [1] - 52:8
**rest** [1] - 22:1
**resting** [1] - 51:9
**restrictions** [1] - 19:7
**result** [1] - 19:8
**resulted** [1] - 86:18
**retired** [3] - 27:9, 37:7, 37:11
**return** [1] - 18:18
**reverence** [2] - 24:22, 42:8
**Richardson** [2] - 35:23, 96:6
**right-hand** [1] - 49:25
**rights** [5] - 8:25, 14:23, 15:7, 16:2, 16:4
**ring** [2] - 51:19
**risk** [2] - 17:2, 56:25
**robbery** [7] - 30:22, 31:9, 34:1, 34:2, 42:22, 56:21, 57:10
**Robert** [1] - 37:11
**role** [7] - 30:11, 30:13, 39:8, 91:17, 91:20, 92:2
**rolling** [1] - 79:17
**roof** [41] - 26:4, 26:13, 27:6, 28:1, 28:12, 28:16, 28:19, 29:3, 33:15, 34:9, 34:13, 35:6, 35:7, 59:11, 64:13, 64:16, 64:17, 65:13, 65:15, 66:4, 66:8, 66:12, 67:10, 67:16, 67:18, 67:21, 67:24, 78:21, 78:23, 79:6, 79:7, 81:10, 81:22, 82:7, 82:9, 82:13, 82:17, 88:21, 90:13, 90:18, 90:21
**roofs** [1] - 33:20
**rooftop** [2] - 33:19
**room** [4] - 17:24, 20:15, 22:15, 60:6
**ROOM** [1] - 1:22
**round** [4] - 26:16, 47:9, 73:16, 88:10
**rounds** [11] - 27:19, 47:5, 47:11, 48:5, 48:10, 48:14, 48:16, 48:20, 55:22, 67:17, 81:6
**routine** [3] - 22:8, 29:8, 95:16
**Rule** [2] - 60:22, 103:18
**rule** [2] - 24:15, 26:14
**ruled** [3] - 101:17, 101:20, 102:10
**rules** [2] - 23:19, 61:6

**Rules** [5] - 10:14, 12:6, 12:10, 21:16, 101:18
**ruling** [6] - 10:15, 58:24, 101:16, 101:24, 102:6, 102:8
**rumors** [1] - 46:25
**run** [1] - 33:10
**running** [2] - 30:1, 36:10
**runs** [2] - 26:23, 98:16
**RUSSELL** [24] - 2:15, 5:6, 5:18, 6:15, 6:21, 7:3, 25:20, 32:4, 44:6, 47:7, 50:6, 60:1, 72:19, 74:24, 75:5, 87:22, 94:2, 94:5, 96:23, 101:13, 101:23, 102:11, 102:17, 103:12

## S

**safe** [3] - 32:23, 86:12
**safety** [1] - 17:3
**sake** [4] - 44:15, 44:16, 76:11
**San** [1] - 37:12
**save** [1] - 62:2
**saw** [37] - 11:1, 11:18, 11:20, 28:5, 32:17, 33:4, 33:17, 36:7, 39:23, 40:4, 40:5, 42:11, 42:16, 43:10, 43:11, 43:25, 44:1, 44:6, 62:25, 63:12, 64:9, 64:11, 64:14, 64:15, 64:16, 73:24, 73:25, 75:13, 75:14, 75:19, 75:22, 76:1, 76:4, 77:3, 86:6, 88:10, 96:16
**see..** [1] - 45:22
**seek** [1] - 9:2
**seeking** [1] - 56:20
**self** [1] - 77:5
**semantics** [1] - 82:14
**sense** [1] - 75:15
**senses** [1] - 11:9
**separately** [1] - 9:15
**sequence** [1] - 84:5
**Sergeant** [2] - 35:23, 96:6
**sergeant** [3] - 35:24, 37:8, 96:5
**series** [1] - 40:18
**serious** [11] - 24:9, 24:14, 25:13, 28:10, 30:22, 31:9, 42:18, 44:3, 54:9, 54:14, 54:20
**service** [2] - 18:11, 18:13
**session** [1] - 10:22
**SESSION** [2] - 1:16, 5:4
**set** [7] - 7:21, 7:23, 7:25, 25:2, 31:18, 76:16, 83:3
**seven** [19] - 13:21,

70:21, 71:1, 72:1, 73:16, 77:3, 78:16, 83:8, 83:12, 84:16, 84:20
**second-story** [1] - 33:20
**seconds** [13] - 39:24, 40:1, 40:6, 42:12, 44:9, 64:8, 84:17, 84:22, 85:1, 85:3, 85:4, 97:17, 100:5
**secretaries** [1] - 87:10
**secretary** [1] - 87:9
**Section** [3] - 14:21, 15:1, 15:20
**SECTION** [1] - 105:12
**secured** [1] - 14:23
**see** [62] - 10:21, 13:15, 20:6, 20:7, 25:25, 26:2, 26:10, 26:17, 26:20, 27:17, 29:6, 31:5, 32:15, 35:2, 37:15, 47:3, 47:10, 48:1, 48:3, 48:17, 48:19, 49:22, 50:22, 51:5, 57:4, 57:24, 59:8, 61:10, 61:17, 62:22, 62:24, 66:3, 67:16, 69:17, 70:5, 70:7, 70:10, 70:12, 70:24, 73:7, 73:22, 75:8, 75:16, 77:12, 77:15, 78:1, 80:3, 80:6, 80:8, 80:10, 81:24, 83:6, 91:9, 97:5, 97:22, 98:12, 99:23, 100:3, 100:24, 103:11
**scenario** [2] - 55:18, 56:15
**scene** [8] - 29:12, 34:4, 40:3, 59:13, 59:14, 86:14, 86:21, 97:24
**schedule** [1] - 22:4
**schedules** [1] - 22:7
**scope** [1] - 14:13
**Scott** [1] - 37:8
**screen** [1] - 20:8
**scroll** [1] - 97:18
**search** [5] - 31:16, 32:19, 36:2, 92:10, 92:20
**searching** [1] - 18:24
**seasons** [1] - 62:18
**seated** [1] - 18:8
**second** [3] - 5:18, 12:10, 15:18, 15:21, 17:12, 25:2, 25:13, 33:20, 52:22, 67:22, 69:19, 70:14, 70:15,

47:10, 48:10, 49:6, 49:15, 52:21, 76:18, 76:20, 77:10, 77:13, 78:4, 78:7, 83:3, 83:8, 83:12, 84:9, 84:20, 84:21, 84:25
**several** [6] - 29:25, 31:6, 32:20, 47:16, 71:12, 88:25
**shall** [1] - 14:24
**share** [2] - 95:8, 95:12
**shared** [1] - 95:18
**shell** [1] - 73:8
**shift** [1] - 39:5
**shocked** [1] - 60:5
**shocks** [4] - 16:16, 16:21, 16:25, 17:5
**shoot** [30] - 28:7, 31:10, 31:21, 32:17, 32:21, 32:23, 32:24, 33:4, 33:7, 34:24, 35:9, 42:13, 42:16, 44:1, 44:7, 44:9, 49:4, 49:5, 49:7, 56:21, 57:2, 57:3, 57:5, 57:9, 67:9, 68:22, 85:8, 85:9, 85:13
**shoot-on-sight** [1] - 57:3
**shooting** [55] - 8:18, 27:1, 29:6, 33:1, 34:16, 35:20, 36:24, 38:21, 38:24, 38:25, 39:11, 39:25, 40:6, 42:12, 44:17, 44:22, 47:7, 47:14, 50:15, 51:25, 52:4, 53:20, 55:9, 55:21, 56:8, 59:7, 64:6, 64:8, 65:5, 66:14, 66:16, 66:17, 67:20, 67:23, 68:16, 68:17, 70:14, 73:21, 77:17, 77:18, 78:9, 80:17, 80:18, 86:4, 86:6, 86:17, 86:18, 91:11, 98:19, 98:22, 99:4, 99:8, 99:25, 100:7, 103:9
**shooting/policy** [1] - 56:24
**short** [1] - 62:25
**shorter** [1] - 85:25
**shorthand** [1] - 6:19
**shortly** [1] - 30:18
**shot** [22] - 23:14, 24:3, 26:1, 26:3, 26:12, 28:4, 28:13, 28:14, 35:18, 55:16, 56:4, 64:18, 66:21, 67:2, 68:3, 69:5, 69:7, 77:24, 88:18, 89:7, 89:14
**shotgun** [3] - 28:25, 92:12, 92:15
**shotguns** [1] - 92:18

**shots** [67] - 26:9, 26:12, 36:20, 49:15, 52:18, 54:13, 54:18, 54:19, 68:3, 68:7, 68:12, 68:14, 69:11, 69:13, 69:16, 69:19, 70:4, 70:15, 70:16, 70:19, 70:21, 71:1, 71:2, 72:4, 73:16, 73:18, 75:25, 76:3, 76:16, 76:18, 76:21, 76:24, 76:25, 77:2, 77:3, 77:10, 77:13, 78:5, 78:8, 78:11, 78:13, 78:17, 80:15, 81:1, 81:11, 81:15, 81:21, 81:25, 82:3, 82:5, 82:18, 82:21, 82:24, 83:3, 83:8, 83:12, 84:4, 84:8, 84:16, 84:20, 84:25, 88:23, 88:25, 89:3, 89:18
**shoulder** [1] - 98:13
**shoved** [1] - 73:24
**show** [11] - 21:21, 31:23, 50:18, 60:10, 60:11, 61:16, 61:20, 73:4, 73:6, 86:16, 103:18
**showed** [1] - 89:22
**showing** [2] - 60:3, 60:12, 65:2
**shown** [2] - 61:9, 86:19
**side** [15] - 12:9, 21:19, 22:11, 37:8, 49:20, 49:23, 49:25, 50:21, 51:22, 70:7, 70:22, 70:25, 79:17, 83:6, 102:7
**sidebar** [7] - 21:2, 21:6, 21:10, 61:23, 87:22, 101:9, 102:1
**sidebars** [1] - 102:3
**sides** [2] - 19:4, 102:7
**sidewalks** [1] - 11:12
**sight** [3] - 31:11, 55:7, 55:8, 55:10, 55:12, 56:22, 57:3, 72:2
**sights** [1] - 56:13
**sign** [2] - 89:22, 97:20
**significance** [2] - 22:8, 74:18, 97:22
**significantly** [1] - 28:12
**Silva** [1] - 36:2
**similarly** [1] - 84:24
**simple** [1] - 57:8
**simplest** [1] - 83:20
**simply** [1] - 83:25
**single** [2] - 8:14, 54:3
**sister** [1] - 47:12
**sit** [3] - 78:12, 92:24, 92:25
**site** [1] - 17:24

**sitting** [1] - 95:25
**situation** [4] - 19:14, 31:20, 56:16, 86:11
**situations** [2] - 92:2, 93:15
**six** [4] - 13:19, 19:20, 49:6, 75:3
**skimmed** [1] - 27:20
**slant** [1] - 82:16
**slanted** [1] - 79:6
**slide** [5] - 48:16, 48:18, 48:22, 49:1, 49:10
**slightly** [1] - 84:2
**slow** [2] - 30:2, 66:23
**snap** [5] - 51:20, 51:23, 53:15, 53:16, 53:17
**snaps** [1] - 51:18
**society** [1] - 16:8
**solely** [2] - 8:12, 10:23
**someone** [8] - 24:14, 39:16, 54:15, 54:21, 57:9, 63:22, 63:23, 86:24
**sometime** [1] - 86:13
**sometimes** [9] - 10:18, 12:1, 13:4, 14:7, 19:14, 21:9, 21:10, 23:4, 90:23
**somewhat** [1] - 90:23
**sone** [1] - 9:1
**soon** [1] - 57:4
**sooner** [1] - 19:24
**sorry** [4] - 51:6, 59:24, 75:9, 96:24
**sort** [1] - 78:22
**sounds** [1] - 42:4
**south** [6] - 39:14, 94:13, 94:24, 95:2, 95:6, 95:17
**space** [1] - 33:15
**spare** [2] - 49:25, 50:19
**speaking** [2] - 20:7, 81:4
**specific** [2] - 41:18, 82:1
**specifically** [16] - 26:19, 28:22, 41:3, 45:17, 50:12, 52:13, 63:25, 64:3, 70:15, 72:3, 74:6, 75:2, 76:8, 89:12, 93:22, 97:16
**spell** [1] - 38:10
**spent** [2] - 19:20, 53:3
**split** [1] - 95:1
**spot** [1] - 98:2
**SPRING** [1] - 1:22
**staff** [1] - 18:23
**stage** [1] - 22:17
**stairs** [2] - 72:2, 96:17
**stamps** [1] - 44:20
**stand** [9] - 6:1, 11:4,

**Stop** [3] - 36:16, 36:24, 85:13
**stop** [8] - 29:9, 35:13, 36:6, 36:24, 85:8, 85:22, 85:23, 92:21
**stopped** [2] - 12:22, 36:7
**stopping** [2] - 37:2, 76:18
**story** [3] - 33:13, 33:20, 35:18
**straight** [2] - 62:1, 62:4
**strap** [1] - 53:14
**STREET** [1] - 1:22
**street** [1] - 33:20
**Street** [2] - 94:14, 94:15
**stricken** [2] - 10:16, 13:4
**strictly** [2] - 94:19, 95:18
**strike** [9] - 40:24, 52:8, 68:25, 69:1, 79:18, 79:20, 80:10, 80:16, 95:21
**strongly** [1] - 25:18
**struck** [8] - 27:18, 28:1, 70:16, 70:17, 76:5, 77:6, 89:4, 89:23
**stud** [1] - 51:13
**stuff** [1] - 92:17
**stumbling** [1] - 83:2
**subject** [5] - 54:8, 54:13, 54:19, 56:20, 92:11
**substantial** [1] - 56:25
**substantially** [1] - 60:4
**substantive** [1] - 14:18
**successfully** [1] - 91:24
**suggested** [1] - 93:11
**suggestion** [1] - 21:7
**SUITE** [2] - 2:6, 2:10
**summary** [1] - 8:17
**supervisor** [1] - 86:14
**surrender** [2] - 36:15, 36:24, 43:4
**surrounded** [1] - 71:10
**surrounding** [1] - 37:3
**surveillance** [2] - 92:3, 92:4
**suspect** [5] - 34:17, 43:13, 58:19, 91:25
**sustain** [3] - 12:13, 12:15, 12:23
**sustained** [2] - 13:2, 52:9
**swing** [1] - 90:24
**switch** [1] - 95:11
**switched** [2] - 94:19,

95:17
**SWORN** [1] - 38:9
**sworn** [3] - 9:21, 74:10, 93:24
**sympathetic** [1] - 60:6
**sympathy** [1] - 8:11

**T**

**tab** [1] - 22:23
**talks** [1] - 24:19
**target** [2] - 55:25, 56:11
**Taser** [1] - 35:7
**taught** [1] - 35:10
**taxes** [2] - 12:22, 12:25
**teaches** [2] - 41:8, 42:6
**team** [1] - 36:2
**techniques** [1] - 28:23
**telephone** [1] - 17:23
**temperature** [1] - 62:13
**ten** [1] - 96:1
**tenants** [1] - 30:12
**term** [8] - 7:6, 15:4, 21:2, 74:9, 82:20, 87:9, 88:6, 88:22
**terminology** [1] - 48:21
**terms** [13] - 29:24, 34:21, 50:14, 53:20, 55:2, 66:21, 67:2, 75:13, 78:19, 78:24, 83:21, 84:15, 88:8
**terrible** [1] - 19:9
**test** [2] - 24:2, 40:25
**testified** [2] - 13:15, 23:6
**testifies** [1] - 11:5
**testifies..** [1] - 5:8
**testify** [10] - 5:15, 13:12, 13:23, 20:17, 22:24, 27:10, 28:4, 37:12, 58:20, 58:23
**testifying** [5] - 11:8, 11:20, 13:17, 37:9, 73:25
**testimony** [26] - 9:21, 9:25, 10:15, 10:18, 10:25, 13:9, 13:13, 13:19, 13:20, 14:1, 14:2, 20:5, 20:6, 27:7, 27:23, 58:4, 58:10, 58:15, 58:21, 61:8, 74:10, 74:16, 74:17, 76:10, 93:25
**tests** [1] - 40:19
**text** [1] - 17:23
**THAT** [2] - 105:12, 105:15
**THE** [94] - 2:4, 2:4, 2:13, 5:16, 5:21, 6:5, 6:13, 6:19, 6:25, 7:4,

7:10, 25:22, 38:6, 38:10, 38:12, 38:18, 45:7, 45:12, 45:25, 46:5, 46:8, 50:5, 50:7, 51:1, 51:3, 52:9, 57:13, 57:15, 57:17, 58:2, 58:4, 58:8, 58:19, 59:2, 59:10, 59:15, 59:20, 59:24, 60:13, 60:21, 60:25, 61:5, 61:21, 62:4, 62:6, 62:9, 64:23, 65:19, 66:23, 69:1, 72:17, 72:20, 74:7, 74:25, 75:4, 75:6, 75:16, 76:9, 76:14, 79:20, 85:21, 85:24, 87:23, 90:1, 94:1, 94:6, 96:21, 97:1, 97:4, 97:6, 97:8, 97:11, 99:17, 100:12, 101:3, 101:16, 102:3, 102:16, 102:25, 103:10, 103:13, 103:23, 105:10, 105:11, 105:13, 105:14, 105:15, 105:16, 105:17, 105:19, 105:20
**themselves** [2] - 24:1, 27:23
**theory** [1] - 22:3
**therefore** [1] - 14:9
**thereof** [1] - 98:10
**thinking** [2] - 58:23, 77:8
**thinks** [1] - 12:9
**third** [16] - 33:13, 35:18, 52:15, 52:24, 53:1, 63:22, 65:8, 65:10, 71:22, 78:8, 84:21, 88:15, 89:3, 89:17, 90:24, 91:11
**THIS** [1] - 105:18
**threat** [13] - 24:9, 24:12, 28:10, 30:25, 32:22, 37:3, 38:2, 42:18, 43:16, 44:3, 54:8, 54:14, 54:20
**threatened** [6] - 24:13, 25:12, 26:7, 26:8, 42:20, 43:20
**threatening** [2] - 43:19, 68:2
**three** [32] - 9:22, 13:16, 16:16, 26:20, 49:5, 52:1, 52:3, 52:25, 78:11, 78:18, 78:20, 78:25, 80:5, 80:9, 80:11, 80:14, 80:21, 81:1, 81:6, 81:11, 81:14, 81:21, 84:6, 84:10, 84:12, 84:25, 89:18, 92:16, 94:23, 95:4, 95:9

**Three** [1] - 37:23
**throughout** [5] - 17:10, 31:5, 36:12, 72:3, 103:22
**throw** [1] - 35:8
**timeline** [1] - 98:5
**timing** [1] - 84:3
**TITLE** [1] - 105:13
**Title** [1] - 14:20
**TO** [1] - 105:12
**today** [5] - 21:1, 60:14, 78:12, 92:24, 92:25
**tomorrow** [7] - 30:7, 62:15, 100:15, 100:25, 101:7, 102:15, 103:15
**tone** [1] - 74:19
**took** [7] - 8:13, 30:1, 35:21, 36:10, 67:22, 94:18
**top** [4] - 48:17, 51:10, 85:13, 100:4
**total** [9] - 26:13, 44:22, 52:2, 52:3, 52:17, 52:25, 54:24, 83:3, 96:17
**totality** [1] - 52:14
**totally** [1] - 82:6
**tough** [1] - 48:24
**Tovar** [1] - 36:5
**toward** [4] - 34:10, 43:19, 53:11, 77:21
**towards** [5] - 70:24, 80:24, 81:2, 83:6, 91:13
**traffic** [6] - 29:9, 35:13, 36:6, 58:14, 92:21, 95:16
**trained** [10] - 32:12, 32:13, 32:14, 34:23, 53:21, 53:23, 54:1, 55:9, 55:20, 87:8
**training** [10] - 23:23, 24:16, 32:12, 34:22, 40:11, 40:20, 41:8, 53:22, 56:19, 57:3
**Training** [1] - 40:15
**trajectory** [2] - 27:20, 27:22
**transcribed** [1] - 74:15
**transcript** [2] - 20:4, 99:11
**TRANSCRIPT** [4] - 1:15, 105:14, 105:16, 105:18
**transmission** [2] - 99:3, 99:6
**transmissions** [1] - 6:4
**transmitted** [1] - 99:7
**trapped** [1] - 34:9
**travels** [1] - 46:22
**treat** [1] - 14:10
**treated** [1] - 21:16
**tremendous** [1] - 19:12

**Trevor** [1] - 8:21
**TREVOR** [3] - 1:7, 2:4, 105:5
**trial** [22] - 7:25, 8:4, 10:6, 10:7, 10:23, 12:7, 17:10, 18:7, 18:10, 18:22, 19:5, 19:9, 19:15, 19:18, 20:4, 21:3, 22:24, 57:23, 74:9, 74:11, 103:22
**TRIAL** [3] - 1:15, 1:16, 5:4
**trials** [2] - 7:17, 21:18
**tried** [3] - 30:15, 31:25, 64:3
**trigger** [2] - 34:18, 55:3
**trip** [1] - 35:8
**tripping** [1] - 77:8
**TRUE** [1] - 105:13
**true** [6] - 9:12, 76:1, 76:3, 80:22, 90:20
**truly** [2] - 26:22, 34:8
**truth** [2] - 74:12, 94:8
**try** [5] - 19:3, 48:14, 59:21, 62:16, 80:12
**trying** [6] - 62:13, 63:20, 67:9, 80:21, 96:23, 97:2
**tuck** [1] - 75:16
**tucked** [1] - 75:15
**tucking** [1] - 75:10
**TUESDAY** [2] - 1:18, 5:1
**Tuesday** [1] - 103:5
**turn** [12] - 35:1, 50:3, 64:20, 65:17, 72:16, 74:5, 76:7, 77:21, 93:24, 96:20, 97:14, 99:22
**turned** [1] - 34:10
**turning** [1] - 55:5
**TV** [1] - 32:8
**Tweet** [1] - 19:17
**Tweeted** [1] - 19:18
**twice** [2] - 21:1, 27:2
**Twitter** [1] - 19:17
**two** [32] - 9:21, 10:11, 13:15, 14:11, 15:6, 15:16, 16:14, 17:3, 19:16, 23:13, 24:6, 25:11, 26:11, 28:22, 31:7, 36:19, 48:8, 49:5, 51:22, 52:14, 53:18, 63:17, 85:1, 85:3, 85:4, 93:9, 95:3, 95:6, 95:8, 95:18
**Tyler** [18] - 8:19, 8:21, 16:6, 16:17, 17:2, 17:6, 23:15, 24:3, 32:17, 36:15, 36:17, 36:18, 36:21, 36:25, 37:25, 38:2, 39:10, 58:17

**type** [2] - 87:10, 87:12
**typed** [4] - 86:24, 86:25, 87:1, 98:1
**typing** [1] - 87:12

**U**

**unarmed** [3] - 26:1, 26:13, 27:5
**under** [22] - 6:21, 10:13, 14:12, 14:20, 14:22, 15:5, 15:7, 15:9, 15:11, 15:14, 16:2, 16:5, 16:7, 16:13, 21:16, 33:10, 60:22, 74:11, 82:8, 86:9, 86:12, 103:18
**underlying** [1] - 42:8
**underneath** [1] - 23:1
**undersheriff** [1] - 37:12
**undertaken** [2] - 17:1, 17:6
**undisputed** [1] - 26:10
**undisputedly** [1] - 31:2
**undo** [2] - 51:15, 53:5
**unfair** [1] - 60:4
**unfasten** [1] - 53:14
**unfolds** [1] - 103:11
**uniform** [1] - 50:15
**uninvolved** [1] - 59:13
**union** [1] - 86:19
**United** [6] - 14:21, 14:24, 15:8, 16:2, 16:8, 18:9
**UNITED** [6] - 1:1, 1:21, 105:11, 105:13, 105:17, 105:20
**unless** [4] - 9:15, 13:1, 17:18, 24:8
**unreasonable** [2] - 24:23, 42:3
**unrelated** [1] - 17:7
**up** [58] - 18:2, 20:7, 29:4, 29:16, 31:16, 31:18, 35:6, 36:13, 36:17, 36:19, 36:23, 38:1, 40:10, 43:13, 53:11, 59:3, 61:24, 63:21, 64:12, 67:24, 72:2, 76:12, 78:22, 78:25, 79:4, 79:7, 79:8, 79:14, 79:24, 80:4, 80:7, 80:12, 80:22, 81:5, 81:15, 81:22, 81:24, 82:4, 82:6, 82:8, 82:9, 82:13, 86:16, 86:19, 88:17, 89:15, 91:8, 94:18, 95:9, 96:17, 100:23, 101:5, 101:6, 101:7, 102:25, 103:19
**upright** [1] - 82:22

**ups** [1] - 60:11
**upsetting** [1] - 61:10
**upward** [1] - 27:20
**upwards** [1] - 67:8
**urge** [2] - 20:4, 100:17
**utility** [1] - 49:21
**uttered** [1] - 103:7
**uttering** [2] - 88:3, 88:5

**V**

**value** [1] - 60:3
**vantage** [1] - 66:14
**vehicle** [7] - 94:12, 95:23, 95:24, 95:25, 96:5, 96:8, 96:11
**verbally** [1] - 36:22
**verbiage** [2] - 42:4, 74:4
**verdict** [8] - 8:5, 9:24, 15:19, 15:22, 17:11, 18:19, 19:19, 22:16
**versa** [1] - 22:7
**via** [1] - 17:23
**vice** [1] - 22:6
**vicinity** [3] - 28:18, 71:24, 90:11
**victims** [1] - 57:1
**view** [5] - 66:13, 67:14, 69:14, 69:15, 75:14
**viewed** [1] - 58:17
**violated** [1] - 8:24
**violates** [1] - 19:6
**VIRGINIA** [1] - 1:5
**voice** [2] - 74:19, 85:13
**volley** [9] - 70:15, 78:14, 78:16, 85:1, 88:15, 89:3, 89:9, 89:10, 89:17
**vouching** [1] - 25:23
**vs** [2] - 1:10, 105:6

**W**

**waist** [1] - 34:10
**waistband** [12] - 68:5, 68:7, 69:4, 70:8, 73:23, 74:1, 74:4, 75:8, 75:9, 75:15, 75:17, 77:14
**wait** [3] - 58:6, 74:7, 102:15
**waiting** [5] - 21:13, 60:14, 60:16, 62:11, 102:4
**walk** [2] - 86:13, 86:21
**walk-through** [1] - 86:13
**walked** [1] - 11:6
**Walnut** [1] - 94:15
**warm** [1] - 62:16

**warning** [2] - 85:7, 85:12
**warrant** [7] - 30:20, 30:21, 30:23, 31:9, 33:25, 42:21, 63:6
**waste** [3] - 19:9, 19:12, 21:4
**wasted** [1] - 19:21
**watch** [3] - 18:19, 39:3, 55:24
**ways** [1] - 92:7
**weapon** [21] - 25:7, 26:2, 45:24, 47:5, 47:11, 47:13, 47:19, 48:9, 49:17, 53:12, 63:3, 63:13, 68:11, 68:20, 77:21, 79:11, 79:13, 79:16, 79:25, 80:3, 80:6
**weapons** [5] - 29:17, 29:22, 65:11, 92:22, 93:3
**wear** [2] - 39:3, 49:20
**Web** [1] - 17:24
**week** [1] - 19:11
**weeks** [1] - 19:20
**weight** [4] - 11:24, 12:1, 13:22, 14:3
**well-lit** [1] - 66:20
**Wendy** [1] - 22:19
**WEST** [1] - 2:16
**west** [5] - 94:24, 94:25, 95:4, 95:11, 95:17
**WESTERN** [1] - 1:3
**wet** [1] - 11:12
**whatsoever** [1] - 36:23
**white** [1] - 103:8
**whole** [1] - 103:22
**WILSHIRE** [1] - 2:5
**window** [2] - 43:12, 43:13
**wise** [1] - 61:12
**wisely** [1] - 21:9
**wisest** [1] - 62:17
**wish** [2] - 20:12, 75:1
**WITH** [2] - 105:16, 105:19
**withdraw** [1] - 93:18
**witness** [37] - 5:8, 5:17, 6:6, 9:21, 10:25, 11:1, 11:4, 11:5, 11:8, 11:10, 11:17, 12:11, 12:13, 12:20, 12:21, 13:10, 13:13, 13:15, 22:6, 23:5, 38:7, 59:22, 59:23, 59:24, 61:16, 61:20, 61:23, 74:10, 74:11, 74:13, 101:10, 101:20, 102:9, 103:21
**WITNESS** [8] - 38:9, 38:12, 58:4, 75:16, 85:24, 97:6, 97:11,

99:17
**witness'** [8] - 13:16, 13:17, 13:19, 13:20, 14:4, 22:4, 79:21
**witnesses** [15] - 10:4, 13:12, 13:23, 13:24, 18:22, 19:1, 20:17, 21:25, 22:4, 22:7, 22:24, 23:6, 24:2, 61:4
**WITNESSES** [1] - 3:4
**woman** [1] - 63:19
**Woods** [17] - 8:19, 8:23, 16:6, 16:17, 17:6, 23:15, 24:3, 32:17, 36:15, 36:17, 36:18, 36:21, 36:25, 37:25, 38:2, 39:10, 58:17
**WOODS** [3] - 1:7, 2:4, 105:5
**woods** [113] - 8:21, 26:1, 26:3, 26:12, 27:2, 27:5, 27:12, 27:18, 27:24, 28:5, 28:9, 28:11, 28:13, 28:15, 29:8, 29:22, 29:24, 30:1, 30:10, 30:18, 30:19, 30:23, 31:2, 31:6, 31:16, 32:19, 32:20, 32:21, 32:22, 33:4, 33:5, 33:6, 33:7, 33:9, 33:12, 33:19, 34:3, 34:10, 34:13, 35:24, 36:7, 36:8, 36:12, 39:23, 40:4, 40:5, 42:11, 42:18, 44:2, 52:4, 56:18, 59:9, 62:22, 63:2, 63:12, 63:15, 63:25, 64:3, 64:12, 64:14, 64:16, 65:13, 66:8, 66:14, 67:9, 67:13, 67:17, 68:3, 68:12, 69:14, 70:15, 71:1, 71:16, 72:7, 72:10, 73:19, 73:22, 73:25, 75:8, 75:13, 76:1, 76:4, 76:22, 77:3, 77:12, 77:18, 78:1, 78:9, 78:13, 78:20, 80:15, 81:24, 82:2, 83:8, 83:12, 85:7, 85:12, 88:2, 88:6, 88:10, 88:13, 88:16, 89:3, 89:13, 90:11, 92:21, 93:2, 93:11, 93:16, 96:12, 103:19
**woods'** [3] - 27:15, 33:25, 43:24
**Woods'** [1] - 17:2
**woods's** [3] - 60:18, 62:24, 70:19
**woods..** [1] - 72:5
**Woodson** [2] - 8:21,
8:23
**word** [2] - 58:13, 58:14
**words** [13] - 14:2, 24:10, 27:2, 29:15, 54:7, 82:1, 86:5, 88:3, 88:5, 89:10, 93:15, 95:24, 98:8
**works** [3] - 32:11, 35:11, 98:7
**worry** [1] - 55:23
**wounds** [3] - 27:13, 27:19, 60:12
**wrist** [1] - 39:3
**writing** [2] - 17:22, 102:6
**wrote** [2] - 5:23, 87:4

**Y**

**year** [2] - 23:16, 47:18
**years** [5] - 37:23, 41:14, 87:8, 92:16, 94:23
**yellow** [1] - 73:7
**yielded** [1] - 43:3
**yourself** [10] - 20:14, 42:19, 54:9, 54:14, 54:21, 56:4, 75:7, 86:24, 88:23, 89:14
**yourselves** [2] - 57:21, 100:17

**Z**

**zoom** [1] - 47:23